IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ILA LAFRENTZ, JIM LAFRENTZ,)
KATHERINE PORTERFIELD, AND )
WILLIAM LAFRENTZ,           )
Individually And as         )
Representative of the       )
Estate of JAMES B.          )
LAFRENTZ,                   )
    Plaintiffs,             )
                  )
vs.                         ) NO. 4:18-cv-04229
                  )
3M COMPANY, AND GENERAL     )
DYNAMICS CORPORATION,       )
    Defendants.             )


REMOTE ORAL AND VIDEOTAPED DEPOSITION

DARRELL BEVIS

Taken on behalf of Defendants

December 2, 2020



Sandy A. Treft, CSR, RPR


Certified Shorthand Reporter


Texas CSR #


**Exhibit 2**

Page 50

1  fit check test that have been done by 3M internally and
2  have been produced in this litigation?
3      **A. I've never seen the list that 3M has presented**
4  **to show that they did these tests. I know they had**
5  **(inaudible) --**
6      Q. Mr. Bevis, when you bend over we can't hear
7  you.
8      **A. Yes, yes, I stopped speaking when I bent over.**
9  **Okay. I didn't say anything so you didn't miss**
10  **anything.**
11      **You know, I'm not sure what all 3M might**
12  **have tried.**
13      Q. Okay.
14      **A. I mean, you go to the height of the ridiculous**
15  **and there you find some of the things that 3M does to**
16  **get a respirator approved, such as cleaning a respirator**
17  **by blowing the reverse direction, a collection of the**
18  **contaminant with compressed air so that it could be**
19  **classed a half mask respirator.**
20      Q. Have you ever conducted a study on the
21  effectiveness on the positive pressure fit check on the
22  3M 8710?
23      **A. Many, many, many, many times.**
24      Q. Have you ever published any of that data that
25  have you?

Page 51

1      **A. No, I have not. All I was doing was satisfying**
2  **myself that it was as ridiculous as it looked.**
3      Q. Did you present that information to OSHA when
4  you testified in California when they were doing the
5  2006 rule change?
6      **A. Oh, I probably did. I can't remember**
7  **specifically when it was that I testified to at that**
8  **point.**
9      Q. And does OSHA consider the fact that you can
10  use the manufacturer's recommended procedure to do the
11  fit check on both the 8710 and the 8210 which is
12  currently on the market?
13      **A. They didn't do that until 1996 I think without**
14  **the comment that it must be as effective as the accepted**
15  **negative and positive pressure tests.**
16      Q. And have they made a determination and allowed
17  3M 8710 to continue on the market up until the time it
18  was taken off, the 8210 still be marketed?
19      **A. OSHA has nothing to do with allowing**
20  **respirators be on the market or not.**
21      Q. Well, if OSHA says that it's not acceptable for
22  use by employees that are working in the workplace, they
23  could say it's not an accepted respirator, correct?
24      **A. If OSHA writes citations, then it's not an**
25  **accepted respirator.**

Page 52

1      Q. You took the position one time in a deposition
2  that you considered it your role as an expert witness to
3  help the plaintiff win. Do you still take that
4  position?
5      **A. When I take a case -- I mean, that's something**
6  **that you try to make it look bad. But any consultant**
7  **who takes a case for a plaintiff has to believe that**
8  **that plaintiff has been hurt or wronged by a**
9  **manufacturer, in this case respirators and 3M.**
10      **And I am totally convinced that anybody**
11  **wearing a single use respirator including our poor**
12  **healthcare people for TB using the same filtering face**
13  **pieces are being hurt by a terrible designed respirator**
14  **because tiny particles are going to leak into the face**
15  **piece and the fabric or paper or -- since the employees**
16  **call it paper, I frequently refer to it as paper,**
17  **although, I know it's a blown web.**
18      **But paper doesn't form a seal to the face.**
19  **Neither does the polypropylene blown web form a seal to**
20  **the face.**
21      Q. Do you consider yourself an advocate for the
22  plaintiff then?
23      **A. No. I consider myself an asset to the**
24  **plaintiff because of my knowledge of respirators and**
25  **particularly in the -- in the case of the 8710 I know of**

Page 53

1  **no one who outside of 3M saw these respirators earlier**
2  **than I and Ed Hyatt when they were brought to Los Alamos**
3  **and we told them this is ridiculous. These things will**
4  **never provide protection. We were careful not to say**
5  **would never be approved because we know the politics of**
6  **the system.**
7      Q. Did you know that Ed Hyatt was a consultant for
8  3M and helped with the quality control program?
9      **A. Oh yes, I did. I knew. He didn't help design.**
10  **He didn't agree with protection factors of 10 or**
11  **anything else. He helped them with one phase which was**
12  **quality control. And that's because 3M had a real**
13  **quality control problem and NIOSH was ready to withdraw**
14  **the approval if they didn't correct that.**
15      Q. So you're saying Ed Hyatt didn't believe in the
16  respirator, but yet he went to work for 3M as a
17  consultant after he retired from Los Alamos and that he
18  helped put together a quality control program and he did
19  other consulting work besides that. You are aware of
20  that, aren't you, Mr. Bevis?
21      **A. Absolutely I am aware of that and I have no**
22  **doubt that Ed fully believed as he always did that that**
23  **respirator used for a protection factor of five probably**
24  **wouldn't kill anybody.**
25      Q. Is there anywhere at any point in time in

14 (Pages 50 to 53)

Page 90

1     MR. WEBB: Objection. Nonresponsive.
2    Q. (BY MR. WEBB) You make the implication -- let me
3 just read it and make sure that we're on the same page.
4 When you say these four design features, you're talking
5 about the 8710, correct?
6    **A. That is correct.**
7    Q. Require that NIOSH ignore, that's not saying
8 that they took into consideration and made a
9 determination. You're saying ignored testing and design
10 requirements. They're not something that they can just
11 pass off, but you said testing and design requirements
12 in sub part K of 30 CFR, Part 11 to approve the
13 sub-standard if they're not able to meet the standards
14 and that means they're not meeting the requirements of
15 the 30 CFR, Part 11, right?
16    **A. You know what, you interrupt it any way you**
17 **want to interpret it, but what I'm saying is that they**
18 **made requirements for other respirators that the 8710 or**
19 **any other filtering face piece respirator could not meet**
20 **so they did not require them for making approval.**
21    **Now, is that right or wrong, I don't know,**
22 **but I would -- to me that says they made special**
23 **provisions, but you interpret it however you want to**
24 **interpret it.**
25    Q. Let's take a five minute break.

Page 91

1    **A. I'm sorry?**
2    Q. We're going to take a five minute break.
3    THE VIDEOGRAPHER: We are off the record
4 at 1:58 p.m. Central Standard Time.
5    (Recess from 1:58 p.m. to 2:06 p.m.)
6    THE VIDEOGRAPHER: We are back on the
7 record at 2:06 p.m. Central Standard Time.
8    MR. WEBB: Will you pull it up a little
9 further please where it says face piece?
10    Q. (BY MR. WEBB) Mr. Bevis, what is the made of
11 paper, slash, fabric, slash, fiber mean?
12    **A. That's so when I talk to a jury the jury**
13 **understands what we're talking about. If I say it's**
14 **made of fiber or fiber filter media, the polypropylene**
15 **falls into that category. And I'm simply talking in**
16 **terms that they will understand. So I made sure we got**
17 **the fabric and the fiber filter media in there.**
18    Q. So it's not made of paper, correct?
19    **A. Not made of paper.**
20    Q. And it's not made of fabric, is it?
21    **A. No, sir.**
22    Q. All right. So basically this should read made
23 of fiber filter media?
24    **A. You interpret that any way that you want to.**
25 **I've put down what I want so that when this report is**

Page 92

1    **presented to the jury and we read those parts that all**
2 **of the jury will understand.**
3    Q. Well, but what you put down, the paper is
4 incorrect and would be misleading to the jury, wouldn't
5 it?
6    MR. PEEK: Form.
7    THE WITNESS: No, because they think it's
8 paper anyway. If we say fabric, if we say fiber,
9 they're going to think the same. So I put what I
10 intended there.
11    Q. (BY MR. WEBB) Okay. So you intended to put down
12 paper which you know is incorrect. You put down fabric
13 which you know is incorrect; is that correct?
14    **A. I put it down there so I can talk to the people**
15 **I need to talk to, yes.**
16    Q. So you're going to provide misleading
17 information to the jurors if you tell them that it's
18 paper and it's fabric?
19    MR. PEEK: Form.
20    THE WITNESS: Absolutely not. I will be
21 talking to them in terms that they're used to.
22    Q. (BY MR. WEBB) Even if those terms are incorrect?
23    MR. PEEK: Form.
24    THE WITNESS: Even if those terms are
25 incorrect. You're talking to what is this and then you

Page 93

1 compare that to this elastomeric and you say would you
2 really go into a hazardous material with this thing no
3 matter what it's made of?
4    And I'll tell you now that the
5 manufacturer wants us to say that it's a fiber filter
6 media so we'll say that, but look at this, this is
7 rubber and this actually will form a seal, how about
8 this or this.
9    Q. (BY MR. WEBB) Is this -- are you going to show
10 them the OSHA 2006 report that said that the 3M 8710 was
11 better than the elastomeric that was rated with a 10 or
12 actually --
13    **A. That is not what OSHA said.**
14    Q. Oh yes, that's exactly what OSHA said.
15    **A. No, that is what you folks put in there.**
16    Q. No. Didn't OSHA find that based upon their
17 review that the 3M 8710, those type respirators were
18 actually better than the elastomeric?
19    MR. PEEK: Form.
20    THE WITNESS: No, they did not.
21    Q. (BY MR. WEBB) Okay.
22    **A. Okay. I'd be happy to discuss that if you want**
23 **to discuss it.**
24    Q. I think we'll wait and do that in front of a
25 jury, thank you.

Page 102

1    A.  No, I thought you said the others -- I had just
2   said we developed the first quantitative fit testing.  I
3   and three others at Los Alamos.
4    Q.  Okay.  What I'm asking you is --
5    A.  You're good at twisting my words.
6    Q.  What I'm asking you is it says evaluations of
7   the test methodology by me, that's the saccharine test
8   methodology, right?
9    A.  Right, right.
10   Q.  Who are the others that did the saccharine
11  testing?
12   A.  How about Nelson Liddell of NIOSH.
13   Q.  Okay.  Who else?
14   A.  Chingtsen Bien, private consultant, respirator
15  expert.
16   Q.  Who else?
17   A.  Those are two other experts.  There aren't many
18  respirator experts out there.  And oh, by the way,
19  Chingtsen Bien was with OSHA.  And that's
20  C-h-i-n-g-t-s-e-n B-i-e-n for the court reporter.
21       THE REPORTER:  Thank you.
22   Q.  (BY MR. WEBB) On Page 5 at the bottom where it
23  says paper fabric, that's also incorrect, correct?
24   A.  Oh yeah, yeah.  That's talking again in terms
25  of people's belief, so that's incorrect.

Page 103

1    Q.  So this sentence here says it's impossible to
2   produce a sufficient positive or negative pressure
3   inside the face piece when the face piece seal is paper
4   or fabric.  That --
5    A.  Those --
6    Q.  Let me finish my question before you start
7   answering, please.
8    A.  Okay.
9    Q.  So that whole sentence is incorrect because you
10  say it's paper fabric.  It's not paper fabric; it's
11  polypropylene micro blown fibers, correct?
12   A.  Micro blown, no.  It's blown micro fibers, not
13  micro blown.  But it is blown micro fibers and that
14  is --
15       THE WITNESS:  Brad, should I note that --
16  should I make a revision to the report?
17   Q.  (BY MR. WEBB) We'll talk about --
18   A.  I made an error and I put paper in there and
19  should have -- huh?
20       MR. PEEK:  We can discuss that later.
21  You're doing fine.
22       THE WITNESS:  Okay.  Okay.  That sounds
23  good.
24   Q.  (BY MR. WEBB) And at the last page of the
25  report, Page 6.

Page 104

1    A.  Yes, sir.
2    Q.  The subject respirators did not provide
3   sufficient protection to prevent inhalation exposure of
4   Mr. LaFrentz to very substantial amounts of airborne
5   respirable asbestos fibers.  What is a substantial
6   amount?
7    A.  Absolutely.  You know, that's a question that
8   everybody asks, What is a substantial amount?  If you
9   have a substance that is carcinogenic that means it
10  causes cancer.  How much does it -- of a carcinogen does
11  it take to cause that cancer and when you can define
12  that, then that's a substantial amount.
13       Now, in this case with Mr. LaFrentz based
14  on what we -- our testing as much as 25 percent of the
15  outside concentration is going to get inside the
16  respirator.  And that was published in Los Alamos
17  documents.  So 25 percent of the outside is a
18  substantial amount.
19   Q.  I thought you said it had a protection factor
20  of five?
21       DEFENSE COUNSEL:  Objection.
22  Nonresponsive.
23       THE WITNESS:  I'm sorry?
24   Q.  (BY MR. WEBB) I thought you said it had a
25  protection factor of five?

Page 105

1    A.  If it had a protection factor of five, I said
2   remember that is the worse case scenario for the fifth
3   percentile.  That means that 95 percent of the people
4   are going to get that or better, but there's 5 percent
5   that they might get a whole lot worse.
6       DEFENSE COUNSEL:  Objection.
7   Nonresponsive.
8       THE WITNESS:  I thought I explained it
9   pretty well.
10   Q.  (BY MR. WEBB) You can't define for me what very
11  substantial amount is in this sentence?
12   A.  A substantial amount would be certainly
13  25 percent as we showed at Los Alamos, 25 percent of
14  whatever is outside particularly with a carcinogen.
15   Q.  Okay.  Let me look over my notes.  I think I'm
16  pretty close to being finished.
17       Mr. Bevis.
18   A.  Yes.
19   Q.  What percentage of your current income is from
20  litigation and expert testimony?
21   A.  Somewhere in the neighborhood of -- in normal
22  times 40 percent to 50 percent, however, these are not
23  normal times and the wells rather dry so I can't really
24  say.
25       I'm doing some local work probably -- I'm

27 (Pages 102 to 105)