# Juror Self-Disclosure in the Voir Dire: A Social Science Analysis†

DAVID SUGGS*
BRUCE D. SALES**

The term "voir dire" has been translated as "to speak the truth"[1] or "to see them talk."[2] It refers to the preliminary examination of a potential witness or juror when his competence is in issue. It has also taken on the colloquial meaning of referring to the entire stage of trial in which jurors are empaneled. To convey this latter meaning, many people use the term "jury selection" rather than voir dire, which incorrectly implies that the jury is actively selected. In fact, the jury is not "selected," but is composed of persons who were not rejected through a process of exclusion.[3] During voir dire, questions are put to prospective jurors by the attorneys or judge or both; after this time, the attorneys may exercise challenges to remove particular jurors from the panel. Those remaining after the exercise of these challenges comprise the jury.

There are two types of challenges which may be made to remove prospective jurors—challenges for cause and peremptory challenges. A challenge for cause is successful whenever it is shown that the juror does not satisfy statutory requirements for jury service[4] or that the

† Preparation of this article was partially supported by a grant from the National Institute of Mental Health, Center for Studies for Crime and Delinquency.

* B.A. 1975, J.D. 1979, Ph. D. 1980, University of Nebraska at Lincoln. Associate of Donovan, Leisure, Newton & Irvine, New York, NY.

** B.A. 1966, Ph. D. 1971, University of Rochester; J.D. 1973, Northwestern University. Professor, University of Nebraska College of Law and Department of Psychology; Director of Law-Psychology Graduate Training Program.

[1] BLACK'S LAW DICTIONARY 1746 (4th ed. 1968).

[2] Zeisel & Diamond, *The Effect of Peremptory Challenges on the Jury and Verdict: An Experiment in a Federal District Court*, 30 STAN. L. REV. 491, 491 n.1 (1978) (noting that this is an incorrect translation).

[3] "The right to challenge is the right to reject, not the right to select." 1 F. BUSCH, LAW AND TACTICS IN JURY TRIALS § 74 (encyc. ed. 1959).

[4] A person does not become eligible for jury duty until he has reached the minimum age prescribed by statute. *See, e.g.*, ALA. CODE § 12-16-60(a)(1) (Supp. 1980) (19 years); CONN. GEN. STAT. ANN. § 51-217 (Supp. 1980) (18 years). Nonresidents are usually excluded from jury duty, *see, e.g.*, IND. CODE § 33-4-5-7 (1976), and some states exempt various government officials, *see, e.g.*, CONN. GEN. STAT. ANN. § 51-219 (Supp. 1980), and attorneys, *see, e.g., id.*, from serving as jurors. In addition, grounds for challenges for cause commonly provided for by statute include: conviction of a felony, *see, e.g.*, ALA. CODE § 12-16-150(5) (1975); indictment for a similar offense within a fixed time, *see, e.g., id.* § 12-16-150(3); having scruples against capital punishment, *see, e.g.*, IND. CODE § 35-1-30-4(3) (Supp. 1980); relation by blood or affinity to a party in interest, *see, e.g., id.* § 35-1-30-4(4), or to any attorney in the case, *see, e.g.*, ALA. CODE § 12-16-150(4), (11) (1975); previous jury service within a year, *see, e.g.*,

Exhibit 2

*INDIANA LAW JOURNAL*

juror is so biased or prejudiced that he cannot render a fair and impartial verdict based on the law and evidence as presented at trial.[5] Attorneys may make an unlimited number of challenges for cause during voir dire. When a challenge is made, it is up to the judge to determine its validity. In addition, the judge may remove a juror for cause *sua sponte*.

For several reasons, the use of challenges for cause is inadequate to remove those jurors who may have significant biases or prejudices. First, assuming that the juror is willing to admit to being biased or prejudiced, the judge may decide that the juror is not so biased or prejudiced as to be incompetent to serve on the jury as a matter of law. Second, if the juror admits that he has formed an opinion about the case, it is standard procedure to ask if he can set aside that opinion and decide the case on the basis of the evidence to be presented.[6] Since all of us like to think we can be fair, it is the rare juror indeed who will admit to being unable to set aside an already formed opinion. Nevertheless, challenges for cause are rarely sustained when the juror maintains that he can be impartial. Third, the problem of using challenges for cause to eliminate jurors is further complicated by the fact that "[j]urors often, either consciously or unconsciously, lie on *voir dire*."[7]

Since challenges for cause are so infrequently sustained, the exercise of peremptory challenges remains the chief means for securing an impartial jury. Unlike challenges for cause, the number of peremptory challenges allowed is limited by statute.[8] No explanation need be given for the use of a peremptory challenge, and attorneys may use their allotted challenges for whatever tactical reasons they desire.[9] Theoretically, after the attorneys have exercised their peremptory challenges, those jurors who were most biased will have been eliminated, and the resulting jury will be relatively impartial.

In order to exercise their peremptory challenges intelligently, at-

---

IND. CODE § 35-1-30-4(15) (Supp. 1980); and solicitation of service as a juror, *see, e.g., id.* § 35-1-30-4(10).

[5] *See, e.g.,* CONN. GEN. STAT. ANN. § 51-240 (Supp. 1980).

[6] *See, e.g.,* IND. CODE § 35-1-3-4(2) (Supp. 1980).

[7] Broeder, *Voir Dire Examinations: An Empirical Study,* 38 S. CAL. L. REV. 503, 528 (1965).

[8] *See, e.g.,* IND. CODE § 34-1-20-7 (1976); *id.* §§ 35-1-30-2 to -3. Peremptory challenges are regarded as a privilege granted by legislative authority and a litigant may exercise them as a matter of right only to the extent authorized by the legislature. *See* Kunk v. Howell, 40 Tenn. App. 183, 189, 289 S.W.2d 847, 877 (1956).

[9] Note, *Limiting the Peremptory Challenge: Representation of Groups on Petit Juries,* 86 YALE L.J. 1715, 1715, 1718 (1977). A few recent cases, however, have held that some uses of peremptory challenges may be impermissible. *See, e.g.,* People v. Wheeler, 22 Cal. 3d 258, 583 P.2d 748, 148 Cal. Rptr. 890 (1978) (systematic use of peremptory challenges by prosecutor to eliminate blacks from jury denied defendant the right to jury representing a fair cross-section of the community).

torneys must gain information through voir dire regarding jurors' attitudes toward the opposing litigants, counsel for both sides and the legal and factual issues which are relevant to the case. Yet attorneys do not receive adequate information through voir dire upon which to base their peremptory challenges. One study concludes that "[*v*]*oir dire* was grossly ineffective not only in weeding out 'unfavorable' jurors but even in eliciting the data which would have shown particular jurors as very likely to prove 'unfavorable.'"[10] Another study summarizes:

> [O]n the whole, the voir dire, as conducted in these trials did not provide sufficient information for attorneys to identify prejudiced jurors. The average performance score of the prosecution was near the zero point ..., indicating an inability to distinguish potential bias; defense counsel performed only slightly better .... Perhaps most significant is the inconsistent performance of attorneys. Occasionally, one side performed well in a case in which the other side performed poorly, thereby frustrating the law's expectation that the adversary allocation of challenges will benefit both sides equally.[11]

Given that the typical voir dire does not produce sufficient information to identify prejudiced jurors, the question becomes why this is so. This article will answer this question by first asserting that voir dire may be ideally characterized as a self-disclosure interview because it purports to obtain background and attitudinal information which might affect a juror's decision in the case. The balance of this article will then demonstrate that the procedures used during voir dire and the psychological atmosphere in which it takes place are virtually guaranteed to inhibit rather than facilitate such self-disclosure. To support this thesis, a number of variables will be examined: first, whether the voir dire is conducted by the attorneys or by the judge; second, whether the potential jurors are questioned as a group, as individuals within a group or individually; third, the interaction distance between the prospective jurors and the interviewer; and fourth, the environmental characteristics of the room in which the questioning takes place. For each of these variables, the current legal practice and its rationale will be examined. Research from social science literature tending to indicate that the current legal practice discourages self-disclosure during voir dire will then be presented. The research presented is not specifically addressed to the issue of juror self-disclosure. Rather, it is basic social science research which has been undertaken to explore the determinants of self-disclosure in clinical and experimental settings. Although application of the conclusions of this research to the setting of the courtroom involves extrapolation, the extent of the research and the consistency of its

---

[10] Broeder, *supra* note 7, at 505.
[11] Zeisel & Diamond, *supra* note 2, at 528-29.

results are great enough to raise serious questions as to the validity of current voir dire practices. Finally, a number of recommendations will be made for modifying the current practices to enhance self-disclosure by jurors and, thus, facilitate the intelligent exercise of peremptory challenges by attorneys.

## THE PURPOSES OF VOIR DIRE

There are three judicially sanctioned purposes for voir dire. The first two are related to causal challenges while the third is related to the exercise of peremptories. First, voir dire may always be used for the purpose of determining whether the juror satisfies statutory requirements for serving on a jury.[12] Second, jurors may also be questioned to determine if they can impartially participate in the deliberation on the issues of the case based solely on the law and evidence as presented at trial.[13] This second purpose is mandated by the sixth amendment guarantee of the right to trial by an impartial jury.[14] Nevertheless, the extent of questioning allowed for this purpose is restricted to determining if the juror is biased or prejudiced as a matter of law.[15] Often, when the judge conducts questioning of this type, it will simply take the form: "'Can you be fair?' Once the juror has answered 'Yes,' everything else is considered irrelevant and the judge passes on to the next juror, even though Adolph Hitler himself would have answered that question in the affirmative."[16]

The third, and final, judicially sanctioned purpose of voir dire is to provide the attorney with a procedure by which he may obtain information to exercise the peremptory challenges intelligently.[17] The scope of

---

[12] 2 A. AMSTERDAM, B. SEGAL & M. MILLER, TRIAL MANUAL FOR THE DEFENSE OF CRIMINAL CASES § 328 (1967).

[13] Hare, *Voir Dire and Jury Selection,* 29 ALA. LAW. 160, 173 (1968).

[14] *See* Witherspoon v. Illinois, 391 U.S. 510, 518, 521 (1968).

[15] A prejudiced juror is one who has actually decided how he will rule in the case before the trial. A biased juror, on the other hand, has an inclination to favor one side over the other. If the juror admits that he has already decided on what the outcome of the case should be, the juror may be excluded as a matter of law. In order to be successful in challenging a prospective juror for cause on the ground of bias, however, it is necessary to show that the bias is of such a magnitude as to lead to the natural inference that the juror will not act impartially. *See generally* Flowers v. Flowers, 397 S.W.2d 121 (Tex. Civ. App. 1965).

[16] Garry, *Attacking Racism in Court Before Trial,* in MINIMIZING RACISM IN JURY TRIALS xv, xxii (A. Ginger 1969).

[17] *See* Evans v. Mason, 82 Ariz. 40, 46, 308 P.2d 245, 249 (1957); ABA PROJECT ON MINIMUM STANDARDS FOR CRIMINAL JUSTICE, STANDARDS RELATING TO TRIAL BY JURY § 2.4 (1968). *See also* MacGutman, *The Attorney-Conducted Voir Dire of Jurors: A Constitutional Right,* 39 BROOKLYN L. REV. 290 (1972); Van Dyke, *Voir Dire: How Should It Be Conducted to Ensure that Our Juries Are Representative and Impartial?,* 3 HASTINGS CONST. L.Q. 65 (1976); Comment, *Court Control over the Voir Dire Examination of Prospective Jurors,* 15 DE PAUL L. REV. 107 (1965).

Some jurisdictions, however, do not sanction this purpose, and allow only questions

questioning for this purpose is much broader than that associated with challenges for cause. For example, under this rubric questioning is often allowed to probe the juror's occupation, marital status, number of ' children, past jury service, residence, exposure to news coverage of the case, attitudes toward the death penalty, degree of belief in the concept that the defendant is innocent until proven guilty and attitudes toward racial minorities.[18]

The broader scope of permissible questioning for this purpose results from the importance of peremptory challenges, and the courts have frequently recognized this importance. In *Swain v. Alabama*,[19] for example, the United States Supreme Court stated: "The persistence of peremptories and their extensive use demonstrate the long and widely held belief that peremptory challenge is a necessary part of trial by jury."[20] This use of voir dire to gain information for peremptory challenges is based on the recognition by the law that

> the rules of evidence can only partly limit the extent to which a juror's bias affects his deliberation. The tests which the law furnishes to the jury for weighing evidence are crude and imperfect and provide few internal checks on jury prejudice. There is a critical area in every case, where a juror must rely on his own experience to reach a decision. If bias permeates a juror's thinking, it may distort the importance of evidence consistent with it. . . . Bias may, therefore, be a fact of singular importance in the case.[21]

The notion that verdicts are frequently affected by the jurors' values and biases is supported by a report that "in about two-thirds of all cases the jurors are likely to differ over the significance of the evidence presented to them in the trial. In only about one-third of the trials is the jury unanimous on the first ballot; in two-thirds of the cases the jurors differ in their vote."[22]

In addition to the above three approved purposes, voir dire is often used for reasons which are not judicially sanctioned. Some attorneys

---

which might uncover legal grounds for challenges for cause. 2 A. AMSTERDAM, B. SEGAL & M. MILLER, *supra* note 12, § 334. In these jurisdictions, "any enlightenment given by the answers which serves to inform counsel's judgment on the intelligent exercise of peremptory challenges is at best a by-product, and often one suspiciously regarded." *Id. See also* Van Dyke, *supra*, at 89-90.

[18] For general discussions of the proper scope of voir dire, see 2 A. AMSTERDAM, B. SEGAL & M. MILLER, *supra* note 12, §§ 334, 336; 1 F. BUSCH. *supra* note 3, § 84; Bodin, *Selecting a Jury*, in CIVIL LITIGATION AND TRIAL TECHNIQUES 211, 225-62 (H. Bodin ed. 1976).

[19] 380 U.S. 202 (1965).

[20] *Id.* at 219.

[21] *See* MacGutman, *supra* note 17, at 303-04. The concept of bias used here is the same as that referred to in the challenge for cause, *see* note 15 *supra*, with the exception that the attorney does not have to prove that the juror will not act impartially before exercising a peremptory challenge.

[22] Zeisel & Diamond, *The Jury in the Mitchell-Stans Conspiracy Trial*, [1976] AM. B. FOUNDATION RESEARCH J. 151, 173 (footnote omitted).

abuse the voir dire by using it as a means to ingratiate themselves with the jurors and to indoctrinate the jurors to their version of the case before the presentation of evidence.[23] Attempts at ingratiation may take a variety of forms. The "grandstand play" occurs when the attorney declines the opportunity to question the prospective jurors, announcing his faith in the jury system and in that particular panel.[24] This method is not often employed, however, and jurors tend to regard an attorney who uses this method as careless in his treatment of the case.[25] More commonly employed methods of ingratiation include such obvious strategies as exaggerated courtesy extended to members of the panel, concerned but polite questioning as to the health of the older members, joking with the panel and making it known that the jurors and the attorney have mutual acquaintences or associations. Attorneys also use voir dire to attempt to indoctrinate the prospective jurors. For example, one author recommends that attorneys use voir dire to teach jurors important facts, to expose damaging facts in the case in order to reduce their impact, to instruct jurors as to the law involved and to force jurors to face their own prejudices.[26]

A minimum level of rapport between the person conducting voir dire and the jurors is necessary for a productive dialogue. However, at the point at which the establishment of effective rapport becomes an attempt at ingratiation, it becomes unacceptable and should be guarded against. Likewise, while the jurors must be given some minimum level of introduction to the facts of the case during voir dire since the questioning cannot take place in a vacuum, this introduction should not be allowed to become indoctrination in the pejorative sense. The concern of the judiciary over these two unacceptable purposes of voir dire seems to be somewhat justified. A study of a number of cases in a midwestern federal district court concludes that attorneys use about eighty percent of voir dire time indoctrinating the jury panel.[27] The study adds, however, that such indoctrination attempts by the attorneys often do not appear to succeed.[28]

## ATTORNEY-CONDUCTED AS OPPOSED TO JUDGE-CONDUCTED VOIR DIRE

Traditionally, the questioning of jurors during voir dire was left to at-

---

[23] *See* Blunk & Sales, *Persuasion During the Voir Dire*, in PSYCHOLOGY IN THE LEGAL PROCESS 39 (B. Sales ed. 1977); Field, *Voir Dire Examinations—A Neglected Art*, 33 U. MO. KAN. CITY L. REV. 171 (1965).

[24] *See* M. BELLI. MODERN TRIALS § 121, at 803 (1954).

[25] *Id.* at 804.

[26] *See* A. GINGER, JURY SELECTION IN CRIMINAL TRIALS §§ 7.18-.21 (1975).

[27] Broeder, *supra* note 7, at 522.

[28] *Id.* at 522-23.

torneys.[29] In recent years, however, there has been a move away from attorney-conducted and toward judge-conducted voir dire. At present, only nineteen states allow attorneys to exercise primary control over the conduct of voir dire in both civil and criminal cases.[30] In fifteen states, the judge has unfettered control, although attorneys may submit questions for the judge to ask.[31] The judge, in his discretion, may or may not ask the questions or, alternatively, may allow the attorneys to directly question jurors after he has questioned them. The remaining jurisdictions divide the responsibility for conducting voir dire between the judge and the attorneys. Usually this means that the judge will begin by asking standard questions and then the attorneys will be allowed to ask their own questions concerning particular matters important to the case at hand.

In the federal system, judges may allow attorneys to conduct voir dire, but are not obligated to do so.[32] In the event the judge elects to conduct the voir dire himself, he is required to allow the attorneys to supplement the examination or to submit further questions to be asked by the judge. Nevertheless, the scope of supplemental questioning lies in the discretion of the judge. In fact, by 1977, "approximately three-fourths of federal judges conduct voir dire examinations without oral participation by counsel."[33] It would seem that the trend toward increasing judicial control over the conduct of voir dire is continuing; a 1970 report revealed that at that time only fifty-six per cent of the federal district judges reported that they conducted the voir dire without oral participation by counsel.[34]

One of the justifications given for this recent shift is that it prevents attorneys from abusing the voir dire process. Those who support judge-conducted voir dire argue:

> [It] saves time, promotes respect for the court, brings the judge into greater prominence at the very outset, reveals that an impartial court can obtain an impartial jury better than partisan counsel, that extended individual questioning by counsel may embarrass or even

---

[29] *See* McGuirk & Tober, *Attorney-Conducted Voir Dire: Securing an Impartial Jury*, 15 N.H. B.J. 1, 4 (1973).

[30] *See* Van Dyke, *supra* note 17, at 95-97.

[31] *See id.*

[32] *See* FED. R. CIV. PROC. 47(a); FED. R. CRIM. PROC. 24(a).

[33] G. BERMANT, CONDUCT OF THE VOIR DIRE EXAMINATION 6 (Federal Judicial Center Pub. 1977).

[34] *See* COMMITTEE ON THE OPERATION OF THE JURY SYSTEM, JUDICIAL CONFERENCE OF THE UNITED STATES, REPORT ON VOIR DIRE PROCEDURES (1970). There are regional differences in the degree of counsel participation allowed. G. BERMANT, *supra* note 33, at 5-20. Federal district courts sitting in states which allow attorney participation in the state courts are more likely to allow a greater degree of attorney involvement in the federal voir dire. *Id.* at 10-13.

insult the juror, or that he may become brainwashed and committed by counsel before any evidence has been heard.[35]

There is no question but that abuse by attorneys of voir dire through ingratiation and indoctrination attempts will be completely eliminated by judge-conducted voir dire. In addition, the assertion that judge-conducted voir dire saves time is supported by data. In a direct comparison of voir dires conducted by attorneys and judges, one study finds that judge-conducted voir dire results in a significant savings of time.[36] Yet, there is no objective data to support the assertion that a judge is more likely than partisan counsel to obtain an impartial jury. It is also doubtful that any attorney would intentionally embarass or insult a prospective juror, since such conduct would alienate not only that particular juror, but also the remaining jurors who witness the event.

Those who support the attorney-conducted voir dire argue that inquiry into the biases of jurors requires the interviewer to have a thorough knowledge of the legal issues involved in the case and of the evidence to be presented by both sides. Because the trial judge does not, and should not, have such knowledge at the time of voir dire, it has been argued that he is not as competent as the attorneys to question the jurors.[37] In addition, some commentators argue that judges do not ask pressing or probing questions about the jurors' attitudes and that, "[e]ither because of institutional pressures to keep their calendars moving or because of their lack of sympathy to one or both of the litigants, many judges question prospective jurors without much interest or enthusiasm, hoping that a panel can be quickly assembled and that the trial can begin."[38] Studies which report that judge-conducted voir dire saves time have been criticized because, if the studies are examined as a whole, no conclusive proof exists one way or the other. Even though some studies do show a statistically significant savings of time through the use of judge-conducted voir dire, the time differences are not dramatic when compared to the overall length of the trial.[39]

Finally, supporters of attorney-conducted voir dire argue that it is unnecessary to eliminate attorney participation simply because attorneys

---

[35] Braswell, *Voir Dire—Use and Abuse,* 7 WAKE FOREST L. REV. 49, 54 (1970); *see* Levit, Nelson, Ball & Chernick, *Expediting Voir Dire: An Empirical Study,* 44 S. CAL. L. REV. 916 (1971); Note, *Judge Conducted Voir Dire as a Time-Saving Trial Technique,* 2 RUT.-CAM. L.J. 161 (1970).

[36] *See* Levit, Nelson, Ball & Chernick, *supra* note 35, at 946-49.

[37] *See* MacGutman, *supra* note 17, at 327-28; Padawer-Singer, Singer & Singer, *Voir Dire by Two Lawyers: An Essential Safeguard,* 57 JUDICATURE 386, 391 (1974); Comment, *The Jury Voir Dire: Useless Delay or Valuable Technique,* 11 S.D. L. REV. 306, 317-18 (1966).

[38] Van Dyke, *supra* note 17, at 76.

[39] *See id.* at 88-89 (noting that what little court time was saved by judge-conducted voir dire was made up for by additional pretrial conferences).

have been known to abuse it. A number of commentators point out that the conduct of the voir dire has always been subject to the judicial discretion of the courts.[40] Thus, the judge has the power to curtail any attorney abuse of the voir dire.

### *Social Science Research Relevant to a Determination of Who Should Conduct Voir Dire*

There is a considerable body of basic research investigating how status differentials and reinforcement techniques affect self-disclosure in interview situations. There is also a considerable body of research which illustrates how attitudes may be communicated to others through nonverbal communication. This research indicates that attorneys are probably better suited to conduct the voir dire.

### Status Differentials Between the Judge and Attorneys

The judge obviously has the highest status of anyone in the courtroom. He is physically separated from and elevated above everyone else, and is addressed by jurors and attorneys alike as "your honor." One psychological study seems to indicate that the judge would be the more appropriate interviewer to elicit juror self-disclosure.[41] It finds that both males and females disclose more to a high-status male interviewer than to one of low status.[42] On the other hand, the status level of female interviewers does not appear to affect the amount of self-disclosure from either male or female subjects. Since there are currently more male judges and attorneys than there are female judges and attorneys, the judge, having a higher status than the attorney would appear to be the more appropriate interviewer in most cases.

Other studies, however, indicate that there is a curvilinear relationship between the status of the interviewer and interviewee and the amount of self-disclosure; too great a status differential between the interactants may lead to an interviewing bias effect.[43] One study on bias in information interviews states:

> [B]ias is likely to occur in the interview when there is social distance between interviewer and respondent. Status distance and threatening questions may create a situation in which the respondent feels pressure to answer in the direction he believes will conform to the opinions or expectations of the interviewer. . . .

---

[40] *See, e.g.,* Comment, *supra* note 17, at 110; Comment, *supra* note 37, at 318.

[41] *See* Brooks, *Interactive Effects of Sex and Status on Self-Disclosure,* 21 J. COUNSEL-ING PSYCH. 469, 473 (1974).

[42] *Id.*

[43] *See, e.g.,* Williams, *Interviewer Role Performance: A Further Note on Bias in the Information Interview,* 32 PUB. OPINION Q. 287 (1968).

It would seem likely that the role performance of the interviewer
could either enhance or mitigate the biasing effects of status
characteristics and potentially threatening questions.[44]

Furthermore, another study finds that liking for a person will vary as a
function of perceived similarity.[45] A large status differential between
the interactants will most likely reduce perceived similarity and, in
turn, the degree of self-disclosure. Finally, it has been found that such
interviewer biasing effects are greatest when the respondent perceives
the social distance between himself and the interviewer to be either
very large or very small.[46] When social distance is very large, the
respondent may hedge opinions out of fear of retaliation from a more
powerful interviewer. On the other hand, when the social distance is
very small, he may hedge opinions so as not to alienate an equal.

While the lawyer is in a higher status position in the courtroom as
compared to the prospective jurors, he is at an intermediate social dis-
tance from the jurors as compared to the judge. It is probable that at-
torneys will be seen by the jurors as more similar to themselves than is
the judge. Given these circumstances, it appears that attorneys would
be better suited than the judge to interview prospective jurors and
elicit self-disclosure.

### Role Differentials Between the Judge and Attorneys

The judge has an extremely difficult role to fulfill, both intellectually
and emotionally. He must be the arbiter of fine points of law, coordinate
the activities of all parties to facilitate a just result and remain above in-
terparty rivalries, all of which require that he remain aloof and emo-
tionally detached. In fact, the judge's physical placement in the court-
room and the use of somber black robes probably evolved to foster such
detachment. The attorneys, on the other hand, are free to modulate
openness and familiarity with prospective jurors without compromising
role requirements. Indeed, the flamboyant and expansive lawyer is a
part of American folklore. Thus, attorneys are capable of interacting
with prospective jurors either in a warm and friendly manner, or in an
aggressive manner, depending on what the situation requires.

Common sense dictates that people prefer to talk to and will reveal
more of themselves to warm and friendly people, than they will to those
who are aloof and emotionally detached. This view is supported by a

---

[44] *Id.* at 287-88 (footnotes omitted).

[45] *See* Knecht, Lippman & Swap, *Similarity, Attraction, and Self-Disclosure,* 8 PRO-
CEEDINGS OF THE 81ST ANNUAL CONVENTION OF THE APA 205 (1973).

[46] Dohrenwend, Colombotos & Dohrenwend, *Social Distance and Interview Effects,* 32
PUB. OPINION Q. 410 (1968).

number of psychological studies.[47] Since an attorney can manipulate his behavior to appear warm and friendly to prospective jurors, whereas the judge runs the risk of compromising his role performance if he acts in that way, it would seem that attorneys are better suited for the role of the interviewer.

Furthermore, because of the greater flexibility in behavior allowed to the attorney in his role as the interviewer, he is in a better position to positively reinforce the prospective jurors' self-disclosure. For example, it has been shown that nonverbal stimuli, such as head-nodding and mm-hmming which indicate interest in what the interviewee is saying stimulate longer speech.[48] Increased eye contact, less physical distance, relaxed posture and a direct orientation of the interviewer's body toward the interviewee all serve to reinforce the interviewee and, thus, elicit more verbalization and presumably more self-disclosure from him.[49] A word of caution is in order, however, in regard to eye contact. Another study indicates that a direct linear relationship between eye contact and intimacy appears to hold only for women subjects: males view continuous eye contact, especially from other males, as threatening.[50] Other research reveals that increased body motion on the part of male therapeutic counselors generates more self-disclosure from subjects, while low levels of body motion on the part of female counselors enhances subject self-disclosure.[51]

The judge would not be at a disadvantage, as compared to the attorneys, in rendering the nonverbal types of positive reinforcement to prospective jurors. But his role requirements and physical placement within the courtroom preclude him from administering some of the other types of reinforcement. For example, the judge's placement behind the bench may prevent him from directly facing the jurors and the fact that he wears a robe may obscure expressive body motions and relaxed body posture. Attorneys, on the other hand, can get out from behind the table, approach the jury[52] and engage in all of the nonverbal

---

[47] *See, e.g.,* Pope & Siegman, *Interviewer Warmth and Verbal Communication in the Initial Interview,* 2 PROCEEDINGS OF THE 75TH ANNUAL CONVENTION OF THE APA 245 (1967); Simonson, *The Impact of Therapist Disclosure on Patient Disclosure,* 23 J. COUNSELING PSYCH. 3 (1976); Worthy, Gary & Kahn, *Self-Disclosure as an Exchange Process,* 13 J. PERSONALITY & SOC. PSYCH. 59 (1969).

[48] *See* Matarazo, *The Interview,* in HANDBOOK OF CLINICAL PSYCHOLOGY 403, 443-44 (B. Wolman ed. 1965).

[49] *See* Mehrabian, *A Semantic Space for Nonverbal Behavior,* 35 J. CONSULTING & CLINICAL PSYCH. 248 (1970); Reece & Whitman, *Expressive Movements, Warmth and Verbal Reinforcement,* 64 J. ABNORMAL & SOC. PSYCH. 234 (1962).

[50] Ellsworth & Ross, *Intimacy in Response to Direct Gaze,* 11 J. EXPERIMENTAL SOC. PSYCH. 592 (1975).

[51] *See* Gardner, The Effects of Body Motion, Sex of Counselor, and Sex of Subject on Counselor Attractiveness and Subject's Self-Disclosure (1973) (unpublished manuscript on file at Univ. of Wyo.).

[52] Some judges, however, may restrict the attorneys' movements by requiring, for example, that they remain behind a podium.

methods of reinforcement without appearing artificial or out of character.

As noted above, in addition to an ability to interact with the jurors in a warm and empathic manner, attorneys are better able to interrogate them in an aggressive style without compromising their role. If the interviewer suspects that a juror is lying and is unable to confirm this through friendly questioning, resort to aggressive tactics may be called for. This tactic is supported by the results of a study on the effects of induced anxiety which concludes that individuals tend to regress in stressful situations and respond to stimuli as they have done in the past.[53] Thus, a prospective juror with long-held prejudices might be more likely to admit them in a stressful situation engineered by the attorney's aggressive questioning. A further advantage of the occasional use of aggressive questioning is found in research on psychiatric interviews, which concludes that high anxiety questions produce a higher verbal output than do neutral questions.[54]

From a psychological viewpoint, it appears that more self-disclosure from prospective jurors would be produced by allowing attorneys, rather than the judge, to conduct voir dire. Attorneys are at a moderate social distance from the jurors thus minimizing interviewer biasing effects and they are able to modulate their interviewing behavior to positively reinforce or attack juror responses as necessary.

### Ability to Prejudice Jurors Through Nonverbal Communication

In the preceding sections, it was concluded that attorneys are better suited to conduct voir dire because they are in a position to facilitate the jurors' self-disclosure. This section illustrates that exclusion of attorneys from the voir dire process may lead to bias on the part of jurors resulting from the judge's unintentional communication of whatever biases he may have. To explain this point, it is first necessary to refer to Kalven and Zeisel's classic empirical study[55] of the jury's decisionmaking process. The study, in comparing juries' actual decisions with judges' opinions of how the juries should have decided the cases, finds that juries and judges concur in their decisions about seventy-five percent of the time.[56] This level of concurrence persists even when the juries are confronted with difficult evidentiary and legal issues, which leads to the conclusion that juries are capable of understanding difficult cases.[57] There is, however, an alternative explanation for the high

---

[53] *See* Beier, *The Effect of Induced Anxiety on Flexibility of Intellectual Functioning,* 65 PSYCH. MONOGRAPHS, Whole No. 326, at 17-18 (1951).

[54] Kanfer, *Verbal Rate, Eye Blink, and Content in Structured Psychiatric Interviews,* 61 J. ABNORMAL & SOC. PSYCH. 341, 347 (1960).

[55] *See* H. KALVEN & H. ZEISEL, THE AMERICAN JURY (1966).

[56] *Id.* at 56, 63.

[57] *Id.*

degree of concurrence between jury and judge decisions: "[J]udge/jury concurrence may result, at least in part, because the judge subtly and unintentionally conveys to the jury his feelings about the parties and participants in the case and because the jury is influenced by his cues."[58]

The judge may communicate feelings and attitudes about the litigants to the jury through kinesic and paralinguistic behavior. Kinesic behavior, or body language, includes: facial expressions, body posture, body movements, body orientation and hand movements. Paralinguistic behavior includes aspects of speech such as: pitch and tone of voice, pauses and latencies, loudness, tempo and breathing patterns. Both types of behavior are normal components of communicative behavior. Indeed, these behaviors constitute well over half of an individual's total communicative behavior and operate to communicate interpersonal attitudes, express emotions, indicate mutual attentiveness, provide feedback and provide illustrations for speech.[59] Furthermore, these behaviors are for the most part beyond the individual's control. Thus, even if one actively attempts to hide feelings, research indicates that the attitudes and emotions will continue to escape through nonverbal behavior.[60] Not only are nonverbal cues sent by everyone, but nonverbal messages are received and interpreted by others; even untrained observers are able to accurately decode a sender's nonverbal cues.[61] The decoding process is, like the sending of cues, largely unconscious.

The significance of this communication research is enhanced when its findings are coupled with the findings of research concerning experimenter biasing effects. In the last fifteen years, there has been a considerable concern among psychologists that experimenters might be subtly influencing their subjects' responses. In fact, research shows that experimenters will often unintentionally influence the subject to make a "correct" response.[62] This phenomenon is explained by the fact that the experimenter's unintentional actions seem to be reciprocated by attempts on the part of subjects to search for and respond to the experimenter's influence. Research on evaluation apprehension demonstrates that this phenomenon is enhanced when a subject is confronted

---

[58] Note, *Judge's Nonverbal Behavior in Jury Trials: A Threat to Judicial Impartiality,* 61 VA. L. REV. 1266, 1267 (1975).

[59] *See* M. ARGYLE, SOCIAL INTERACTION 110-14 (1969).

[60] *See, e.g.,* Ekman & Friesen, *Nonverbal Leakage and Clues to Deception,* 32 PSYCH. 88 (1969).

[61] P. EKMAN, W. FRIESEN & P. ELLSWORTH, EMOTION IN THE HUMAN FACE: GUIDELINES FOR RESEARCH AND AN INTEGRATION OF FINDINGS 77-108 (1972).

[62] *See* Duncan, Rosenberg & Finkelstein, *The Paralanguage of Experimenter Bias,* 32 SOCIOMETRY 207 (1969); Masling, *Differential Indoctrination of Examiners and Rorschach Responses,* 29 J. CONSULTING PSYCH. 198 (1965); Rosenberg, *The Conditions and Consequences of Evaluation Apprehension,* in ARTIFACT AND BEHAVIORAL RESEARCH 279 (R. Rosenthal & R. Rosnow eds. 1969); Rosenthal, *Interpersonal Expectations: Effects of the Experimenter's Hypothesis,* in ARTIFACT AND BEHAVIORAL RESEARCH, *supra,* at 181.

with an ambiguous situation and is apprehensive about performing well.[63]

When these various research findings are combined, they militate against a wholly judge-conducted voir dire. When a prospective juror is brought to the voir dire, he has been removed from a daily routine and subjected to a novel and ambiguous situation. The prospective juror "wants to serve and do his duty for society . . . . To be selected to judge his fellow man is indeed serious business, and he knows that he will likely be called upon for decisions that are much deeper than daily expressions of opinion."[64] Individuals placed in novel situations will often look to individuals of higher status for guidance as to the appropriate behavior.[65] Since it is obvious that the judge has the highest status of anyone in the courtroom, the jurors may well look to him for such guidance. If the judge conducts the voir dire and has negative feelings toward the parties or their counsel, the communication research indicates he will almost surely convey these feelings to the jurors through nonverbal communication. Research also indicates that the jurors will be able to interpret these nonverbal cues. Furthermore, studies on experimenter bias indicate that jurors may well adopt the attitudes and emotions of the judge as appropriate. Thus, a voir dire conducted solely by the judge may lead to a subtle inculcation of bias in the jurors toward the parties or counsel.

To be sure, attorneys are even more likely than the judge to have biases and prejudices regarding the case. They also lack compunctions against revealing their beliefs and even attempt to do so on the verbal level rather than merely on the nonverbal level. But it is precisely because attorneys are open about their biases that they should be allowed to conduct the voir dire. Jurors are aware that the attorneys are acting as advocates, and, therefore, jurors are less liable to accept their biases as absolute truth. Furthermore, the persuasive attempts of one attorney will be counterbalanced by the other. The judge, on the other hand, is presumed to be impartial and the attitudes which he conveys are more likely to be readily accepted. Also, if a judge conveys negative attitudes toward one side during the voir dire, counsel has no effective way to counter the resulting impact of such conduct on the jury.

## THE METHOD OF ADDRESSING QUESTIONS TO THE PROSPECTIVE JURORS

In most jurisdictions, at least some portion of the voir dire consists of

---

[63] Rosenberg, *supra* note 62, at 324-29.

[64] Brown, *A Juryman's View*, in SELECTED READINGS—THE JURY 102, 102 (G. Winters ed. 1971).

[65] Rosenthal, *On Not So Replicated Experiments and Not So Null Results*, 33 J. CONSULTING & CLINICAL PSYCH. 7 (1969).

questions addressed to the group as a whole.[66] In some voir dires, this is the predominant mode with individual questioning taking place only when a juror has affirmatively responded to a question put to the group and follow up questions are required. Many voir dires, however, start with some brief group questioning on general topics, followed by an extended period of questioning addressed to specific individuals seated within the group as a whole. Occasionally, prospective jurors are questioned out of the presence of the other members of the panel—particularly when there has been massive publicity surrounding the trial and the judge concludes that this form of voir dire is required to determine the extent to which prospective jurors have been "tainted" by the media without further biasing the other prospective jurors.[67] Individual questioning outside the presence of the other jurors may not be allowed, however, if the judge feels that it will unduly lengthen the voir dire process.

In general, the conduct and scope of voir dire is within the discretion of the judge. Determining whether the questioning should be done individually or collectively is also within the discretion of the judge, and most cases hold that a judge does not abuse that discretion by refusing to allow individual examinations.[68] Inherent in the rationale of these cases is the justified belief that group questioning will render a considerable savings of time and the questionable belief that in most cases collective questioning is capable of revealing biases and prejudices.

### Social Science Research Pertaining to the Mode of Questioning

Both the group and the individual-within-a-group styles of questioning are grossly inadequate for producing honest self-disclosure because they engender conformity of responses. It seems intuitively obvious that when people are called for jury duty by a judicial summons, they feel a certain degree of anxiety at being removed from the context of their ordinary lives and ordered to perform a role which will have a significant effect on the lives of others. A variety of investigators find that anxious individuals have an increased need for affiliation while they are awaiting a threatening event.[69] Many prospective jurors perceive interroga-

---

[66] *See* 2 A. AMSTERDAM, B. SEGAL & M. MILLER. *supra* note 12, §§ 331-332.

[67] The American Bar Association has advocated this practice. *See* ABA PROJECT ON MINIMUM STANDARDS FOR CRIMINAL JUSTICE. STANDARDS RELATING TO·FAIR TRIAL AND FREE PRESS § 3.4(a) (1968).

[68] *See, e.g.,* United States v. Tropiano, 418 F.2d 1069 (2d Cir. 1969), *cert. denied,* 397 U.S. 1021 (1970); *cf.* United States v. Addonizio, 451 F.2d 49, 66 (3d Cir. 1971), *cert. denied,* 405 U.S. 936 (1972) (trial court's refusal to examine jurors individually was not an abuse of discretion; noting, however, in dicta, that if there has been extensive pretrial publicity, jurors should be examined individually).

[69] *See* Gerard & Rabbie, *Fear and Social Comparisons,* 62 J. ABNORMAL & SOC. PSYCH. 586, 588-89 (1961); Helmreich & Collings, *Situational Determinants of Affiliative Preference Under Stress,* 6 J. PERSONALITY & SOC. PSYCH. 79 (1967); Sarnoff & Zimbardo,

tion in a public forum to determine their suitability as jurors to be such an event. In addition, conformity increases as the need for affiliation increases.[70] Thus, even before the voir dire begins, there are socio-psychological factors at work which encourage group cohesiveness and conformity of response, thereby militating against honest self-disclosure.

In the group questioning method of conducting voir dire, the entire group of prospective jurors is asked a question such as, "Would any of you be unable to be fair and impartial toward the defendant because of the media coverage which has surrounded this case?" If no one from the group responds to this question, the interviewer moves on to other areas. This technique is hardly fitted for a self-disclosure interview. Since no response is required of any particular individual and factors of group conformity are at work, it is highly unlikely that a prospective juror will respond to such a question, particularly when it would discredit him as a fair person. Even when relatively mundane questions are addressed to the prospective jurors as a group, researchers have observed that they squirm in their seats and look around to see if anyone else is going to volunteer information; if they discover that no other hands are raised, they settle back in their chairs and refuse to respond. In contrast, responses were forthcoming when attorneys later addressed the very same questions to particular individuals.

The technique of questioning an individual within a group is an improvement over group questioning but it still closely resembles the paradigm used by psychologists to study conformity. In one study on independence and conformity, it was found that when an individual was called upon to state his opinions in public after hearing the opinions stated by the majority of the group, over one-fourth of the minority individuals covertly changed their private opinions and stated their public opinions so that they matched those of the majority.[71] When the individual was not required to state an opinion in front of the group, the degree of conformity was markedly lower. Other research in this area, while differing in methodology and emphasis, supports the same conclusion.[72] This research also supports the conclusion that an individual in-

---

*Anxiety, Fear, and Social Affiliation*, 64 J. ABNORMAL & SOC. PSYCH. 356 (1961); Zimbardo & Formica, *Emotional Comparison and Self-Esteem as Determinants of Affiliation*, 31 J. PERSONALITY 141, 161 (1963).

[70] *See* Hardy, *Determinants of Conformity and Attitude Change*, 54 J. ABNORMAL & SOC. PSYCH. 289 (1957); McGhee & Teevan, *Conformity Behavior and Need for Affiliation*, 72 J. SOC. PSYCH. 117 (1967).

[71] Asch, *Studies of Independence and Conformity: A Minority of One Against a Unanimous Majority*, 70 PSYCH. MONOGRAPHS, Whole No. 416, at 11 (1956).

[72] *See, e.g.*, Deutsch & Gerard, *A Study of Normative and Informational Social Influences Upon Individual Judgment*, 51 J. ABNORMAL & SOC. PSYCH. 629, 635 (1955); Sherif, *Group Influences Upon the Formation of Norms and Attitudes*, in READINGS IN SOCIAL PSYCHOLOGY 219, 224-25 (E. Maccoby, T. Newcomb & E. Hartley eds., 3d ed. 1958); *cf.* A.

terview which takes place away from the group is the best way to determine a person's opinions on a given issue[73] because "in the interest of bolstering the opinions of others, [individuals within a group] may make statements that deviate from the truth as they see it."[74]

The conformity experiments demonstrate a sizeable conformity effect when individuals are required to state their opinions in front of members of a group, even under such nonthreatening conditions as requesting each individual to judge line length.[75] This effect is likely to be even more pronounced under the conditions of anxiety which arise when an attorney challenges a juror in the courtroom. For example, when an attorney challenges a juror for cause, he may publicly accuse the juror of being biased or prejudiced because of the opinion he stated.[76] Often the judge will initially reject such a challenge and require the attorney to further question the prospective juror. This questioning can be quite brutal to a novice in the courtroom. If the individual is being questioned within a group, the other prospective jurors witness what can happen to one who makes the "wrong" response. Thus, in an attempt to avoid such close scrutiny, they may alter their responses so as not to give "wrong" answers.

Both of the predominant questioning techniques create a group situation which tends to foster conformity in the expression of personal opinions. If the goal of voir dire is honest self-disclosure, the most effective way to facilitate the achievement of that goal is to interview prospective jurors out of the presence of their fellows, thus eliminating the conformity-generating aspects of group voir dire. Collective questioning is the method least likely to encourage self-disclosure and should be avoided whenever possible.

## INTERACTION DISTANCE DURING VOIR DIRE

The interaction distance between the person conducting the voir dire and the prospective jurors is usually quite large. For example, it is not uncommon to observe a distance of twenty to thirty feet between the interviewer and the prospective jurors. This large interaction distance is most prevalent when questions are addressed to the jurors as a group, probably because such a distance fosters a loud speaking voice from all

---

HARE, HANDBOOK OF SMALL GROUP RESEARCH 361-62 (1962) (discussing small group dynamics).

[73] *See* Chandler, *An Evaluation of the Group Interview,* 13 HUMAN ORGANIZATION 26 (Summer 1954).

[74] *Id.* at 28.

[75] *See* Asch, *supra* note 74.

[76] Most commentators, however, suggest that the attorney politely request the juror be "excused," without making it seem like an accusation. *See, e.g.,* M. BELLI, *supra* note 24, § 120.

parties, thus allowing everyone to hear the questions and answers. Although some assume a closer interaction distance when questioning prospective jurors in an attempt to establish closer rapport with them, such attempts generally are not satisfactory because, in order for everyone in the courtroom, including the court reporter, to hear what is being said, the interactants must still speak very loudly. The result is that the two interactants who are positioned fairly close together speak in stentorian voices for the benefit of others—a result which enhances the artificiality of the interaction and may even hinder the establishment of rapport. Only two voir dires where the interactants were able to maintain a social distance[77] and speak at a normal conversational level have been observed. In one of these, jurors were examined individually, out of the presence of the other jurors, and in a courtroom cleared of spectators. In the other, jurors were questioned individually in the privacy of the judge's chambers. The attorneys involved in both of these cases indicated that in their experience such procedures were extremely rare.

The issue of interaction distance between the interviewer and interviewee has not been addressed in either case law or legal literature. This is probably because whoever conducts voir dire theoretically has the option of assuming a close interaction distance with the prospective jurors. If the judge conducts the voir dire, he may ask prospective jurors to take the witness stand next to the bench while they are being questioned individually. Attorneys may approach the prospective juror whether the person is sitting in the jury box or in the witness stand. As already noted, however, the practicalities of current voir dire procedures require the interactants to speak very loudly, even if they are physically very close, and this is not conducive to self-disclosure. Thus, the issue of interaction distance during voir dire is closely tied to the issue of the appropriate environmental characteristics of the room in which voir dire is to take place. If voir dire is to take place in a large public room designed and decorated to reflect a formal atmosphere, the interaction distances which people adopt will also be formal.

*Social Science Research Concerning the Effect of Interpersonal Distance on Self-Disclosure*

Four main categories of interpersonal distance are used to define and maintain interpersonal relationships: intimate distance (contact to one and one-half feet); personal distance (one and one-half to four feet); social distance (four to twelve feet); and public distance (twelve or more feet).[78]

---

[77] *See* E. HALL, THE HIDDEN DIMENSION 114-16 (1966); text accompanying note 78 *infra*.

[78] E. HALL, *supra* note 77, at 113-20.

Most voir dires take place with a public distance between the speakers. There is some evidence to suggest that this public distance is most conducive to persuasion, the primary function of the attorneys during the trial.[79] It is doubtful, however, that a public distance is conducive to eliciting self-disclosure during voir dire. At the close phase of public distance, around twelve feet, speakers adopt a formal style of speaking and at the more distant phases, speaking style becomes positively frozen. The frozen style of speech is for people who expect to remain strangers. Both the verbal and nonverbal aspects of the communicative process must be exaggerated at this distance with the result that communication tends to assume stereotypic forms.

It is argued that the extent to which the behavior of an interviewee is affected by the interviewer is inversely proportional to the distance, both physical and psychological, which separates one from the other.[80] This hypothesis is supported by a number of research studies on interpersonal attraction in general,[81] and self-disclosure interviews in particular.[82] These studies show that closer physical distance facilitates communication and the formation of a positive feeling. The self-disclosure studies find that when interviews are conducted at distances ranging from three to six feet, the interviewee feels more comfortable, speaks significantly more and reveals more of himself to the interviewer. In addition, one study on interaction distance indicates that interviewers are able to form much stronger impressions of the interviewee's personality at interview distances ranging from four to six feet than they are at closer and farther distances.[83] Thus, the relationship between distance and self-disclosure is not a linear function. If the interview distance is decreased to less than approximately three feet, the interviewee becomes anxious and self-disclosure decreases. A height differential between the interactants 'at close interpersonal distances would generate even more discomfort in the person at the lower level.

---

[79] *See* Albert & Dabbs, *Physical Distance and Persuasion*, 15 J. PERSONALITY & SOC. PSYCH. 265 (1970).

[80] Kleck, *Interaction Distance and Non-verbal Agreeing Responses*, 9 BRIT. J. SOC. & CLINICAL PSYCH. 180 (1970).

[81] *See* Cook, *Experiments on Orientation and Proxemics*, 23 HUMAN RELATIONSHIPS 61 (1970); Willis, *Initial Speaking Distance as a Function of the Speakers Relationship*, 5 PSYCHONOMIC SCI. 221 (1966).

[82] *See* Jourard & Friedman, *Experimenter-Subject "Distance" and Self-Disclosure*, 15 J. PERSONALITY & SOC. PSYCH. 278 (1970); C. Lassen, Interaction Distance and the Initial Psychiatric Interview: A Study on Proxemics (1969) (unpublished dissertation, Yale Univ.); J. Weber, The Effects of Physical Proximity and Body Boundary Size on the Self-Disclosure Interview (1972) (unpublished dissertation, Univ. S. Cal.); *cf.* Knight & Blair, *Degree of Client Comfort as a Function of Dyadic Interaction Distance*, 23 J. COUNSELING PSYCH. 13 (1976) (noting client comfort is highest at midrange distances).

[83] *See* Patterson & Sechrest, *Interpersonal Distance and Impression Formation*, 38 J. PERSONALITY 161 (1970).

Thus, if the interviewer approaches the interviewee in order to enhance self-disclosure, he should also adjust his height so as not to arouse anxiety in the interviewee. For example, if the interviewee is seated, the interviewer can adjust his height by also sitting. The evidence supporting the notion that there is an optimal interpersonal distance of three to six feet for self-disclosure interviews is substantial and consistent. The legal system should take advantage of this research and modify the voir dire procedure to allow the interviewer to question the prospective juror at this distance.

The issue of optimal interview distance also has ramifications for some of the other issues regarding voir dire procedures. Use of the optimal distance is not possible if the jurors are questioned in the traditional group or individual-within-a-group manners. Unless the individual being questioned is placed in the witness stand, it is physically impossible to approach the prospective jurors at the optimal distance in those interview contexts. The evidence concerning distance also has a bearing on the determination of whether the attorneys or the judge should conduct voir dire. When the judge does the questioning, he generally remains at the bench and is not able to approach the jurors; even if a prospective juror is brought closer to the judge and placed in the witness stand, the judge and juror will still not directly face one another. In addition, the judge looks down at the prospective jurors, further hindering juror self-disclosure. Thus, the findings on the subject of optimal interview distance add further weight to arguments in favor of individualized attorney-conducted voir dire.

## ENVIRONMENTAL ASPECTS OF THE COURTROOM AND THEIR IMPACT ON JUROR SELF-DISCLOSURE

While the exact environmental characteristics of particular courtrooms will vary, in general, the courtroom may be described as a very large, public room charged with a ritualistic atmosphere and staged with props that clearly demarcate the roles assigned to the various participants. Courtrooms are devoid of any props which denote warmth and informality. When group questioning is employed, the prospective jurors are often seated in the spectator section. In such a situation, the "bar" literally acts as a physical barrier between the interviewer and prospective jurors. Frequently, a small subgroup of the prospective jurors is randomly selected to come before the bar and sit in the jury box. Although these jurors may be questioned as individuals, it is usually in the presence of the surrounding group, and, once again, there is a physical barrier created by the jury box between the interviewer and the prospective jurors. Even though the judge directs and controls the events taking place, he is physically removed from the proceedings. The

judge sits in an elevated, enclosed box which allows only his upper torso and head to be seen. Moreover, the upper torso is somewhat obscured by a voluminous, ceremonial black robe. Thus, a double set of physical barriers separates the judge and the prospective jurors—those which isolate the jurors and those which surround, elevate and obscure the judge.

Very little has been written about the environmental aspects of the courtroom from a legal perspective. Presumably, the ritualistic atmosphere is encouraged for the same reasons which support the practice of requiring witnesses to take the oath; ritual is presumed to impress upon the individual the gravity of the events which are about to transpire and, therefore, encourage candor.[84] The legal view regarding the appropriate atmosphere in which to conduct voir dire may be illustrated by considering an experiment involving an unusual voir dire practice conducted largely without a judge being present.[85] In this method of empanelment, voir dire takes place in an ordinary room which seats twenty-five prospective jurors, as well as the judge, attorneys, clerk and court reporter. When all of the parties have been assembled, the prospective jurors are sworn in. The judge explains the purpose of voir dire and the procedures to be followed and asks only a few very general questions. The judge then leaves the room and the rest of the voir dire is conducted by the attorneys. If one of the attorneys objects to the nature of the other attorney's questioning, the procedure is halted and the judge returns to resolve the dispute. Once the jury has been selected, it is then transferred to a courtroom for trial.

This procedure is highly unusual not only in the degree of latitude afforded to the attorneys, but also in that it takes place in a room which is much smaller than the courtroom and presumably does not have all of the trappings which normally furnish a courtroom. Attorneys who have participated in this type of voir dire generally approve of it.

> All say that the atmosphere allows them to become acquainted and develop a degree of rapport with the jurors that is normally not possible irrespective of whether the voir dire is conducted primarily by the judge or primarily by counsel. Every attorney stated that the system is a fair one. All agreed that it allows sufficient latitude in the examination of prospective jurors.[86]

Despite the fact that the attorneys praised the method in part because of its less formal atmosphere, the study concludes that voir dire should not be regularly conducted in an informal room.

> For a juror to respect the process it must be unmistakably "judicial" in order to convey an official and formal air. . . . Especially because

---

[84] *See* Levit, Nelson, Ball & Chernick, *supra* note 35, at 939, 950.

[85] *See id.* at 931-36.

[86] *Id.* at 938 (footnotes omitted).

the voir dire comes at the very beginning of the trial, all care must be taken to assure that the tone is not one of excessive casualness.[67]

Thus, the legal community takes the position that excessive casualness is an evil which must be guarded against in order to insure the integrity of the trial. The legal community should also be aware, however, that excessive formality during the voir dire will inhibit juror self-disclosure and thus hinder the exposition of bias and prejudice.

*Social Science Research Relevant to the Environmental Aspects of the Courtroom and Their Effect on Juror Self-Disclosure*

The large size of the courtroom appears to have an effect on preferred interpersonal distance which may in turn affect the amount of self-disclosure generated in the voir dire. One study proposes that an inverse relationship exists between room size and preferred interaction distance between subjects.[88] Thus, in a large room, subjects assume a close interpersonal distance, whereas in a small room, subjects tend to assume larger interaction distances. Another study suggests that interaction distances decrease in large rooms because both auditory and visual sensations diminish with the increase in room size:[89] "Screaming across a void does not make for comfortable conversation; rather than increase the volume, most people choose to decrease the void."[90] The implication for voir dire taking place in a large courtroom is that people prefer to have a fairly close interaction distance. This preference is blocked, however, either because of the physical barriers in the courtroom or because of the necessity of everyone in the courtroom being able to hear the exchange of questions and answers. The blocking of these preferred distancing patterns probably generates discomfort and anxiety for the prospective juror, thus reducing self-disclosure. If this is indeed the case, two solutions come readily to mind: either remove the voir dire from the context of the large, open courtroom or remove the physical barriers between the participants to allow closer interaction distances, thereby eliminating the necessity of loud speaking voices by the participants during the exchange.

In addition, environmental aspects may affect the jurors independently of their relation to the attorneys. Specifically, although there is a considerable distance between the interviewer and the interviewee in the typical voir dire, the distance between the various interviewees is

---

[87] *Id.* at 939.

[88] *See* Sommer, *The Distance for Comfortable Conversation: A Further Study,* 25 SOCIOMETRY 111, 115 (1976).

[89] *See* White, *Interpersonal Distance as Affected by Room Size, Status, and Sex,* 95 J. SOC. PSYCH. 241, 248 (1975).

[90] *Id.*

minimal. When prospective jurors are seated in the spectator section, as is the case in most group-style voir dires, they are usually in actual physical contact with those on either side of them. Even when prospective jurors are brought into the jury box for questioning, the distance between jurors does not exceed several feet. In studying the effects of room size and crowding on stress and self-disclosure, one researcher concludes that, under conditions of crowding as, for example, where subjects are shoulder to shoulder, the subjects are significantly less comfortable, exhibit more nonverbal indicators of stress such as manipulating objects and frequently changing positions and are less willing to discuss intimate topics.[91] Thus, the seating of prospective jurors in a compact grouping probably leads to reduced self-disclosure.

It has long been the common sense view that reduced privacy leads to reduced self-disclosure. A study finding that self-disclosure in a dyad increases under conditions of isolation[92] supports this view. Other research, also supporting the common sense view, concludes that reduced privacy decreases client self-disclosure in a counseling setting and this occurs even when partial barriers such as desks or bookcases are employed to encourage the client's perception of privacy.[93] From this research, it would seem that one way to encourage self-disclosure among prospective jurors is to conduct voir dire in the most isolated setting possible, for example, in the judge's chambers. To be sure, the complete isolation of a client-counselor setting cannot be achieved since the voir dire must include, at a minimum, the juror, judge, both litigants in a civil case or the defendant in a criminal case, counsel for both sides and the court reporter. Yet, a small group setting is much more conducive to self-dislcosure than a voir dire which takes place in front of fifty or more spectators.

The final aspect of the environment considered here is the degree of warmth or coldness of the room in which voir dire takes place. "Hard architecture" is described as that which is unyielding, impervious and impersonal, and it is argued that such architecture tends to foster isolation and estrangement among people.[94] The courtrooms in which voir dire is conducted can typically be characterized as "hard" rooms. Empirical data from a counseling analogue demonstrates that subjects disclose significantly more in a "soft" rather than a "hard" room.[95] This result

---

[91] *See* Sundstrom, *An Experimental Study of Crowding: Effects of Room Size, Intrusion, and Goal Blocking on Nonverbal Behavior, Self-Disclosure and Reported Stress,* 32 J. PERSONALITY & SOC. PSYCH. 645 (1975).

[92] *See* Altman & Haythorn, *Interpersonal Exchange in Isolation,* 28 SOCIOMETRY 41 (1975).

[93] Holahan & Slaikeu, *Effects of Contrasting Degrees of Privacy on Client Self-Disclosure in a Counseling Setting,* 24 J. COUNSELING PSYCH. 55 (1977).

[94] R. SOMMER, TIGHT SPACES *passim* (1974).

[95] Chaikin, Derlega & Miller, *Effects of Room Environment on Self-Disclosure in* a *Counseling Analogue,* 23 J. COUNSELING PSYCH. 479 (1976).

might occur because hard architecture makes status differences be-
tween client and counselor more salient, because a soft environment is
similar to that in which friends interact or because a soft environment is
more conducive to a feeling of relaxation and ease.[96] Whatever the
reason, both common sense and empirical data clearly demonstrate that
more self-disclosure is forthcoming in a warm and intimate room than in
a cold and impersonal one. Therefore, voir dire could be improved by
removing it from the courtroom and into the judge's chambers or into
some other room especially designed for the voir dire of prospective
jurors.

## RECOMMENDATIONS FOR THE LEGAL SYSTEM

The courtroom functions as a public forum in which society deter-
mines the civil and criminal liabilities of its members through the use of
an adversarial system. The structure of the courtroom and the pro-
cedures which are used in the courtroom setting have evolved to fur-
ther that function. Although voir dire is nominally a part of the adver-
sary system, it should be conceptualized as a separate part of the trial
process. Since the purpose of voir dire is to obtain information from pro-
spective jurors regarding their qualifications and attitudes toward
issues in the case at hand, it can best be conceptualized as a self-dis-
closure type of interview. The research which has been reviewed above
demonstrates that self-disclosure is markedly affected by situational fac-
tors. Thus, the voir dire situation needs to be tailored to facilitate self-
disclosure. Present voir dire practices are not designed to encourage
self-disclosure and indeed seem almost intended to discourage open,
honest self-revelation.

There are several specific recommendations for revising the pro-
cedures used in conducting voir dire which could encourage self-
disclosure among prospective jurors. First, emphasis should be placed
on individual rather than group or individual-within-a-group question-
ing. Second, questioning should be conducted by attorneys rather than
by the judge. Third, the interviewer should conduct the interview from
a distance of three to six feet from the jurors. Fourth, the questioning
should take place in a smaller room than is traditionally employed, but
should not result in crowding. And finally, the room where voir dire
takes place should have a warmer and more intimate atmosphere than
that of the cold, hard, ritualistic settings where it is presently con-
ducted. Essentially, these recommendations urge the legal system to
de-emphasize the adversarial approach to voir dire and to transform it
into a more relaxed proceeding where free and open self-disclosure can
take place.

---

[96] *Id.*

Once voir dire is moved to a more open setting, there are four other recommendations derived from the psychological literature which could be employed to facilitate disclosure. First, positive reinforcement should be given to the juror when he makes self-disclosing statements. Second, the interviewer should make self-disclosing statements about himself to the prospective juror. Third, a model of self-disclosure should be offered to the juror prior to the voir dire. And finally, jurors should be instructed to disclose information about themselves.

The first of these recommendations, the giving of positive reinforcements to increase self-disclosing statements by the juror, was mentioned previously in dealing with the issue of who should conduct voir dire. These reinforcements could take the form of verbal praise or nonverbal indicators of interest, such as increased eye contact, direct body orientation, relaxed posture, head-nodding and mm-hmming.

The second recommendation, that the interviewer disclose himself to the prospective juror during the voir dire, is based upon a considerable body of research indicating that interviewer disclosure appears to facilitate self-disclosure in interviewees.[97] There are three theoretical explanations for this phenomenon. One explanation is that the interviewer's example of self-disclosure tends to lessen the interviewee's inhibitions concerning self-disclosure.[98] In addition, there is evidence indicating that the phenomenon might be the result of the modeling aspect of the situation.[99] In other words, the interviewees use the interviewer's behavior as a discriminative cue to guide their own behavior. Finally, the phenomenon may be viewed as a social exchange process in which the disclosures follow a norm of reciprocity.[100] Whatever the cor-

---

[97] Davis & Skinner, *Reciprocity of Self Disclosure in Interviews: Modeling or Social Exchange?*, 29 J. PERSONALITY & SOC. PSYCH. 779, 779 (1974). There is, however, other research indicating that when subjects view interviewer self-disclosure as inappropriate to the interviewer's role, they may actually withdraw and disclose less of themselves when confronted by the interviewer's disclosures. *See* Derlega, Lovell & Chaikin, *Effects of Therapist Disclosure and Its Perceived Appropriateness on Client Self-Disclosure*, 44 J. CONSULTING & CLINICAL PSYCH. 866 (1976). Further research needs to be done to determine which interviewee personality variables are associated with this phenomenon. Empirical research is also needed to determine whether most prospective jurors would view voir dire as an inappropriate social situation for interviewer self-disclosures thereby rendering this strategy of generating juror self-disclosure untenable.

[98] *See* A. BANDURA, PRINCIPLES OF BEHAVIOR MODIFICATION 192-96 (1969). There is, however, some data indicating that interviewees maintain elevated levels of self-disclosure only if the interviewer also continues to disclose, *see* Davis & Sloan, *The Basis of Interviewee Matching of Interviewer Self-Disclosure*, 13 BRIT. J. SOC. & CLINICAL PSYCH. 359 (1974), thus militating against this disinhibitory theory.

[99] *See* Marlatt, *Exposure to a Model and Task Ambiguity as Determinants of Verbal Behavior in an Interview*, 36 J. CONSULTING & CLINICAL PSYCH. 268 (1971). However, there is also evidence indicating that interviewees do not model the content of interviewers' disclosures. *See* Davis & Sloan, *supra* note 98. This tends to negate the modeling theory.

[100] *See* Worthy, Gary & Kahn, *supra* note 47, at 59-60.

rect explanation,[101] the principle of interviewer disclosure can get out of hand. For example, one study finds that an intermediate level of interviewer self-disclosure, such as four disclosures during a thirty minute interview as opposed to none or twelve, leads to greater self-disclosure by the interviewees.[102] Thus, if the interviewer makes too many self-disclosures, the results may be counter-productive. This finding has an implication for the decision whether to question prospective jurors individually or within the group context. If individuals are questioned with the entire group present, the attorney may not be able to safely employ the self-disclosure technique since he may have overexposed himself. Thus, interviewer self-disclosure should only be employed in conjunction with a truly individual voir dire. The type of disclosure made by the interviewer also needs to be considered. Interviewees respond more to a warm therapist making demographic·disclosures than to a warm therapist making personal disclosures.[103] Thus, the voir dire interviewers should not disclose information which is too personal. It is doubtful that the parties involved in voir dire would consider personal disclosures appropriate on the part of the judge or attorney anyway.

It is also recommended that a model of self-disclosure be provided to prospective jurors prior to the voir dire. In a study in which the subjects witnessed an interview of a self-disclosing stooge and were then asked how much they would be willing to disclose in the interview, it was discovered that subjects exposed to high disclosing stooges are significantly more willing to disclose information about themselves than are those exposed to low disclosing stooges.[104] There was no interaction between the interviewer and the subject or between the stooge and the subject, so that willingness to disclose in this instance must be a function of modeling rather than of a social exchange process. In addition, another study demonstrates that a model for self-disclosure on videotape can increase subject self-disclosure in subsequent interactions.[105] In some jurisdictions, prospective jurors are exposed to movies which attempt to explain the functions of the trial and the role of the juror in a trial. These movies could be adapted to include a segment showing a voir dire in which prospective jurors are highly disclosing. Based on the

---

[101] It seems that self-disclosure follows a norm of reciprocity, *see* notes 97-98 *supra*, and that, therefore, self-disclosure on the part of the interviewer on a fairly continuous basis throughout voir dire would facilitate self-disclosure on the part of the prospective jurors.

[102] *See* Mann & Murphy, *Timing of Self-Disclosure, Reciprocity of Self-Disclosure, and Reactions to an Initial Interview*, 22 J. COUNSELING PSYCH. 304 (1975).

[103] Simonson, *The Impact of Therapist Disclosure on Patient Disclosure*, 23 J. COUNSELING PSYCH. 3 (1976).

[104] *See* Thase & Page, *Modeling of Self-Disclosure in Laboratory and Nonlaboratory Interview Settings*, 24 J. COUNSELING PSYCH. 35 (1977).

[105] *See* Annis & Perry, *Self-Disclosure Modeling in Same-Sex and Mixed-Sex Unsupervised Groups*, 24 J. COUNSELING PSYCH. 370 (1977).

research findings described above, this should lead to increased self-disclosure in the real voir dire.

The final recommendation for altering voir dire procedures is that the jurors be instructed to disclose information about themselves. Two studies demonstrate that descriptive instructions by themselves will significantly increase subject self-disclosure in interviews.[106] Although such instructions are sometimes given, they are frequently mentioned almost as an afterthought or in an offhand manner. The research indicates that self-disclosing instructions should always be given and emphasized prior to voir dire.

## CONCLUSION

The voir dire is an important part of the trial process in which the constitutional right to an impartial jury is at stake. In order to protect that right, it is essential that attorneys obtain as much information about prospective jurors as possible so that they may challenge for cause those who are biased or prejudiced as a matter of law. Juror self-disclosure will also allow the attorney to protect his client's legal interests by permitting him to exercise his peremptory challenges on the basis of solid information rather than on speculation and guesswork. Unfortunately, current voir dire practices are not conducive to promoting juror self-disclosure. Thus, in order to further the goals of voir dire, research from the social sciences on the subject of self-disclosure interviews, should be implemented to change current voir dire practices and increase self-disclosure.

---

[106] *See* McGuire, Thelen & Amolsch, *Interview Self-Disclosure as a Function of Length of Modeling and Descriptive Instructions,* 43 J. CONSULTING & CLINICAL PSYCH. 356 (1975); Stone & Gotlib, *Effect of Instructions and Modeling on Self-Disclosure,* 22 J. COUNSELING PSYCH. 288 (1975).