*Journal of Criminal Justice* Vol. 19, pp. 451–462 (1991)
All rights reserved. Printed in U.S.A.

0047-2352/91 $3.00 + .00
Copyright ©1991 Pergamon Press plc

# JUROR HONESTY DURING THE VOIR DIRE

RICHARD SELTZER

Department of Political Science
Howard University
Washington, D.C. 20059

MARK A. VENUTI

Geneva, New York

GRACE M. LOPES

D.C. Prisoners' Legal Services Project, Inc.
Washington, D.C. 20036

## ABSTRACT

*The voir dires of thirty-one criminal trials were observed, and 190 of the jurors subsequently were interviewed. Many of the same questions asked during the voir dire were asked in the individual interviews. Approximately 25 percent of the jurors said during the interview that they (or a family member) had been a victim of a crime, but these jurors had not come forward when this question was asked during the voir dire. Similarly, almost 30 percent of the jurors who were interviewed said during the interview that they knew a law enforcement officer, but these jurors had not come forward during the voir dire.*

## INTRODUCTION

In theory, trial by jury in the United States means a trial by disinterested and unbiased members of the litigant's community.[1] Therefore, jury trials customarily begin with the voir dire, the process in which jurors are asked questions by the presiding judge or the lawyers for the parties in an attempt to discover biases or prejudices which can be used to disqualify them or used as a basis for peremptory challenges. Although "voir dire" literally means "to speak the truth," there has been considerable research into and debate

**Exhibit 4**                                      451

over the extent to which, and the optimum conditions under which, speaking the truth takes place.

This issue, the extent to which jurors give accurate answers to questions posed during voir dire, affects the integrity of the trial process because judges and lawyers rely on these answers in deciding which individuals will comprise the jury. Although the value of particular voir dire answers for making decisions about the biases or prejudices of individuals may be debatable, the issue of juror honesty is relevant and worthy of examination because decisionmakers do rely upon these answers.

This article surveys the literature and then reports on an empirical study of actual jurors. The study adds weight to the belief that jurors, at least in voir dires similar to those examined in this study, which were relatively brief and conducted in open court, are significantly prone to withhold information.

## REVIEW OF THE LITERATURE

There has been substantial debate over voir dire practices.[2] Some argue that the voir dire in most courts is too perfunctory and that juror biases therefore will not be uncovered. These critics claim that when voir dire is conducted by the judge and is nonsequestered, jurors will not be forthcoming in their responses. Others state that the voir dire is too time consuming.[3] They argue that many attorneys use the voir dire to advance their cases rather than to ask questions to detect juror bias.

Many commentators have called for expanding voir dire. Fahringer (1980) and Bush (1976) found that in the single trials they investigated a large percentage of jurors lied during the voir dire. Fahringer found that whereas 71 percent of the jurors had a fixed opinion as to guilt, only 15 percent admitted during the voir dire that they had a predisposition. Bush found that one-third of the veniremen in the Camden 28 trial lied under oath. Both authors have called for greater participation by attorneys in the voir dire. Although these two studies based their conclusions upon only one trial each, other researchers have based their conclusions upon no original investigation at all (Suggs and Sales, 1981–1982; Van Dyke, 1976).

There have been only a few empirical studies of voir dire. The studies using mock jurors have been somewhat unrealistic. Jones (1985; 1987), in a study of 116 jury eligible subjects, had these subjects fill out a series of questionnaires. Later, during the mock voir dire, many of these same questions were asked again. She manipulated whether the person asking the questions was the judge or an attorney and whether the questions were asked in a "formal" or "informal" (folksy) manner. Jones concluded that jurors were more honest under attorney-conducted voir dire than under judge-conducted voir dire. She also concluded that judges were unable to increase disclosure when they used a less formal (more folksy) approach. She attributed these findings to the fact that her subjects liked the attorney better than the judge (regardless of question-asking manner) and that they tried to report what they believed the judge wanted to hear. However, her simulation deviated considerably from normal practices in actual voir dires. In particular, judges do not interrupt trials to give jurors 125-item questionnaires, nor do attorneys or judges ask voir dire questions using 9-point attitudinal scales. In addition, the time interval between when the jurors filled out the questionnaires and when the same questions were asked in court appeared to be under half an hour.

Some investigators have examined actual voir dires. Balch et al. (1976) did a content analysis of three voir dires. They concluded that voir dire was not entirely true to its name—speak the truth. Only 41 percent of the statements made during the voir dire were made by the jurors and 63 percent of their statements consisted of one word: yes or no. Balch et al. found that voir dire was more of a rite of passage than a way to obtain information about the jurors.

Broeder asked 225 jurors about the voir dire process in the early 1960s. He found that

> Voir dire was grossly ineffective not only in weeding out "unfavorable" jurors but even in

eliciting the data which would have shown particular jurors as very likely to prove "unfavorable." (1965:505)

He surmised that the voir dire was viewed with disdain by many judges and attorneys. In addition, many jurors lied during the voir dire. Although he provided many useful anecdotes, he did not subject his interviews to any numerical analysis.

Linda Marshall (1983) obtained questionnaires from 277 ex-jurors in two counties in Illinois. She found that 18 percent of the jurors admitted to withholding information during the voir dire. Jurors who were excused were often willing to slant their answers in order to get excused from jury duty. Some jurors who served on a case slanted their answers so they would not be excused. She did not find any consistent patterns relating self-disclosure to whether the voir dire was conducted by the judge or by the attorneys. Unfortunately, she did not observe any of the voir dires.

The importance of the voir dire was assessed empirically by Zeisel and Diamond (1978). In twelve separate trials in United States District Court in Northern Illinois, they had three sets of jurors observe the trials: the jurors who served on those cases, the jurors who were peremptorily excused, and jurors chosen at random from the venire. The subjects later filled out a questionnaire. After modelling the data based upon work by Kalven and Zeisel (1966), Zeisel and Diamond found that use of peremptory challenges could have affected the outcome of between five and eight cases. They concluded that most attorneys did not use their challenges effectively.

In an attempt to expand and round out the research in this area, the present study, although not without its own limitations, involved observations of actual trials and post-trial interviews with actual jurors. Experimental data can be problematic because of unrealistic settings, unrepresentative samples, and the fact that subjects know they are not sitting on an actual trial.[4] Interviews with actual jurors present a unique set of problems: (1) response rates are likely to be lower; (2) delay between the time of the trial and the interview may affect recall, and it is awkward to ask about behavior or attitudes held prior to jury selection; (3) different juries might react to different stimuli, and it is difficult to determine how that affects response distributions; (4) it is virtually impossible to have a random sample of jury trials; (5) by interviewing only actual jurors, one selects out jurors who have been excused; and (6) combining jurors who sit on a variety of cases into one sample might be construed as combining apples and oranges. Despite these serious limitations, interviews with real jurors can complement experimental research and potentially uncover issues that would remain hidden in experimental research.

## METHODOLOGY

Interviews were conducted with 190 jurors, who sat on a total of thirty-one cases. The researchers observed the entire cases the jurors sat on and conducted post-trial interviews with them after the verdicts were returned. Data collection was done in two stages. In the first stage (June 1984–May 1985), interns from the Public Defender Service of Washington, D.C. were used to observe the trials and to interview the jurors. In the second stage (July 1986–July 1987), outside funding was obtained and used to pay professional interviewers.[5]

### Courtroom Observations

Interns from the Public Defender Service of Washington, D.C. observed felony and misdemeanor jury trials in the Superior Court of the District of Columbia. A large variety of cases was observed. The defendants in these cases were charged with the following types of offenses: sexual assault (3 cases), possession and/or distribution of drugs (9), assault (5), armed robbery (6), receiving stolen goods (1), murder (4), theft (1), and possession of a dangerous weapon (2). Interns observed these trials from the beginning of jury selection until the verdict was announced. They

Case 4:18-cv-04229 Document 162-4 Filed on 07/01/21 in TXSD Page 3 of 12

used standardized observation forms to take detailed notes on the trials.

The trial observations were conducted with the permission of the Chief Judge of the Superior Court of the District of Columbia. However, administrative court personnel were unwilling to provide the researchers with information about trial scheduling. The only practical solution to this problem was to station interns outside the jury waiting room. Interns followed the panels as they moved to the courtrooms. Once an intern ascertained that the case was a criminal trial that was not expected to last over two weeks, the case was selected for observation.[6] This method was used for the majority of cases. In other situations, interns observed trials after learning about them through the "grapevine." Thirty-one of the trials that were observed are analyzed in this article. An additional twenty trials that were observed are not analyzed because of difficulties encountered with the post-trial interviews.[7] The trials subject to analysis were equally divided in terms of the final verdict (acquittals versus convictions).

*Juror Interviews*

Only jurors who actually sat on the cases observed were interviewed. At the request of the court, juror interviews did not begin until three weeks after the juror's term of duty was completed. Almost all interviews were completed within three months of the trial date. The investigators are aware that recall after an extended period of time may be poor. However, based upon discussion of the issue with the interviewers and review of the responses to the open-ended questions, it appears that only a few of the interviews reflect inadequate juror recollection. We assume the reason for this was that jury duty was a major incident in each juror's life.

Difficulties arose in scheduling the post-trial interviews. A letter was sent to each juror who had an identifiable address. The letter explained the purpose of the study and indicated that the juror's cooperation would be sought. However, addresses could not be found for 9 percent of the jurors, and it was not possible to interview these jurors. Sixty percent of the jurors did not have listed home telephone numbers or work telephone numbers that the researchers were able to obtain.[8] The interviewers drove to the homes of these jurors in an effort to schedule the post-trial interviews. The research staff attempted to make a minimum of five drive-bys or telephone calls to all jurors. However, the staff was unable to contact an additional 28 percent of the jurors.[9] Refusals were less of a problem than the difficulties in contacting the jurors. Only 12 percent of the jurors refused to participate in the study. In sum, the staff was able to interview 51 percent (190) of the 372 jurors selected for the study.[10] Of the jurors who were interviewed, 32 percent were women; 42 percent were under the age of 40; 78 percent were Black; and 26.7 percent were college graduates. The researchers were unable to obtain any data from the court that could be used to compare these percentages with demographic information on those who actually served jury duty or were eligible for jury duty.[11]

During the courtroom observations the observers wrote down the text of all voir dire questions and the identification numbers of the jurors who responded. However, if jurors did respond to a question and the staff was unable to ascertain their juror identification numbers,[12] all jurors in that case were coded as "maybe" responding to that question. Later, these results were matched with the respondents. For each question asked during the voir dire, jurors were coded as coming forward, not coming forward, or "maybe" coming forward.

In the interviews, jurors were asked a series of questions that paralleled questions asked of the jurors during the voir dire. These data were used to determine whether jurors should have responded to particular questions during the voir dire. There were two common questions asked during voir dire, which were used in the questionnaire in this study: Had the juror, juror's family, or juror's friend ever been a victim of crime? and Did the juror know any police officers?[13] Judges and lawyers use varying criteria when deciding to strike a juror based on responses to voir dire questions; affirmative answers to the two questions

analyzed here does not guarantee that a juror will be disqualified.

## THE VOIR DIRE PROCESS

There were some common elements to the thirty-one voir dires observed in this study. Questions were asked of the jurors in open court. Jurors usually identified themselves by raising their hands. In most circumstances, some follow-up questions were also asked in open court. However, for some questions, jurors were asked to approach the bench for the follow-up questions. In all cases, if jurors identified themselves as crime victims, they were asked to approach the bench.

Twenty-nine percent of the voir dires lasted an hour or less. Only 13 percent of the voir dires lasted over two hours. In four cases, only six questions were asked. The judge was the only person asking questions in 63 percent of the cases. In only one case did the judge leave the voir dire entirely in the hands of the attorneys. The process of exercising peremptory strikes appeared hurried. In 65 percent of the cases, attorneys were given five minutes or less between the end of the voir dire and the exercising of peremptory strikes.

The research staff asked jurors several yes–no questions about the voir dire. Only 8 percent of the jurors believed that "some of the questions were too personal." In a follow-up question, half of these jurors identified the crime victimization question as being too personal. Only 5 percent of the jurors said they "[felt] uncomfortable answering all these questions in front of so many other jurors." However, 9 percent of the jurors responded affirmatively to the following question: "If you could have spoken to the judge—one-on-one—are there some things you would have wanted to tell him/her during this questioning about yourself?" There was a clear sentiment among some jurors that the voir dire was too perfunctory. Twenty percent of the jurors interviewed responded affirmatively to the question, "After getting to know the other jurors in this case and hearing their opinions, are there additional questions you think the judge should have asked you or the other jurors?" Two percent of the jurors volunteered the statement that jurors had lied during the voir dire.

### Crime Victims

The manner in which judges or attorneys asked about experiences with crime differed from case to case. In most situations the voir dire question read as follows, "Have you, any of your close relatives, or friends ever been a victim, or a witness to, or charged with, a crime?" In some situations a time frame of the last three or five years was incorporated into the question. In other situations the question might have left out the reference to friends or relatives.

In the post-trial interviews for the present study, jurors were asked the following question, "have you or any of your close family members or friends ever been a victim of a crime?" The percentage responding affirmatively was 46.2. Those who did so were then asked who had been the victim, when the crime had occurred, and what type of crime it had been. Therefore, it was possible to match the interview question with the question asked during the voir dire.[14]

Of the 928 potential jurors who were asked this question during the voir dire, approximately one-quarter responded affirmatively.[15] The research staff was able to determine that 158 of the 190 jurors interviewed in this study had been asked some variant of this question. Of the jurors interviewed, 8.9 percent had come forward during the voir dire in response to this question. Apparently, many of the potential jurors who responded affirmatively to this question were excused for cause or with peremptory challenges. However, 24.7 percent of the jurors who said during the post-trial interview that they or members of their families had been crime victims had not come forward on this issue during the voir dire.

There are several possible explanations. First, it is possible that some jurors, members of their families, or their friends became victims of crime between the time of the trial and the time of the interview. The Bureau of Justice Statistics in a recent survey of criminal victimization in the District of Columbia

Case 4:18-cv-04229  Document 162-4  Filed on 07/01/21 in TXSD  Page 5 of 12

(Cox and Collins; 1985) found that, over the course of a year, 7.4 percent of residents were victimized by a violent crime and 15.9 percent by a nonviolent crime. Assuming that ratios similar to these hold for jurors, it is unlikely that many of the jurors were victimized in the average two-month period between the time of jury service and the time of the interview.

A second possibility is that although both the post-trial interview question and the question typically asked by the courts referred to any crime, jurors may not have responded during the voir dire if they believed the crime was not serious but may have responded during the post-trial interviews. However, the proportion of jurors who came forward during the voir dire and said in the post-trial interview that the crime they referred to was a nonviolent crime was the same as the proportion of jurors who did not come forward during the voir dire but said during the interview that they were victims of nonviolent crime.

A third possibility is that jurors were less likely in the voir dire compared to the interview situation to remember situations when family members or friends were victims of crime. However, when data from only those jurors who personally had been victims of crime were examined, 52 percent who should have come forward during voir dire had not.

A fourth possibility is that jurors might have been interpreting the voir dire question as, "Have you been a victim of a crime that would affect your judgment in this case?" The different contexts in which the question was asked and hence interpreted could affect the response distribution.

Another explanation is that jurors were not telling the truth during the voir dire. One factor that may partly account for this is that jurors dislike responding to this question in open court. It is also likely that they recognize (as discussd above) that jurors who respond affirmatively to this question have less chance of being chosen for jury duty. Jurors also may be more willing to mention experience with crime in an informal interview compared to a formal courtroom, where the person asking the question appears as an authority figure.

If the reason for the discrepancy is that jurors misinterpret the question or lie, the parties to the case are not obtaining the information required to seek or decide challenges for cause or to exercise peremptory challenges intelligently.

## Knowledge of Police Officers

There were different variants of the way jurors were asked during voir dire about friends or relatives who were police officers. The most inclusive phrasing was, "Do you, any of your relatives, or any of your close friends work for the police, FBI, or any other type of law enforcement agency?" In some situations the question was limited to working for the police. In other situations jurors were not asked about friends or relatives. Of the 790 jurors who were asked some variant of this question, 16.3 percent responded affirmatively during the voir dire.

In the post-trial interview jurors were asked, "Are any of your close friends or relatives currently employed in law enforcement occupations?" If they responded yes, they were asked how many friends and relatives had worked in a law enforcement occupation. Jurors also were asked if they had "ever been employed in a law enforcement occupation?" Of the jurors interviewed, 23.8 percent had friends who worked in law enforcement, 21.9 percent had relatives who worked in law enforcement, and 11.4 percent had once worked in law enforcement themselves (in all, 38.4 percent of the jurors responded affirmatively to at least one of these three questions). The research staff was able to match up the way the court asked this question with the way it was asked in the post-trial interview. Of the jurors interviewed, 7.9 percent had come forward during the voir dire in response to this question,[16] but an additional 29.6 percent should have come forward and had not.

In sum, 39 percent of the jurors interviewed in this study should have come forward in response either to the questions regarding crime victimization or the questions regarding knowledge of police officers but did not.[17] For the remainder of this article, jurors who did not come forward in response to one or both of these questions, but should have,

Case 4:18-cv-04229  Document 162-4  Filed on 07/01/21 in TXSD  Page 6 of 12

are termed "inconsistent jurors." The degree of inconsistency among the entire venire is probably less than the 39-percent figure given above. As previously pointed out, jurors who do come forward are disproportionately excused.

Inconsistent jurors create two different serious problems. First, to the extent that inconsistent jurors succeed in concealing bias or prejudice that would have led to disqualification, their presence on juries at the least potentially undermines the justice system's goal of trial by disinterested peers; at the worst, such jurors may vote based on their hidden predilections instead of the evidence, with injustice the result.

Second, inconsistent jurors, when discovered, can create additional litigation or at least undermine confidence in the justice system. The recent trial of Colonel Oliver North of the Iran–Contra scandal is a case in point. North's attorneys discovered after the trial that one of the jurors falsely answered "no" to the question, "Have you or any member of your immediate family ever been involved as a party to or appeared as a witness in any court proceeding (civil or criminal) or in any investigation by a federal or state authority or by an official legislative body or agency?" The juror's large family had significant prior involvement with criminal and civil proceedings and investigations, and the juror had testified before a grand jury concerning a brother two years prior to the North trial. This discovery led to a motion for a mistrial by North, and it surely also will be an issue on appeal.

## ATTITUDINAL NONRESPONSE

This study has shown that there is a serious problem of nonresponse by jurors during the voir dire to factual questions about the jurors' backgrounds. It also examined the way jurors responded to attitudinal questions. During the voir dires, four attitudinal questions were asked, which were then asked in a parallel manner during the post-trial interviews. These four questions concerned: (1) whether jurors would believe that a defendant was guilty, based on a previous conviction of the defendant [137];[18] (2) whether jurors had problems applying the standard of reasonable doubt [212]; (3) whether jurors believed that the defendant has the burden of proof or should not be presumed innocent [235]; and (4) whether defendants who did not testify should be considered guilty [172]. Not a single juror, either among those interviewed post-trial or those who were members of the venires, came forward in court in response to any of these questions.

Questions asked in the post-trial interviews that parallel the thrust of these voir dire questions and percentages of affirmative responses are displayed in Table 1. As is clearly illustrated, some jurors should have responded to the four types of voir dire questions mentioned above. However, caution is warranted in interpreting these results because the post-trial interview questions were not asked exactly the same way as the questions asked by the court. Nevertheless, it is clear that jurors do not generally respond to attitudinal questions during the voir dire.

## CHARACTERISTICS OF THOSE WHO DID NOT COME FORWARD

The investigators also were interested in determining whether some demographic subgroups were more likely than others to be inconsistent jurors. As discussed above, Marshall (1983) examined some of these questions in her study of voir dires in Illinois. In the discussion below, her findings are compared with those of the present study.

No effect was found in the present study for the following variables: whether the juror had previously served jury duty; if the juror said he/she was looking forward to jury duty; how favorable the juror said the term of jury service was; age; education; employment status; occupation; where the juror was born; whether the juror worked in a supervisory capacity; income; religion; marital status; whether the juror had children; whether the juror had ever been in the army; how often the juror read a daily newspaper or watched

Case 4:18-cv-04229   Document 162-4   Filed on 07/01/21 in TXSD   Page 7 of 12

TABLE 1

JUROR RESPONSE TO ATTITUDINAL QUESTIONS

| Item | Percent Responding Affirmatively |
|---|---|
| 1. When the defendant does not testify in his or her own behalf: | |
| a. he or she loses the presumption of innocence | 6.4 |
| b. he or she may be considered guilty of the offense | 7.0 |
| c. he or she is exercising a right to remain silent | 85.6 |
| d. other incorrect answer given | 1.0 |
| 2. Pretend that you are called as a juror in future criminal cases. I'm going to read to you a list of legal principles that people have different opinions about. I would like to know how you would apply them in these cases. Would you apply them in all cases, in most cases, in some cases, or in no cases? The defense does not present any witnesses at trial, and only cross-examines the government witnesses, the defendant is probably guilty. | |
| a. all cases | 3.4 |
| b. most cases | 10.1 |
| c. some cases | 44.9 |
| d. no cases | 35.4 |
| e. no opinion | 6.2 |
| 3. [Asked in cases where defendant did not testify] What did you think of the fact that the defendant did not testify? How did that affect your verdict? | |
| a. had effect | 19.2 |
| b. had some effect | 11.5 |
| c. had no effect | 69.2 |
| 4. Pretend that you are called as a juror in future criminal cases. I'm going to read to you a list of legal principles that people have different opinions about. I would like to know how you would apply them in these cases. Would you apply them in all cases, in most cases, in some cases, or in no cases? If a defendant testifies at the trial, he has to prove he is innocent. | |
| a. all cases | 21.7 |
| b. most cases | 12.2 |
| c. some cases | 13.3 |
| d. no cases | 49.4 |
| e. no opinion | 3.3 |
| 5. The effect of a "not guilty" plea is: | |
| a. to require the state to prove a majority of the elements of the crime beyond a reasonable doubt | 24.7 |
| b. to require the state to prove each element of the crime beyond a reasonable doubt | 64.5 |
| c. to require that the defendant present evidence proving his or her innocence | 10.2 |
| d. other incorrect answer given | 0.5 |

TABLE 1 (continued)

| Item | Percent Responding Affirmatively |
|---|---|
| 6. When a trial begins, you should presume that the probability that the defendant committed the crime is about: | |
| a. 75% | 3.2 |
| b. 50% | 14.0 |
| c. 25% | 5.4 |
| d. 0% | 77.4 |
| 7. Evidence that a defendant was previously convicted of a crime should be considered: | |
| a. only in relation to the issue of guilt or innocence | 16.8 |
| b. only if it is a past crime of similar nature to the one presently being charged | 25.9 |
| c. only in relation to the truthfulness or untruthfulness of the defendant's testimony | 51.4 |
| d. other incorrect answer given | 2.7 |
| e. don't know | 3.2 |
| 8. [only asked if juror sat on case where defendant had prior record which came out] The defendant had a prior conviction for ———————. How did that affect how you viewed this case? | |
| a. had effect | 15.3 |
| b. had some effect | 2.1 |
| c. had no effect | 78.0 |

the daily news; and whether the juror had ever studied law.[19]

Jurors who said they had no opinion about how happy they were to be chosen for jury duty were more likely (marginally significant) to be inconsistent jurors on the crime victimization question than jurors who expressed either satisfaction or dissatisfaction (42 percent v. 20 percent; $X^2 = 5.5, 2; p = .06$). This is somewhat surprising. It had been expected that jurors who were happy about being chosen would have been more likely to be inconsistent jurors. However, in retrospect, it makes some sense that jurors who were unresponsive to the post-trial interview question would also have been unresponsive during the voir dire.

Males were more likely than females to be inconsistent jurors on the "knowledge of police officers" question (45 percent v. 23 percent; $X^2 = 7.4, 1; p = .007$). This finding is in accord with those of Marshall (1983:109), who also found female jurors to be somewhat more honest than males. Jones, however, found that female jurors were more likely than males to change their answers during the voir dire (1985:90). Blacks were more likely than whites to be inconsistent jurors on the knowledge of police officers (34 percent v. 10 percent; $X^2 = 2 = 6.4, 1; p = .01$). Marshall (1983) did not test for racial variables in her study. Jurors who attended church once a month or more frequently were more likely than other jurors to be inconsistent jurors with respect to knowledge of police officers (37 percent v. 17 percent; $X^2 = 6.9, 2; p = .03$). However, this difference disappeared after race was controlled for in a logit model ($L^2 = 3.50, 2$). Marshall did not test for religion variables in her study.

The present study also examined whether or not certain characteristics of the case or the voir dire process could have affected jurors' truthfulness during the voir dire. It examined the type of charge, the number of charges, the length of the voir dire, the

number of questions asked during the voir dire, and who asked these questions. Jurors appeared to be much more consistent if the defendant was charged with a more serious crime (see Table 2) such as murder or sexual assault. However, jurors were not particularly consistent in armed robbery cases. Nevertheless, in more serious cases jurors may have been more honest (or may have been attempting to avoid service) because of the gravity of the offense. It is also possible that the judge and attorneys may have been asking the voir dire questions in a less perfunctory style during more serious cases.

No statistically significant differences were found based upon the number of charges against the defendant, who asked the questions during the voir dire, or the number of voir dire questions that were asked. Given the previous research, it was particularly surprising that who asked the voir dire questions had no effect upon whether jurors were consistent or not.

Finally, the study examined whether or not there was a difference between the verdicts rendered by those jurors who were inconsistent during the voir dire and those rendered by the other jurors. In the post-trial interviews, jurors were asked, "When you first walked into the jury room to begin deliberations, did you believe the defendant was guilty or not guilty of _____. There was no significant relationship between responses to this question or post-deliberation verdict and whether or not the juror was inconsistent during the voir dire.

## CONCLUSION

This study supports previous studies on the voir dire process, which have found, to a significant degree, that jurors withhold information or lie during voir dire. As pointed out earlier, this poses serious problems and has led to calls for reform of the voir dire process in the hope of at least reducing the amount of withheld information or lying.

Most of the voir dires in this study were brief and perfunctory. It seems likely that some information was withheld because the questions were confusing or because little time was given for reflection after they were asked; other likely possibilities are that jurors seek to avoid embarrassment or, for myriad reasons, to qualify for or avoid service. Nevertheless, we caution readers against over-interpreting our findings, given the problems with data collection discussed throughout this article.

Thus, it is likely that more extensive voir dire or techniques such as pre-voir dire questionnaires or sequestering jurors for sensitive questions should lead to more truthful responses. However, institutional or large-scale reform faces legal doctrine that, although recognizing the fundamental right to voir dire, leaves the actual process within the province of the individual trial judge.[20] The answer lies, at least in part, with continued research into this area and efforts to educate lawyers and judges about the problems with voir dire and the need to be creative and open-minded about solutions. With such efforts the voir dire process should evolve into one that better

TABLE 2

NONRESPONSE OF JURORS BY CHARGE

| Charge | Nonresponse Crime Victim | Nonresponse Know Police | N of Juries |
|---|---|---|---|
| sexual assault | 0.0% | 16.7% | 3 |
| drug and/or guns | 21.0 | 21.1 | 11 |
| assault | 33.3 | 46.7 | 5 |
| armed robbery | 41.7 | 28.0 | 6 |
| theft, receiving stolen goods | 50.0 | 66.7 | 2 |
| murder | 0.0 | 10.0 | 4 |

$X^2 = 19.4, 5; p = .002$   $X^2 = 17.4, 5; p = .004$.
Some charges were collapsed in order to meet basic statistical assumptions.

safeguards the fundamental rights underpinning it.

## ACKNOWLEDGMENTS

We wish to thank the Faculty Resource Program in the Social Sciences, Humanities, and Education of Howard University and the Public Defender Service of the District of Columbia for their generous assistance.

## NOTES

1. The Sixth Amendment to the United States Constitution entitles the accused in a criminal prosecution "to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . ." The right to an impartial jury also emanates from the due-process clauses of the Fifth and Fourteenth Amendments. See *Turner* v. *Murray*, 476 U.S. 28, 36 n.9 (1986); *Ham* v. *South Carolina*, 409 U.S. 524 (1973). The due-process clause ensures certain "essential demands of fairness," such as unbiased jurors.

2. The classic debate on the issue of judge- versus attorney-conducted voir dire is found in a special issue of *Judicature*, in articles by Stanley (1977) and Begam (1977).

3. For an empirical analysis of the time it takes to conduct the voir dire, see Levitt, Nelson, Ball, and Chernick (1971) and Bermant (1978).

4. Many mock jury studies have been competently conducted. See, e.g., Hastie, Penrod, and Pennington (1983). For a critique of mock jury studies see Bermant, McGuire, McKinley, and Salo (1974–1975).

5. In general, there were few significant differences in the item-response distributions for the two types of interviewers after other salient differences were controlled for. In particular, more drug cases were observed in the second stage of the study. After controlling for this difference (using logit models), the differences which were found disappeared.

6. Interns usually could find out how long a trial was likely to last by asking court personnel. We did not examine longer trials (only a few cases lasted over two weeks) because we believed that in longer trials judges would be more willing to grant hardship excuses and this might skew how jurors responded to voir dire questions. We certainly make no claims as to having a random sample of cases.

7. In most instances we were unable to locate master jury lists with addresses, and in other instances we were unable to interview more than five jurors from a trial. We used five successful interviews as a cutoff point because it became clear after we read through many of the interviews that this was the minimum number of interviews that had to be completed if we were to understand the jury dynamics.

8. Many of the jurors worked at places where it was impossible to track down the juror (e.g., large government agencies). C&P Telephone Company informed us that approximately 35–40 percent of the telephone numbers in the District of Columbia are unlisted. The fact that the percentage of jurors in this study who did not have listed numbers was somewhat higher than this indicates that some of these jurors were relatively poor. This should come as no surprise. We have found in other research that upper-income citizens are more apt to try to avoid jury duty because of their job responsibilities.

9. We believe that perhaps as many as half of the jurors who could not be contacted no longer lived at the address given on the master jury lists. Washington, D.C. has a highly transient population. In the most recent *Annual Housing Survey* it was found that 15.0 percent of the populace had moved within the previous twelve months (U.S. Bureau of the Census, 1984: Table B1). To complicate matters further, some jurors moved prior to serving jury duty and appeared because their mail had been forwarded. Finally, in other research we conducted, we found that 16.7 percent of jurors who were qualified were unemployed (compared to 6.2 percent of the general population of the District of Columbia). Unemployed people are more likely to move than employed people.

10. Unfortunately, the firm that was hired for the second stage of interviewing lost almost all the records on the interviewing process. Therefore, it is impossible to state exactly how many of the second stage interviews were conducted face-to-face or over the telephone or why certain interviews were not conducted. Some of the figures used in this article on reasons for noninterviews are based upon the first eighty interviews.

11. In the District of Columbia prospective jurors are selected from a combined list of registered voters and those holding a driver's license.

12. Some jurors approached the bench without publicly stating their names or juror numbers.

13. A third question often asked during the voir dire is whether the juror knows any attorneys. Unfortunately, our question was much less inclusive. We asked jurors if they knew anyone who had studied law. We would have many jurors respond affirmatively who would not be expected to respond during the voir dire.

14. In some cases the judge asked about crimes similar to the one the defendant was charged with. We excluded those cases from our analysis. In many of our interviews jurors were unable to remember when a crime had occurred. On the other hand, in half of the cases in which the victimization question was asked, there was no date limitation mentioned in the question. Nevertheless, it is probable that some of the jurors who did not say when the crime had occurred may have been misclassified as not coming forward during the voir dire when they should have. There probably was also a bias working in the other direction. We did not ask jurors if they had ever been a witness to or accused of a crime. These jurors would have come forward while we would have predicted that they would not.

15. There is some uncertainty about this figure because we do not have complete data on the number of jurors in each panel. Some jurors were excused for cause before this question was asked.

16. It appears that many jurors who did come forward during the voir dire when questioned about police

Case 4:18-cv-04229 Document 162-4 Filed on 07/01/21 in TXSD Page 11 of 12

who were acquaintances were later excused for cause or by peremptory challenges.

17. One cannot simply add the proportion of jurors who did not come forward in response to the crime victimization questions but should have (24.7 percent) to the proportion of jurors who did not come forward when they should have in response to the questions about knowledge of police officers (29.6 percent) to obtain the overall summary percentage. This would result in double counting since some jurors should have come forward in response to both questions but did not.

18. The number in brackets following each item refers to the number of jurors in the venires who were asked some variant of the question.

19. Marshall (1983) found that age, employment status, and previous jury duty did have some influence on juror honesty.

20. See *Ham v. South Carolina*, 409 U.S. 524, 527, 528 (1973), in which the Court held that the trial judge should have inquired during voir dire about prejudice against Blacks but noted "the traditionally broad discretion accorded to the trial judge in conducting *voir dire*"; *Turner v. Murray*, 476 U.S. 28, 37 (1986), in which the Court held that the jury venire should have been questioned about racial prejudice but similarly noted that "the trial judge retains discretion as to the form and number of questions on the subject, including the decision whether to question the venire individually or collectively"; *U.S. v. Washington*, 819 F.2d 221, 224 (9th Cir. 1987), in which the Court held that the trial judge may insist upon conducting the voir dire examination; *Trujillo v. Sullivan*, 815 F.2d 597, 606 (10th Cir. 1987), in which the Court stated that "individual and sequestered death-qualifying voir dire is not constitutionally dictated."

# REFERENCES

Balch, R. W.; Griffiths, C. T.; Hall, E. L.; and Winfree, L. T. (1976). The socialization of jurors: The voir dire as a rite of passage. *J Crim Just* 4:271–83.

Begam, R. G. (1977). Who should conduct the voir dire?—The attorneys. *Judic* 61:75–77.

Bermant, G. (1978). *Conduct of the voir dire examination—Practices and opinions of federal district judges*. Washington, D.C.: Federal Judicial Center.

———, McGuire, M.; McKinley, W.; and Salo, C. (1974–1975). The logic of simulation in jury research. *Crim Just B* 1–2:224–33.

Broeder, D. W. (1965). Voir dire examinations: An empirical study. *S Calif Law Rev* 38:503–28.

Bush, N. (1976). The case for expansive voir dire. *Law and Psych Rev* 2:9–25.

Cox, B. G., and Collins, J. J. (1985). *Criminal victimization of Disrict of Columbia residents and Capitol Hill employees*. Washington, D.C.: Bureau of Justice Statistics.

Fahringer, H. P. (1980). In the valley of the blind: A primer on jury selection in a criminal case. *Law & Contemp Prob* 43:116–36.

Hastie, R.; Penrod, S. D.; and Pennington, N. (1983). *Inside the jury*. Cambridge: Harvard University Press.

Jones, S. E. (1987). Judge versus attorney-conducted voir dire. *Law and Hum Behav* 11:131–46.

——— (1985). *Judge versus attorney-conducted voir dire: An empirical investigation of veniremen self disclosure*. Ph.D. dissertation, University of Alabama.

Kalven, H. Jr., and Zeisel, H. (1966). *The American jury*. Chicago: University of Chicago Press.

Levitt, W. H.; Nelson, D. W.; Ball, V. C.; and Chernick, R. (1971). Expediting voir dire: An empirical study. *S Calif Law Rev* 44:916–95.

Marshall, L. L. (1983). *Juror, judge, and counsel perceptions of voir dire*. Ph.D. dissertation, Boston University.

Stanley, A. J. (1977). Who should conduct the voir dire?—The judge. *Judic* 61:70–75.

Suggs, D., and Sales, B. D. (1981–1982). Juror disclosure in the voir dire: A social science analysis. *Indiana L J* 56:245–71.

Van Dyke, J. (1976). Voir dire: How should it be conducted to ensure that our juries are representative and impartial. *Hastings L J* 65:65–97.

Zeisel, H., and Diamond, S. S. (1978). The effect of peremptory challenges on jury and verdict: An experiment in federal district court. *Stanford L Rev* 30:491–531.

Case 4:18-cv-04229  Document 162-4  Filed on 07/01/21 in TXSD  Page 12 of 12