Case 4:18-cv-04229 Document 162-5 Filed on 07/01/21 in TXSD Page 1 of 6



# Building a Better Voir Dire Process

By Judge Gregory E. Mize and Paula Hannaford-Agor

The challenge of voir dire is to elicit meaningful information about prospective jurors' abilities to maintain fairness and impartiality, and to obtain that information with reasonable efficiency. Jury selection is a tense process for all the major actors, and some of that tension is between lawyers and judges. Jury selection can be a tug-of-war between judges and lawyers with different agendas, but it is in everyone's interest to minimize that tension. The ABA's recent adoption of principles to guide the process provides an opportunity for bench-bar action plans leading to more fair and productive voir dire.

The parties and their lawyers want to learn as much as possible about the attitudes and life experiences of each venire member to know who they want to keep out of the jury box. But at times, lawyers obtain so little information that jury selection becomes a hunch game.

The trial judge, with dozens—or hundreds—of like-kind cases on his or her docket, wants to administer justice in a timely and efficient manner so that other cases can be given prompt attention. Speed can be a top goal for some judges. Others, however, share the lawyers' thirst for juror information in order to

Exhibit 5

rule intelligently on motions to strike for cause. Still others may abide by the gravitational drag of *Batson v. Kentucky* and its progeny to police against race and gender discrimination during the exercise of peremptory strikes.[1]

These competing professional interests are seldom resolved to anyone's satisfaction. The recent promulgation of "gold standards" for voir dire, and the completion of expansive empirical research regarding actual courtroom practices in all states, may serve as catalysts for trial judges and lawyers to reach some fruitful compromises.

The 1990s witnessed a barrage of attacks, in both the popular and legal media, questioning the quality of jury decisions in civil cases. In response, the American Bar Association (ABA) launched the American Jury Project, an intense effort to inspire judges and lawyers to improve jury trial practices. After twelve months of intensive work, the group, composed of trial practitioners, judges, and jury experts from across the country, produced the *ABA Principles for Juries and Jury Trials*, with accompanying authoritative commentary.

In adopting the nineteen principles, the full ABA House of Delegates recognized the "legal community's ongoing need to refine and improve jury practice so that the right to jury trial is preserved and juror participation is enhanced."[2] The principles "define our fundamental aspirations for management of the American jury system" while expressing "the best of current-day jury practice in light of existing legal and practical constraints."[3]

Mindful of constitutional requirements and the privacy interests of prospective jurors, the principles suggest practices for judges and lawyers that promote intelligent and lawful exercise of for-cause and peremptory strikes. A gold standard for jury selection is set forth in Principle 11: "Courts should ensure that the process used to empanel jurors effectively serves the goal of assembling a fair and impartial jury."

This principle suggests model practices for using pre-voir-dire questionnaires, conducting oral voir dire of prospective jurors, and exercising for-cause and peremptory strikes.

The principle urges the use of questionnaires to improve information-gathering.[4] Written questionnaires are especially useful when questions involve sensitive topics (for example, substance abuse or criminal history) that prospective jurors would understandably feel uncomfortable disclosing orally in a room full of strangers.

Regarding the actual in-court questioning of venire members, the principle advocates that voir dire "be held on the record and [that] appropriate demographic data collected. Questioning of jurors should be conducted initially by the court, and should be sufficient, at a minimum, to determine the jurors' legal qualification to serve in the case."

> Recognizing the special knowledge that each attorney possesses regarding case-presentation strategy and the characteristics of their witnesses, the principle recommends that in a civil case involving multiple parties, the court should permit each separately represented party to participate meaningfully in questioning prospective jurors, subject to reasonable time limits and avoidance of repetition.... Where there is reason to believe that jurors have been previously exposed to information about the case, or for other reasons are likely to have preconceptions concerning it, the parties should be given liberal opportunity to question jurors individually about the existence and extent of their knowledge and preconceptions.[5]

Studies show that focused examination of venire members by the court and counsel in a setting more private than an open courtroom can yield valuable information regarding disqualifying conditions.[6] Additionally, empirical research has repeatedly documented that prospective jurors tend to respond more candidly to questions posed by attorneys than those posed by judges.[7]

Principle 11 aims to boost the efficacy of for-cause and peremptory strikes. It advises that voir dire should "be sufficient to disclose grounds for challenges for cause and to facilitate intelligent exercise of peremptory challenges."[8] So that the exercise of for-cause strikes is not an application of haphazard judgments varying from courtroom to courtroom, the principle encourages

> each jurisdiction [to] establish, by law, the grounds for and the standards by which a challenge for cause to a juror is sustained by the court. At a minimum, a challenge for cause to a juror should be sustained if the juror has an interest in the outcome of the case, may be biased for or against one of the parties, is not qualified by law to serve on a jury, has a familial relation to a participant in the trial, or may be unable or unwilling to hear the subject case fairly and impartially.[9]



**Judge Gregory E. Mize** is retired from the Superior Court of the District of Columbia. He is currently a judicial fellow at the National Center for State Courts where he is guiding NCSC's National Jury Program. His writings include the recently published *State of the States Survey*, the first national study of how jury trials are managed and conducted in federal and state trial courts. He can be reached at gemproductions@mac.com.

**Paula Hannaford-Agor** is the director of the NCSC's Center for Jury Studies. She conducts research and provides technical assistance and education to state court judges and personnel in matters of jury system management and trial procedure. She holds a JD and a master's degree in public policy from the College of William & Mary. She can be reached at phannaford@ncsc.dni.us.



The principle is grounded on the premise that the exercise of evidence-based for-cause strikes should be the primary method to eliminate unfit prospective jurors, reducing pressure to resort to hunch-driven peremptory challenges. Accordingly, the principle supports a low-threshold standard for court rulings on for-cause motions by stating that

> [i]n ruling on a challenge for cause, the court should evaluate the juror's demeanor and substantive responses to questions. If the court determines that there is a reasonable doubt that the juror can be fair and impartial, then the court should excuse him or her from the trial. The court should make a record of the reasons for the ruling including whatever factual findings are appropriate.[10]

Ever since Justice Thurgood Marshall's concurrence in *Batson*, the use of peremptory strikes has been a much-debated topic.[11] Nevertheless, Principle 11 supports both a reasonable number of preemptories and their nondiscriminatory use.

Specifically, it recommends uniformity in the number of peremptory challenges available to each of the parties. Furthermore, the "number of peremptory challenges should be sufficient, but limited to a number no larger than necessary to provide reasonable assurance of obtaining an unbiased jury, and to provide the parties confidence in the fairness of the jury."[12]

Not surprisingly, the principle calls for the use of the three-step *Batson* procedure for policing against the use of peremptory strikes for discriminatory reasons based on race, gender, or ethnicity. Noteworthy, too, is its highlighting of the court's responsibilities:

> The court should state on the record the reasons, including whatever factual findings are appropriate, for sustaining or overruling the challenge. When circumstances suggest that a peremptory challenge was used in a constitutionally impermissible manner, the court on its own initiative, if necessary, shall advise the parties on the record of its belief that the challenge is impermissible, and its reasons for so concluding.[13]

## Current Practices

In April 2007, the Center for Jury Studies of the National Center for State Courts (NCSC) released its findings from a national study that provided the first comprehensive snapshots of jury procedures, operations, and practices in state and local courts.[14] Entitled the *State-of-the-States Survey of Jury Improvement Efforts: A Compendium Report*, the study consisted of three separate, but related, components.

The first part documented statewide jury improvement efforts and the state infrastructure governing jury system management and trial procedures in all fifty states and the District of Columbia. The second component concerned the "Local Court Survey" which had been distributed to the states' general-jurisdiction courts and which focused on local jury operations. The final component focused on the "Judge & Lawyer Survey," in which respondents had been asked to describe jury trial practices employed in their most recent jury trial.

For the "Judge & Lawyer Survey," the NCSC received reports from 11,752 jury trials in state and federal courts in all fifty states plus the District of Columbia, most of which took place between 2002 and 2006. The survey asked judges and lawyers detailed questions about voir dire. Examples of survey questions included queries about who primarily questioned the prospective jurors (the judge or the lawyers); whether jurors were questioned collectively or individually either in the jury box or at sidebar; whether written questionnaires were used to supplement oral voir dire questions; and the total length of the voir dire process.

The survey also collected contextual information about the trials, such as whether the trials was conducted in state or federal courts, the trial locations (state and county or municipality), the type of cases (civil, capital felony, noncapital felony, misdemeanor, or other), the size of the juries impaneled, and the number of peremptory challenges allotted to each side. Overall, the data set provides an extraordinarily rich picture of voir dire practices nationally, as well as variations among states and between state and federal courts.

Some of the study's findings will not surprise lawyers with experience in both state and federal courts or across multiple jurisdictions. For example, voir dire in federal courts is heavily dominated by judges, while state courts tend to lean toward attorney-conducted voir dire. There are some notable exceptions, however. In ten states[15] and the District of Columbia, judge-conducted voir dire is the predominant practice; in another eight states,[16] judges and lawyers share the questioning more or less evenly (Fig. 1, page 7). Whether the judge or the lawyers conduct the bulk of voir dire questioning is often a good indicator of how, and for how long, voir dire is conducted (Table 1, page 8). In judge-conducted voir dire, questions tend to be posed to the entire jury panel with only limited follow-up with individual jurors. As a result, judge-conducted voir dire tends to be much shorter—on average, fifteen to forty-five minutes less than when judges and attorneys share voir dire questioning equally.[17]

For trials in which attorneys conducted the bulk of voir dire, questions were more likely to be posed to individual jurors, either in the jury box or at sidebar, and the length of voir dire was anywhere from twenty-five minutes longer to nearly two hours longer than in trials in which judges and lawyers shared voir dire equally. These characteristics persisted across court jurisdictions and without distinction between civil and criminal trials.

Some of these findings can be attributed to local legal culture. The

law in most jurisdictions grants trial judges extraordinary discretion over voir dire practices. There is surprisingly little cross-pollination between states. As a general matter, federal court practices more closely resemble the practices in the states in which they are located than with fewer jurors. In contrast, trials in which the parties have comparatively more peremptory challenges tend to be characterized by judge-conducted voir dire, less individual questioning of jurors, and less time altogether spent on voir dire.



Fig. 1: Who Questions Jurors During Voir Dire?

- Exclusively or Predominantly Judge
- Evenly Balanced Judge and Attorney
- Predominantly or Exclusively Attorney

those of other courts within the same federal circuit, which suggests that local legal culture tends to encompass the entire legal community within a state but seldom crosses state lines.

There is some evidence from the survey data that voir dire practices may have become institutionalized in their state infrastructures, especially with respect to the statutorily prescribed number of jurors to be impaneled in each case and the number of peremptory challenges allotted to each side. Although they do not provide a perfect correlation in every instance, statistical analyses indicate that trials in which twelve jurors must be impaneled tend to be characterized by more attorney-conducted voir dire, more individual questioning of jurors in the jury box and at sidebar, and more time spent on voir dire compared to cases

These findings suggest there is an inherent compromise that has developed over time and has become part of the local legal culture in each jurisdiction. Judges permit greater levels of attorney participation in voir dire as the number of jurors to be impaneled increases, perhaps to reduce their own workload in questioning larger panels. On the other hand, judges may be more willing to restrict participation for attorneys when the parties have greater latitude to act on hunches and remove jurors with peremptory challenges.

### Ideal Meets Real

In comparing the ABA principles and the NCSC's *State-of-the-States Survey*, we see an ideal standing beside the real. In tandem, they present challenging questions. What do we intend to accomplish? Why do we do what we do during voir dire? Are we fulfilling our mission in actual practice?

To accept the principles is to concur that jury selection should be a rational, information-gathering process for winnowing away citizens who are unlikely to maintain fairness and impartiality throughout the trial. To embrace the principles is to believe that

- during voir dire citizen candor is highly valuable,
- a critical mass of information is needed with respect to each prospective juror in order for the parties and the court to assess whether that citizen should be struck from the panel, and
- a judge must make reasonable and understandable rulings on contested efforts by the parties to eliminate certain prospective jurors.

To implement the principles is to commit to using several information-gathering (and occasionally time-consuming) tools: questionnaires, meaningful co-participation of judge and lawyer during voir dire questioning, and at least some individualized questioning of prospective jurors.

The *State-of-the-States Survey*, like box scores in the sports pages, presents several undeniables. The numbers show that judges and lawyers largely do not conduct voir dire responsibilities in balanced shares. The length of time to conduct jury selection varies significantly depending on whether judges or attorneys dominate the action.

The information-promoting techniques recommended in Principle 11—use of questionnaires and individualized questioning of prospective jurors—are hardly ever employed. Judge-dominated selections are most likely to have voir dire questions addressed to the venire members at large. Conversely, when voir dire is led by attorneys, prospective jurors are significantly more likely to be questioned individually for long periods of time, possibly on matters unrelated to the issues likely to arise at trial.

We add to this landscape an ingre-



### Table 1: Voir Dire Practices

| | State Court | Federal Court |
|---|---|---|
| **Who Conducted Voir Dire (% of Trials)** | | |
| Exclusively or predominantly by judge | 25.9 | 69.6 |
| Judge and lawyers equally | 19.4 | 13.6 |
| Exclusively or predominantly by lawyer | 54.6 | 16.8 |

| | Judge-Dominated Voir Dire | Lawyer-Dominated Voir Dire |
|---|---|---|
| **Voir Dire Methods (% of Trials)** | | |
| Questions posed to full jury panel? | 86.9 | 82.8 |
| Questions posed to individual jurors in jury box? | 46.7 | 65.5 |
| Questions posed to individual jurors at sidebar? | 35.7 | 24.7 |
| General written questionnaire | 28.3 | 38.1 |
| Case-specific written questionnaire | 5.6 | 5.8 |
| **Number of Jurors Impaneled (Mean)** | | |
| Civil trials | 9.2 | 9.8 |
| Felony trials | 11.4 | 11.5 |
| **Number of Peremptory Challenges per Side (Mean)** | | |
| Civil trials | 4.0 | 3.9 |
| Felony trials | 8.5 | 7.6 |

dient mentioned at the start: the differing and often competing jobs of judge and trial lawyer. Throughout the trial, a lawyer is committed to the zealous pursuit of his or her client's best interests to the maximum extent provided by law. In contrast, a judge has no client and is beholden to a lofty, impersonal goal—impartial application of the law in the administration of justice.

Moreover, during jury selection, an additional functional distinction is in play. Under the *Batson* line of cases, trial judges have a singular "affirmative duty to enforce the strong statutory and constitutional policies" that protect prospective jurors from being removed from jury service because of their race, gender, or ethnicity.[18] Indeed, since 1991, trial courts have had the solemn duty to protect the "dignity" of everyone involved in jury selection as well as the "integrity of the courts."[19]

The public-interest duties of trial judges are more easily stated than effectuated. The U.S. Supreme Court fashioned a clumsy enforcement standard that calls on a lawyer, challenged with a *Batson* violation, to proffer an explanation that need not be persuasive or even plausible so long as it is believable and does not deny the equal protection rights of either the juror or a party.[20] In this context, many are not surprised that experienced lawyers, in the heat of adversarial combat, might choose to avoid the strictures of *Batson* in order to seek a client-prone, adversary-unfriendly jury.[21]

Is the future availability of peremptory challenges jeopardized by their too-frequent use in a discriminatory manner? What happens when loyalty to the client conflicts with the right of the citizen to serve on the jury? When the interests of the various stakeholders come into conflict, are there any circumstances in which the interests of individual jurors, or of the broader community, should trump those of the litigants? In the real world, is it left to a few idealists to care about public trust and confidence in the court system?

### Some "What Ifs"

We suggest that readers ponder the real-world dynamics playing out between lawyers and judges during voir dire and place that perception beside Principle 11. Might the ABA's adoption of the principles provide an opportunity for judges and lawyers to begin discussing what a more mutually desirable voir dire could look like? Is there likely agreement among bench and bar in one's home jurisdiction that the "system" would be better served if we worked together to attain greater juror candor in cases?

Would additional disclosures about the life experience of venire members increase discernment of citizen bias and incapacity to serve? If so, would the exercise of for-cause and peremptory strikes become more reason-based? More efficient?

As we pause to think about the whys and hows of jury selection, more questions naturally arise. If the trial judge is expected to protect the civic rights of prospective jurors and promote public trust and confidence in the courts, what is the role of the trial advocate in those regards? To the degree that any potential juror believes he or she is being struck from jury service for no seemingly rational reason, or for a discriminatory pur-



pose, is public trust undermined? Do members of the trial bar have any obligation to make jury selection and deselection a more rational, on-the-record process?

Can we agree that a jury panel free of predispositions toward any party—even the lawyer's own client—leads to a "better" jury? Do we have a duty to provide answers to any of these questions to our clients?

Are there voir dire practices or procedures that plaintiff and defense attorneys would like to see used more often in their jurisdiction? Examples of such practices or procedures might include an opportunity to ask at least a couple of individualized questions to venire members or a voir dire less dominated by judges but still subject to meaningful judicial oversight. Per the new discovery provisions of the Federal Rules of Civil Procedure, would it be advisable for opposing counsel to regularly "meet and confer" before trial regarding the use of a simple juror questionnaire or about filing a joint motion for approval of several voir dire procedures?[22] Are we willing to give up some of our customs in order to achieve a more information-filled voir dire?

Do judges feel their local legal culture would do well to attempt any new practice or procedure during jury selection? Would they prefer that trial lawyers refrain from arguing their case prematurely during voir dire? Are they willing to invite more lawyer participation in exchange for prompt and economical voir dire questioning by attorneys?

Would judges advocate promulgation of a court rule defining the meaning and standards for excusing a prospective juror for cause? Conversely, what routines might they be willing to give up in order to gain a more effective voir dire? Questioning of citizens that is exclusively conducted by judges? Sole reliance on questions posed to the entire panel?

If our reflections and open questions resonate with you, we invite you to inspire, or even lead, an action plan in your jurisdiction to elevate the quality of jury selection practices. This endeavor could include the launch of bench-bar conferences to refine needs and desires and to distill practical options.[23] It might be advisable for volunteer judges and lawyers to design and implement pilot projects that would

- draft model voir dire questionnaires to be used in a sampling of cases and evaluated over a specified time period;
- undertake individualized voir dire in some courtrooms, followed by an evaluation by host judges that would be shared with other judges and the trial bar;
- experiment with balanced judge-lawyer voir dire questioning of prospective jurors;
- try out new procedures for the elimination of unfit venire members using a clearly defined concept of "for cause."

Competing judge-lawyer professional interests in voir dire are seldom resolved to anyone's satisfaction, but the ABA's new standards and the results of an NCSC survey may serve as catalysts for compromise. The possibilities are innumerable. In this matter, you are the jury, and it may be time to render some verdicts. ■

*A version of this article first appeared in the March 2008 issue of* Trial Magazine *and is reprinted with permission.*

### Endnotes

1. 476 U.S. 79 (1986).
2. ABA, Preamble, *Principles for Juries and Jury Trials* 2 (Aug. 2005). The Principles, without the accompanying commentary, are available online at www.abanet.org/juryprojectstandards/principles.pdf.
3. *Id.*
4. The acquisition of information from each prospective juror is not a limitless goal. Principle 7 states, "Courts should protect juror privacy insofar as consistent with the requirements of justice and the public interest." *Id.* at 8.
5. *Id.* at 13-14 (emphasis added).
6. Gregory E. Mize, *Be Cautious of the Quiet Ones* (2003), www.abota.org/publications/article.asp?newsid=94; Gregory E. Mize, *On Better Jury Selection: Spotting UFO Jurors Before They Enter the Jury Room*, 33 CT. REV. 1 (Spring 1999); Kimba M. Wood, *The 1995 Justice Lester W. Roth Lecture: Reexamining the Access Doctrine*, 69 S. CAL. L. REV. 1105, 1118-20 (1996).
7. Susan E. Jones, *Judge- Versus Attorney-Conducted Voir Dire*, 11 LAW & HUM. BEHAV. 131 (1987); David Suggs & Bruce D. Sales, *Juror Self-Disclosure in the Voir Dire: A Social Science Analysis*, 56 IND. L.J. 245, 250-58 (1981).
8. ABA, *supra* note 2, at 14.
9. *Id.*
10. *Id.*
11. Morris B. Hoffman, *Peremptory Challenges Should Be Abolished: A Trial Judge's Perspective*, 64 U. CHI. L. REV. 809 (1997); *Minetos v. City Univ.*, 925 F. Supp. 177 (S.D.N.Y. 1996); Nancy S. Marder, *Beyond Gender: Peremptory Challenges and the Roles of the Jury*, 73 TEX. L. REV. 1041 (1995); Jeffrey Abramson, We the Jury ch. 2 (1994).
12. ABA, *supra* note 2, at 14 (emphasis added).
13. *Id.* at 16.
14. The *State-of-the-States Survey* is the cornerstone of a much larger initiative by the NCSC Center for Jury Studies: the National Program to Increase Citizen Participation in Jury Service (the National Jury Program). For details about the National Jury Program, go to www.ncsconline.org/juries/NCSCFlyer_2006Web.pdf.
15. Arizona, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, Rhode Island, South Carolina, and Utah.
16. California, Colorado, Illinois, Michigan, Nevada, Oklahoma, Pennsylvania, and West Virginia.
17. Gregory E. Mize et al., *The State-of-the-States Survey of Jury Improvement Efforts: A Compendium Report* 29-31 (Apr. 2007), www.ncsconline.org/D_Research/cjs/pdf/SOSCompendiumFinal.pdf.
18. *Powers v. Ohio*, 499 U.S. 400, 416 (1991).
19. *Id.* at 402.
20. *Purkett v. Elem*, 514 U.S. 765, 768 (1995).
21. Justice Stephen Breyer's concurring opinion in *Miller-El v. Dretke* provides a list of pieces from legal literature and news reports demonstrating the false hopes created by *Batson*. 545 U.S. 231, 268-69 (2005) (Breyer, J., concurring).
22. Fed. R. Civ. P. 26(f).
23. The NCSC Center for Jury Studies is available to assist courts across the country in facilitating nonpartisan legal and judicial education programs.