# Report of the Committee on Juries
# of the Judicial Council
# of the Second Circuit

August 1984



**Exhibit 9**

Report of Seven Experiments Conducted by District Court Judges in the Second Circuit

Report of the Committee on
Juries of the Judicial Council
of the Second Circuit

\*\*\*\*\*\*\*\*\*

Report on  Seven Experiments conducted
by District Court Judges in the Second
Circuit

1. Attorney Participation in the Voir Dire.

2. Individual Voir Dire Questioning of Jury Panelists
Out of the Presence of Other Panelists.

3. Pre-Instructing the Jury

4. Allowing Jurors to Submit Questions

5. Affirmatively Advising Jurors that They May Take
Notes

6. Furnishing the Jury with a copy of the Charge

7. Tape Recording the Court's Charge

The Committee on Juries
of the Judicial Council
of the Second Circuit

Leonard B. Sand, Chairman

Hon. T. Emmet Clarie
Hon. Albert W. Coffrin
Rudolph W. Giuliani
Arthur L. Liman
Hon. Eugene H. Nickerson
Norman S. Ostrow
Hon. Milton Pollack
Hon. Robert J. Ward
Jacob D. Zeldes

August 1984

# TABLE OF CONTENTS

Page

I.  Introduction                                                    1

II.  Evaluation of Experiments

   1.  Attorney Participation in the Voir Dire.              10
           A.   Description of Experiment (as furnished
   to the participating judges.
           B.   Commentary

   2.  Individual Voir Dire Questioning of Jury Panelists   32
   Out of the Presence of Other Panelists.
           A.   Description of Experiment (as furnished
   to the participating judges.)
           B.   Commentary

   3.  Pre-Instructing the Jury                              40
           A.   Description of Experiment (as furnished
   to the participating judges).
           B.   Commentary

   4.  Allowing Jurors to Submit Questions                   51
           A.   Description of Experiment (as furnished
   to the participating judges).
           B.   Commentary

   5.  Affirmatively Advising Jurors that They May Take     60
   Notes
           A    Description of Experiment (as furnished to
   to the participating judges).
           B.   Commentary

   6.  Furnishing the Jury with a copy of the Charge        76
           A.   Description of Experiment (as furnished to
   to the participating judges).
           B.   Commentary

   7.  Tape Recording the Court's Charge                    84
           A.   Description of Experiment (as furnished
   to the participating judges).
           B.   Commentary

III. Conclusion                                             90

This material may be protected by Copyright law (Title 17 U.S. Code)

## INTRODUCTION

On November 15, 1982, Chief Judge Wilfred Feinberg appointed a Committee to "consider ways of improving the work of juries throughout federal courts of the Second Circuit."  The Committee membership is listed below.  The Committee had its genesis in the 1982 Judicial Conference of the Second Circuit, the proceedings of which are reported in 97 F.R.D. 545-638.

In April, 1983, the Committee decided that a useful procedure to learn more about jury selection and practice would be to experiment with some of the procedures which had been discussed at the conference.  A series of experiments was devised and district judges throughout the circuit were invited "to agree to adopt experimentally for six trials one or more of several procedures they do not presently utilize."[*]  The Committee stated that the experiments were designed to increase our knowledge concerning these procedures and that the mere fact that the experiments were being conducted did not constitute a recommendation that the procedures be used generally.

[*]At the time the experiments were approved, Rudolph W. Giuliani was not a member of the Committee.  Mr. Giuliani wishes to note that if he had been a member at the time, he would have voted against conducting any experiments involving attorney participation in the voir dire.  Rather, Mr. Giuliani would have argued that with so many areas of the trial process and federal criminal justice system in need of study and improvement, it was an inappropriate use of time and scarce resources to experiment with alternatives to the jury selection process that is generally used in federal courts, i.e., voir dire conducted by the court.  The wisdom of the adage "if it ain't broke, don't fix it" should have prevailed.  If, however, there was still an unquenchable thirst for experimentation in this area, Mr. Giuliani would have argued for a detailed study of the actual experience in the New York courts with attorney conducted voir dire.

The response to this invitation was gratifying and on June 1, 1983, 28 judges throughout the circuit began the experimental use of one or more of the following procedures:

1. Attorney participation in the voir dire by allowing attorneys to ask questions for a maximum of ten minutes. (Participating judges: John M. Cannella (S.D.N.Y.), Warren W. Eginton (D. Conn.), John T. Elfvin (W.D.N.Y.), Morris E. Lasker (S.D.N.Y.), Pierre N. Leval (S.D.N.Y.), Neal P. McCurn (N.D.N.Y.), Robert W. Sweet (S.D.N.Y.), Charles H. Tenney (S.D.N.Y.) and Chief Judge Jack B. Weinstein (E.D.N.Y.).

2. Individual questioning of panelists after a general voir dire in the robing room, out of the presence of the other panelists and the public but in the presence of the court, counsel and the court reporter. (Participating judges: Whitman Knapp (S.D.N.Y.), Joseph M. McLaughlin (E.D.N.Y.), and Eugene H. Nickerson (E.D.N.Y.).

3. Pre-instructing the jury, i.e., a preliminary charge is given to the jury prior to the presentation of the evidence. (Participating judges: Ellen B. Burns (D. Conn.), Chief

Judge Albert W. Coffrin (D.Vt.), and I. Leo Glasser (E.D.N.Y.).

  4. Advising jurors that they may seek to have questions asked of any witness at the conclusion of the witness' examination. (Participating judges: John M. Cannella (S.D.N.Y.), Gerard L. Goettel (S.D.N.Y.), James S. Holden (D.Vt.), Neal P. McCurn (N.D.N.Y.), Jacob Mishler, (E.D.N.Y.), and Eugene H. Nickerson (E.D.N.Y.).

  5. Affirmatively advising jurors that they may take notes. (Participating judges; Frank X. Altimari (E.D.N.Y.), Vincent L. Broderick (S.D.N.Y.), Robert L. Carter (S.D.N.Y.), Morris E. Lasker (S.D.N.Y.), Charles E. Stewart (S.D.N.Y.), and Robert J. Ward (S.D.N.Y.).

  6. Furnishing the jury with a copy of the charge after its delivery which the jury has available to it during deliberations. (Participating judges: Frank X. Altimari (E.D.N.Y.), Joseph M. McLaughlin (E.D.N.Y.), Milton Pollack (S.D.N.Y.), and Robert W. Sweet (S.D.N.Y.).

7.     Tape recording the court's charge and furnishing the jury with the tape and a player during deliberations.   Participating judges:   Charles L. Brieant, Jr. (S.D.N.Y.), Jose A. Cabranes (D.Conn.), Warren W. Eginton (D.Conn.), and Abraham D. Sofaer (S.D.N.Y.).

Each participating judge was furnished with detailed instructions for the procedures to be followed and a set of questionnaires.  The instructions furnished the participating judges are set forth at the beginning of each chapter of this report.  One set of questionnaires asked the judge to evaluate the procedure after each trial and asked for an overall evaluation of the procedure after the sixth trial.   Another set of questionnaires called for the attorneys to evaluate the procedures used during the trial.  A third set of questionnaires was to be used by members of the Federal Bar Council -- under the aegis of George B. Yankwitt and John Wing -- in questioning jurors with respect to the experimental procedures in cases where there had been a hung jury or an acquittal.[*]

Two additional experiments were considered and rejected.   In the area of jury utilization, the Committee considered the possible extension of the procedure used in Connecticut and the Northern District of New York pursuant to which juries for several trials are drawn from a single panel.

[*]     Post-trial questioning of jurors was limited to those circumstances in order to avoid any risk of impairing the integrity of the proceedings.

Jurors are then advised when to report to court because their case had been reached.

At a conference held in Burlington, Vermont, of judges and jury clerks, the Committee concluded that this procedure was useful where there was a single judge trying cases in that locality but that in multi-judge courts, where a single panel is brought in for several judges, it served no useful purpose. Moreover, the Committee concluded that this procedure was already in use where it was worthwhile.

Although no jury utilization experiments were conducted by the Committee, the importance and need for innovative techniques to improve performance in this critical area was fully recognized by this Committee. In this regard we note that, under the aegis of Judge Milton Pollack, who, in addition to membership on this committee, chairs the Jury Committee of the Southern District of New York, several new procedures have been initiated.[*]

---

[*]   Judge Pollack advises that: "The Southern District of New York has implemented a number of programs that are helping to produce considerable improvement in utilization of prospective jurors that we are experiencing now, namely,

a.   One week service, instead of two.

b.   Smaller call-ins.

c.   Breaking summonses into groups, when mailing, in order to have prospective jurors telephone before reporting.  (The smaller the group the easier it is to control the initial call-ins).

(fn continued)

The Committee also recognized that the question whether to use the traditional jury box method of selection or a struck panel system was one of the most significant jury selection decisions which a judge must make. Briefly, under the struck panel system, a number of panelists equal to the jury plus the number of peremptory challenges, is voir dired. Thus, an attorney exercising a challenge will know which panelist will replace the one challenged, unlike the jury box system, where a panelist is drawn from the wheel after each peremptory is exercised. A more detailed description of the two procedures will be found in the proceedings of the 1982 conference.

d.   Use of (4) new, sophisticated code-a-phones.

e.   Empanelling all grand jurors on Mondays, in order to utilize jurors reporting for the first time.

f.   Having all jurors that are already serving call in every night, in case some trials have been postponed, settled or otherwise resolved.

g.   For trials that require 100, or more jurors, we try to arrange with presiding judges to send the jurors in waves. For instance, a request for 100 jurors would bring forth two waves of 50 each.

h.   Reducing the amount of jurors sent to judges starting trials.

CRIMINAL - WHEEL A - 38 (one week trials)
            WHEEL B - 48 (two to four week trials)
            WHEEL C - 58 (trials of four or more weeks)
            CIVIL   -  20

For more than above, judge must request additional panelists in writing in advance.

i.   Having judges, when selecting jurors, send jurors back to jury assembly room as soon as challenged, so they can be reused.

j.   Keeping constantly in touch with courtroom deputies and chambers in case there are settlements, pleas or adjournments.

We are striving to find new ways and ideas to incorporate into an already improved system, in order to achieve even better results with our utilization."

The Committee decided not to experiment with these two jury selection procedures because both systems are already being utilized extensively in the courts of our circuit and so a comparison is readily available.

One matter which the Committee thought of interest was whether one selection procedure took longer than the other and so the Committee asked the United States Attorney's Office in the Southern District of New York to compile statistics on the length of time of the voir dire, noting the method of jury selection utilized and the length and nature of the trial. These statistics appear at page 28 and suggest that there is no significant difference in the time it takes to select a jury under either procedure.

We set forth in our conclusions our overall evaluation of these experiments and what we believe they have, and have not demonstrated.*

---

* To the extent that this report could be read or used as support for permitting attorney participation in the voir dire, Mr. Giuliani asked that the following statement be included:

I do not believe that the results of the attorney voir dire experiment in any way justify a change in the prevailing practice in federal courts of having the court conduct the voir dire. Indeed, the recognition of the need for changes in the conduct of the jury voir dire in the New York State courts, which is done by attorneys argues to the contrary. It would be a mistake to put selective emphasis on the results of this meager study which are mixed at best and ignore the actual real-life experience in the state courts.
(fn continued)

In so doing we are acutely aware of the small sample and limited scope and duration of the experiments. Accordingly, we have refrained from broad abstract generalizations concerning the relative advantages and disadvantages of the experimental procedures, confining our remarks to what the judges, lawyers and jurors involved in experiments themselves, tell us about the feasibility and utility of the procedures in those cases in which they were actually employed.

---

This might be excusable if attorney conducted voir dire was a novel idea. Studies and experiments might then shed some light on its practical effects. However, this has been the prevailing practice in the state courts for many years and it has been viewed by many as one of the prime abuses in the state criminal justice system. In the long run, the price the public would have to pay of further delays in the trial process simply outweighs any additional tactical benefit trial lawyers believe they obtain by questioning jurors themselves. Questioning by a competent judge adequately protects the rights of all parties as well as offers protection against undue delay and tactical misuse of this process. Specific educational courses and training for new judges in the voir dire, as well as perhaps more extensive written or oral submissions by the attorneys to the court prior to the voir dire, to better acquaint the court with the facts and areas of potential prejudice, should remedy any perceived deficiency in the present prevailing federal procedure.

We thank Chief Judge Feinberg for having given us the opportunity to engage in this stimulating and we hope worthwhile venture. Our appreciation is also extended to Steven Flanders, Circuit Executive, and his staff for their invaluable aid, and to Professor Steven A. Reiss, who served as Reporter to the Committee. Our thanks also to the Federal Bar Council and to the participating judges and counsel.

<div align="right">

The Committee on Juries
of the Judicial Council
of the Second Circuit

Leonard B. Sand, Chairman

Hon. T. Emmet Clarie
Hon. Albert W. Coffrin
Rudolph W. Giuliani
Arthur L. Liman
Hon. Eugene H. Nickerson
Norman S. Ostrow
Hon. Milton Pollack
Hon. Robert J. Ward
Jacob D. Zeldes

</div>

August 1984

I.  INSTRUCTIONS FOR EXPERIMENT PERMITTING VOIR DIRE BY COUNSEL

(As furnished to the participating judges)

## THE EXPERIMENT

The Court will conduct a voir dire of the jury panelists utilizing questions suggested in advance by counsel. If the struck panel system of jury selection is utilized, after the Court concludes its voir dire the attorney for each side (in cases not involving multiple parties) will be permitted to question the panelists for a maximum of ten minutes.

The Committee on Juries believes that the struck panel system is the preferable jury selection procedure for this experiment and recommends its use.  However, if the jury box system is used the attorney questioning of the panel will be conducted before the exercise of any peremptory challenges.  It will be in the discretion of the Court whether any further attorney questioning will be permitted after a panelist replaces one who has been challenged.

Each attorney may use this time to address questions to the panel as a whole or to particular panelists as the attorney sees fit.  The panelists should be instructed that the attorneys have only limited time to ask questions and that they should attach no significance to the fact that the attorney(s) question some panelists and not others.  They should not be offended if they are not questioned.

In a case involving multiple parties, the time alloted to each party for questioning the panelists may be set either (1) by the Court, or (2) by agreement among counsel in

consultation with the Court.   The timing arrangement decided upon in a multi-party case should be noted by the Court on the judge's questionnaire.

The purpose of permitting counsel time to question jury panelists is to enable them to secure additional information upon which to base peremptory challenges or challenges for cause. If it becomes apparent to the Court that an attorney's questioning is for another purpose, such as developing rapport or predisposing the panel, or if an attorney's questioning becomes too argumentative or needlessly intrusive into irrelevant private affairs of a panelist, the Court may stop the attorney from asking any further questions of the panelists.

## ATTORNEY PARTICIPATION IN VOIR DIRE

I.  Introduction and Legal Background

Rule 24(a) of the Federal Rules of Criminal Procedure and Rule 47(a) of the Federal Rules of Civil Procedure, both provide that federal district judges may conduct the examination of prospective jurors in either of two ways. The judge may permit counsel to participate directly in the questioning of prospective jurors, or the judge may conduct the voir dire himself, allowing counsel to suggest additional questions to the judge. The method chosen is within the discretion of the judge. United States v. Barnes, 604 F.2d 121 (2nd Cir.), cert. denied, 385 U.S. 961 (1966). See Alridge v. United States, 283 U.S. 308, 310 (1931) ("[voir dire] is conducted under the supervision of the trial court, and a great deal must, of necessity, be left to its sound discretion."). The exclusion of counsel from direct participation in the voir dire has been found to be constitutional. United States v. L'Hoste, 609 F.2d 796 (5th Cir.), on reh, 615 F.2d 383, cert. denied, 449 U.D. 833 (1980); United States v. Ware, 473 F.2d 530, (9th Cir. 1873).

Both methods of examining prospective jurors are currently used in the federal courts. As of 1970, judge-conducted voir dire was the common method of examination in over twice as many federal districts as jointly-conducted voir dire. Note, Judge Conducted Voir Dire as A Time-Saving Trial Technique, 2 Rutgers L.J. 161 (1970). At present, most Second Circuit district judges do not allow counsel to participate directly in the questioning of

prospective jurors except in an unusual circumstance.

Arguments for allowing counsel to participate directly in the voir dire of prospective jurors center on the need to provide counsel with fuller information for pressing challenges for cause and for the more meaningful exercise of peremptory challenges. Counterarguments for excluding counsel from the examination of the venire focus on both the time such examination consumes and the improper use counsel may make of the voir dire, such as attempting to build rapport with the jurors by improper questioning.

This experiment was formulated to explore the possible benefits and detriments of allowing limited direct participation by counsel in the voir dire of prospective jurors. The experiment is especially timely because Congress is presently considering two bills -- S.386 and S. 677 -- that would amend Rule 24(a) of the Federal Rules of Criminal Procedure and Rule 47(a) of the Federal Rules of Civil Procedure respectively to require that counsel for each side be afforded at least thirty minutes to question prospective jurors. The Senate Subcommittee on Courts held hearings on these two bills on March 7, 1984, and the subcommittee reported both bills to the full Senate Judiciary Committee, where they are pending. There has been no action on voir dire legislation in the House.

II.  The Experiment

A.  Introduction

Nine district judges volunteered to allot ten minutes to counsel for each side (in single-party cases) to question prospective jurors after the judicially conducted voir dire.  The participating judges employed this procedure in a variety of contexts, including civil and criminal trials, single- and multi-party cases, and trials where the jury box method of seating jurors was employed.

Most of the judges participating in the experiment used the struck panel method of selecting jurors, which permitted counsel to address all prospective jurors at one time.[*]  Several of the participating judges, however, used either a modified struck panel or the jury box method of seating jurors, which effectively prevented counsel from initially addressing all of the jurors who could be seated.  These judges generally allowed counsel limited time--usually only a couple of minutes--to question panelists replacing those challenged.[**]

---

[*]  For a detailed description of one method of utilizing the struck panel system, see Individual Rules and Procedures of Judges in the United States District Courts for the Southern and Eastern Districts of New York, Committee on Federal Courts, New York State Bar Association, page 101 (1983).

[**] To the extent that it is easier to accommodate counsel's participation in the voir dire where a struck panel system of seating jurors is used, allowing such participation may provide an additional incentive for using the struck panel in preference to the jury box method.  This may cause concern for those judges opposed to the struck panel method in principle because of claims that it more effectively camouflages the use of peremptory challenges to exclude jurors on the basis of race or other

constitutionally suspect criteria. The struck panel system has been said to lend itself more readily to such exclusion because the identity of the replacing panelist is known, including the replacement's race, ethnicity and other characteristics. Also, as utilized by many judges who permit peremptories to be exercised in the robing room, this system conceals from those panelists who ultimately serve on the jury knowledge of which side challenged which panelists. Proponents of the struck panel system counter that it makes the jury selection process more informed and eliminates some of the element of a lottery from the process. Other remedies they claim, may be available to cure discriminatory practices.

It should be noted that the right of any party, including the government, to exercise its peremptory challenges on the basis of race is currently the subject of considerable controversy. In Swain v. Alabama, 308 U.S. 202 (1965), the Supreme Court gave prosecutors great leeway to use peremptory challenges to remove minority jurors, creating a presumption that in any given case "the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the Court." 380 U.S. at 223. The Court held that this presumption can be rebutted, and therefore the prosecutor can be questioned concerning his use of peremptory challenges only by a statistical showing by the defendant of repeated discriminatory use of the challenges in virtually all cases in that locality, "with the result that no Negroes ever serve on petit juries." Id. Swain, however, was decided purely on equal protection grounds. In Duncan v. Louisiana, 391 U.S. 145 (1968), decided three years after Swain, the Court held the Sixth Amendment's right to jury trial to be binding on the states; and in Taylor v. Louisiana, 419 U.S. 522 (1975), the Court held that the Sixth Amendment requires that the jury pool from which the petit jury is chosen be a representative cross-section of the community, and therefore any practice which systemically excludes a distinctive group from the jury pool is unconstitutional.

A number of courts and commentators have argued that Duncan and Taylor require the re-examination of the holding in Swain. At least two state supreme courts have held that Swain is no longer good law. Commonwealth v. Soares, 377 Mass. 461, 387 N.E.2d 499 (Mass. 1979); People v. Wheeler, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (Cal. 1978). The New York Court of Appeals, on the other hand, recently reaffirmed the vitality of Swain. People v. McCray, 57 N.Y.2d 542, 457 N.Y.S.2d 441 (N.Y. 1982). The state joined the defendant in McCray in seeking certiorari on the

question.   Although  the  Supreme  Court  denied  certiorari,  two
Justices  (Marshall  joined  by  Brennan)  dissented,  and  three
Justices (Stevens joined by Blackmun and Powell) noted that they
were  voting  to  deny  the  writ,  not  because  the  issue  lacked
importance, but because there was insufficient development of the
issue  in  the  lower  courts--especially  the  lower  federal  courts.
McCray v. New York, U.S. 103 S.Ct. 2438 (1983).

The  desired  lower  federal  court  fermentation  alluded  to  by
Justices  Stevens,  Blackmun  and  Powell  is  rapidly  taking  place,
most  notably  in  the  Eastern  District  of  New  York.   In  McCray v.
Abrams,   576   F.Supp.   1244   (E.D.N.Y.   1983),   Judge   Nickerson
expressly rejected the continuing vitality of Swain, holding that
a prosecutor's exercise of peremptory challenges to exclude blacks
solely  on  the  basis  of  race  would  violate  a  black  defendant's
rights  under  both  the  Equal  Protection  Clause  and  the  Sixth
Amendment.   More recently, Judge Wexler has disagreed with Judge
Nickerson's  decision  in  McCray,  and  has  held  that  any  party,
including the government, may, in any case, employ racial criteria
in exercising a peremptory challenge to foster its own interests.
King  v.  County  of  Nassau,  52  USLW  2528  (Feb.  28,  1984).

-16-

The experiment was conducted by the nine participating judges in a total of 43 trials. Responses were received from judges for 39 trials; from defense attorneys for 15 trials; and from plaintiffs' attorneys or prosecutors for 13 trials. These responses are the basis for the following report.

B.   The Time Spent on the Procedure

One of the principal concerns about permitting counsel to participate directly in the voir dire is the time which such participation can entail. There is little doubt that placing the questioning of prospective jurors entirely in the hands of the judge is more expeditious. A trial judge is neither required nor expected to ask veniremen every question desired by counsel. United States v. Gibbons, 602 F.2d 1044, 1051 (2nd Cir. 1979), cert. denied, 444 U.S. 950 (1981). Not surprisingly, those empirical studies which have compared the time consumed in voir dires in which counsel participate directly have found the former to be less time-consuming. See Note, Judge Conducted Voir Dire As A Time-Saving Trial Technique, 2 Rutgers Camden L.J. 61, 168 181 (1970); Levit, Nelson, Ball & Chernick, Expediting Voir Dire: An Empirical Study, 44 S.Cal. L. Rev. 916, 950 (1971).

Anticipating the problem of trial delay, the guidelines for the experiment suggested the imposition of a ten minute time limit on each attorney in single-party cases. In multi-party cases, the guidelines allowed the time allotted to counsel for each party to be set either by the judge or by agreement among counsel in consultation with the judge. While most participating judges

-17-

followed these guidelines, some judges allowed unlimited voir dire by counsel while others imposed greater time restraints (five minutes) or divided the ten minutes among all counsel on the same side of a multi-party case.[*]

The ten minute time limit, where invoked, appears to have almost completely eliminated the problem of undue delay. Only one judge reported any delay in the conduct of the voir dire, and one of the attorneys in that case specifically commented that the voir dire was not longer than usual. There were eight instances in which one of the respondents commented specifically on the length of the procedure. In six of the eight instances, the respondent noted that there was no delay in the voir dire or that the experimental procedure actually expedited it. In the remaining two cases, a slight delay was reported. The responses discussing the issue of delay--both those noting its absence and those noting its presence--were evenly distributed between civil and criminal cases, and the respondents included judges, defense counsel, plaintiff's counsel and prosecutors. See Chart No. 1-1, infra.

In five of the 43 cases in which the experimental procedure was used, at least one of the attorneys did not use all of the ten minutes allotted to counsel. Conversely, five judges reported instances in which counsel used all ten minutes but asked questions that the judge found repetitious or unnecessary. It is unclear, however, whether this time-wasting conduct stemmed from counsel's desire to utilize every minute allotted, even if unconstructively, or from counsel's relative inexperience with the procedure.

---

[*] The extent to which there was any divergence from the ten minute recommended guideline cannot be accurately determined from the questionnaire responses.

In contrast to this mis- or under-utilization of the time allotted for attorney questioning, almost one-third (10/32) of all attorneys responded suggested that the time limit be increased. These proposals for increased time ranged from five to 45 minutes, and came from plaintiffs' counsel and from defense counsel in both civil and criminal cases. The desire for additional time was expressed most strongly by criminal defense counsel (5/7). On the other hand, not a single prosecutor indicated that more time would be helpful.

Because the struck panel method of seating jurors, by allowing counsel to address all prospective jurors at once, may be more conducive to direct participation by counsel in the voir dire, a comment on the relative speed of the struck panel and jury box methods of seating jurors is in order. Last year, the office of the United States Attorney for the Southern District of New York, in cooperation with the Second Circuit's Committee on Juries, kept records on the length of time it took to select juries in 33 criminal cases in that district. In addition to the time spent selecting the jury, the participating prosecutors were asked to note the method of jury selection (struck panel or jury box), the anticipated length of the trial, the number of defendants, and the amount of jury selection conducted in the judge's robing room. As summarized in Chart No. 1-2, _infra_, the Southern District survey indicates that there is no significant difference in the time required to choose a jury by either the struck panel or jury box method. Not surprisingly, the critical factor affecting the length of time spent on jury selection is the projected length of the trial.

-19-

C. Attorney Use of Voir Dire for Improper Purposes

In addition to the potential for delay, a second reason for the reluctance of many courts to allow direct attorney participation in the voir dire is the procedure's susceptibility to use for improper purposes, such as indoctrinating or building rapport with the jurors by improper questioning. See Braswell, Voir Dire: Use and Abuse, 7 Wake Forest L. Rev. 49 (1970); Phelps, Voir Dire Examination: Court or Counsel, 11 So.La.U. L.J. 234, 240, 244 (1967); United States v. Anderson, 433 F.2d 865 (8th Cir. 1970); Brundage v. United States, 365 F.2d 616 (10th Cir. 1966). This concern stems from a desire to avoid an adversarial skirmish at the voir dire stage of the proceedings and to prevent the outcome of a trial from depending on the "relative geniality of the attorneys." Phelps, supra, at 243.

In this experiment, respondents in almost one-fourth of the cases (10/43) reported instances of rapport-building. These cases were evenly divided between civil and criminal trials. The judge identified the problem in five cases, the prosecutor (1) or plaintiffs' counsel (3) in four cases, and defense counsel in three cases (two civil and one criminal). The problem was reported by all three respondents in one case.

1. Judicial Reaction

In seven of the nine cases in which counsel's voir dire was reportedly used for improper purposes, the judge gave a negative assessment of the procedure. (The judge in the tenth case did not complete his evaluation form.) In three of these cases the judge interrupted the attorney during improper voir dire questioning. One judge specifically commented that he would rarely employ the procedure because of its use by counsel as an opportunity to give an additional opening statement.

## 2. The Reaction of Prosecutors and Plaintiffs' Counsel

The attorneys, on the other hand, were much more likely to regard the opportunity to establish rapport with prospective jurors with proper questions as a positive aspect of the procedure.[*] In all three cases in which rapport-building was reported by plaintiffs' counsel, the attorneys were quite positive in their evaluation of the experiment. The single prosecutor who reported rapport-building was not, however, content with the procedure. (The defense attorney in that case found participation in the voir dire very helpful, implying that it was the defense attorney who had used the voir dire for improper purposes.)

In the six cases in which rapport-building was identified by any respondent and there was a response from plaintiffs' counsel or the prosecutor (they did not respond in all 10 cases in which rapport building was reported), plaintiffs' counsel or the prosecutor was in favor of the experimental procedure in four cases and opposed in two (one civil, one criminal). In the six instances in which plaintiffs' counsel or the prosecutor was identified by any respondent as the party who attempted to build rapport, the plaintiffs' counsel or prosecutor was in favor of the procedure in five cases.

## 3. Defense Counsel Reaction

In the two cases in which the party reporting rapport-building was a civil defense attorney, the attorney

---

[*] Of course, able trial counsel seeks by every proper means to establish rapport with the jury. The "rapport-building" disparaged in this context is that activity which seeks by improper or irrelevant questioning to influence a juror.

favored the experimental procedure in one case and disliked it in the other. As noted above, the one criminal defense attorney who reported rapport-building was quite pleased with the procedure.

In the five cases in which rapport-building was identified by any respondent and there was a response from defense counsel (defense attorneys did not respond in the other five cases in which rapport-building was reported), defense counsel favored adoption of the experimental procedure in three cases (two criminal, one civil), and opposed its use in two cases (both civil).

4. Summary Observations

Although counsel are less inclined than the judiciary to criticize the use of the voir dire to build rapport with prospective jurors, counsel who properly do not utilize their voir dire for this purpose are apt to complain when it is so utilized. In response to this concern, it is important to note that most possible abuses by counsel of the experimental procedure can be--and were--prevented by proper judicial oversight.* By announcing a set of guidelines prior to the voir dire, and acting quickly to restrain an offending attorney, the courts can

* One bar association report has noted, with respect to state court practices, that "100% of the more experienced judges we surveyed think that judges should have specific educational courses and training into voir dire process. We believe that filling this need could do much to tighten judicial control of excess in lawyer questioning". Building A Consensus on Attorney-Conducted Voir Dire: The Proper Roles of Court and Counsel, A Report by the Criminal Advocacy and Criminal Courts Committees of the Association of the Bar of the City of New York, pp. 4,5 (July, 1984).

effectively prevent and circumscribe improper use of the voir dire by counsel. The prior level of familiarity of counsel (or of the judges) with attorney participation with voir dire is not known and we cannot therefore gauge what influence this may have had on their responses.

D.  The Promotion of an Impartial Jury

Putting aside the potential disadvantages of direct participation by counsel in the voir dire, the question arises whether the procedure furthers the goal of ensuring a just and impartial jury.  In its recent testimony before the Senate Subcommittee on Courts concerning the pending voir dire bills, the American Bar Association reiterated its position that the opportunity to question prospective jurors in both criminal and civil cases is fundamental to the operation of the jury system in our country" ABA Washington Letter, Vol. 20, No. 4 (April 1, 1984) at 4.

The responding attorneys, on the whole, agreed that their participation aided the empaneling of an unbiased jury.  They

commented that the experimental procedure enabled them to exercise their peremptory challenges.

Two judges agreed that counsel was better able to root out latent bias than the judge. One of these judges (Leval) noted that because counsel do not have to maintain an aura of neutrality, they are freer to be more persistent with a juror in order to uncover potential bias. In this judge's experimental trials, the efforts of counsel led to the discovery of prejudice in three instances. The other judge (Tenney), who had allowed counsel to participate directly in the voir dire even before participating in this experiment, maintained that this procedure is invaluable in empaneling an unbiased jury. He noted that a judge would appear partial if he posed certain questions which could legitimately be asked by counsel of prospective jurors.

Two other judges noted an additional benefit of the experimental procedure: the increased sense of participation in the process gained by counsel. These judges added, however, that if this sense of participation were the only benefit of a jointly conducted voir dire, they doubted that the procedure justifies the allocation of time.

As Chart No. 1-4, infra, shows, a majority of the participating judges reacted positively to the experimental procedure and intend to use it-- at least sometimes-- in the future. Those responses that weren't totally enthusiastic seemed to echo the sentiment expressed by Judge Lasker: "It can't do any harm and it may do some good."

E.   Correlations Between Respondents

There were 24 cases in which evaluations were received from more than one participant (judge, defense counsel, plaintiffs' counsel or prosecutor). In 18 cases, all respondents agreed in their assessment of the procedure, whether it was positive or negative. In six cases, at least one respondent expressed a differing viewpoint. It should be noted that the level of responses makes these figures somewhat misleading. In only 17 (3/18) of the cases in which all the respondents were in agreement were evaluations received from all three participants; while in 67% (4/6) of the cases with varying appraisals all three participants responded.

Nevertheless, there are some patterns that emerge. With one exception, in all cases in which the judge was unimpressed with the experimental procedure, the attorneys in the case agreed with the judge's negative evaluation. The single exception involved an instance of improper questioning by counsel. The judge in that case agreed with both attorneys that the procedure is generally desirable, but he disliked it in that instance.

Of the 18 cases in which all of the respondents were in agreement in their evaluations, only three had uniformly unfavorable assessments. In all three cases, each counsel's

participation was limited to the suggested ten minutes.   One of three cases was a multi-party case.   Two of the cases were criminal.

In the remaining 15 cases in which all respondents agreed, all respondents were pleased with the experimental procedure.   The cases were almost evenly split between civil and criminal action, and struck panel and jury box methods of selection.   Three of the cases were multi-party.   In two of the cases, the judge allowed unlimited time for voir dire, while in one case the judge allotted only five minutes to each attorney.   None of these variables seems to have colorably influenced the results of this experiment.

Similarly, in the six cases in which there was a disagreement among the responding parties, four were civil and two were criminal trials.   If any pattern can be discerned from a pool of data this size, it is that defense counsel is the participant most likely to have an assessment different from that of the other participants.   Defense counsel responded in all six cases in which there was disagreement among the respondents.   In only one of these six cases was defense counsel in agreement with another participant.   In that case, both counsel, disagreeing with the judge, expressed their approval of the jointly conducted voir dire in a case in which the judge cut the voir dire short because of the improper questioning of prospective jurors.

## CHART 1-1

### Delay in the Trial Due to Counsel's Participation in Voir Dire

| Respondent Who Mentioned Issue | Type of Case | There Was Delay | There Was No Delay |
|---|---|---|---|
| Plaintiff | Civil | | X |
| Plaintiff | Civil | | X |
| Plaintiff | Civil | X | |
| Prosecutor | Criminal | | X |
| Defense | Criminal | | X |
| Defense | Criminal | | X |
| Judge | Civil | | X |
| Judge | Criminal | X | |

-27-

## CHART 1-2

### Southern District Survey of Time Taken to Select Juries

### in Criminal Cases: Struck Panel vs. Jury Box

| Judge | Jury Box | Struck Panel | Anticipated Length of Trial | # of Defendants | % of Jurors Selected in Robing Room | Time Spent to Select Jury |
|---|---|---|---|---|---|---|
| Gagliardi | X | | 1 day | 1 | 0 | 30 minutes |
| Gagliardi | | | 2.5 days | 1 | 0 | 45 minutes |
| Werker | X | | 2 days | 1 | 0 | 1 hour |
| Bonsal | X | | 2 days | 1 | 0 | 1 hour |
| Metzner | X | | 2 days | 1 | 0 | 1 hour |
| Brieant | X | | 2 weeks | 2 | 0 | 1 hour |
| McMahon | X | | 4 days | 2 | 0 | 1.25 hrs. |
| Gagliardi | X | | 1 day | 1 | 0 | 1.5 hrs. |
| Bonsal | X | | 5 days | 1 | 0 | 1.5 hrs. |
| Broderick | | X | 1 week | 2 | 90 | 1.5 hrs. |
| Griesa | X | | 5 days | 2 | 0 | 1.75 hrs. |
| Carter | | X | 2 days | 1 | 0 | 2 hours |
| Stewart | | X | 2 days | 1 | 0 | 2 hours |
| Sofaer | | X | 1 week | 1 | 20 | 2 hours |
| Carter | | X | 6 days | 2 | 0 | 2 hours |
| Carter | | X | 2 weeks | 2 | 0 | 2 hours |
| Palmieri | X | | 6 days | 2 | 0 | 2.5 hrs. |
| Gagliardi | | X | 2 weeks | 4 | 0 | 2.5 hrs. |
| Gershon | X | | 2 days | 1 | 0 | 3 hours |

CHART 1-2: Page 2

## Southern District Survey of Time Taken to Select Juries
### in Criminal Cases: Struck Panel vs. Jury Box

| Judge | Jury Box | Struck Panel | Anticipated Length of Trial | # of Defendants | % of Jurors Selected in Robing Room | Time Spent to Select Jury |
|---|---|---|---|---|---|---|
| Gershon | X | | 2 days | 1 | 0 | 3 hours |
| Tenney | | (?) | 1 week | 1 | 0 | 3 hours |
| Kram | X | | 7 days | 1 | 0 | 3 hours |
| Broderick | | X | 3-4 days | 1 | 67 | 3.5 hrs. |
| Canella | | X | 2 weeks | 2 | 0 | 4 hours |
| Lowe | X | | 3 days | 1 | 0 | half day |
| Broderick | | X | 4 days | 1 | 75 | half day |
| Leval | combination | | 7 days | 1 | ? | half day |
| Leval | combination | | 1 week | 1 | 0 | 4-5 hrs. |
| Griesa | combination | | 1 week | 3 | 85 | 1 day |
| Lowe | X | | 2 weeks | 1 | 0 | 1 day |
| Goettel | combination | | 6 weeks | 6 | 10 | 1 day |
| Griesa | X | X | 8 weeks | 6 | 100 | 1.5 days |
| Knapp | | X | 9 weeks | 8 | 90 | 4 days |
| Duffy | X | | 4-5 months | 6 | 50+ | 2 weeks |
| Carter | | X | 2 weeks | 2 | 0 | 2 hours |

CHART 1-3

Counsel's Use of Voir Dire for Rapport-Building

| Who Reported | Type of Case | Who Did It | Evaluation of Experiment | | |
|---|---|---|---|---|---|
| | | | Judge | Prosecution or Plaintiff | Defense |
| Judge | Criminal | Prosecutor | Negative | | Negative |
| Judge | Criminal | Prosecutor (cut off by judge) | Negative | Positive | |
| Judge | Criminal | (cut off by judge) | Negative | | |
| Judge | Civil | | Negative | Negative | Negative |
| Defense | Civil (multi-party) | Plaintiff | Negative | | Negative |
| Plaintiff | Civil | Plaintiff | Positive | Positive | |
| Plaintiff | Civil | Plaintiff | | Positive | |
| Prosecutor | Criminal | | Negative | Negative | Positive |
| All participants | Civil | Plaintiff and Defense (cut off by judge) | Negative | Positive | Positive |





## Attorney Participation in Voir Dire: Summary of Responses

Evaluation of Procedure

| | In Favor | Opposed | Somewhat Helpful | Total Responses |
|---|---|---|---|---|

**Judges:** In Favor: 7, 12, 19; Opposed: 7, 4, 11; Somewhat Helpful: 4, 2, 6 — Total Responses: 39

**Plaintiffs' Counsel and Prosecutors:** In Favor: 10, 3, 13; Opposed: 2, 1, 3; Somewhat Helpful: 2, 2 — Total: 18

**Defense Counsel:** In Favor: 4, 6, 10; Opposed: 2, 1, 3; Somewhat Helpful: 2, 2 — Total: 15

Civil Cases ☐   Criminal Cases ▨   Total of Both ▬

Number of Judges Participating in Experiment: 9   Number of Cases in Which Procedure was Used: 43

*(Total is less than 39 because attorneys did not take advantage of procedure in 3 cases)

II    INSTRUCTIONS FOR EXPERIMENT IN WHICH
INDIVIDUAL VOIR DIRE QUESTIONING OF JURY PANELISTS
IS CONDUCTED OUT OF THE PRESENCE OF THE
OTHER PANELISTS
(as furnished to the participating judges)

### THE EXPERIMENT

The Court will conduct a general voir dire of the
jury panelists in open court, using its own questions as well as
questions suggested by counsel.   After this general open court
voir dire, the individualized questioning of any particular
panelist will be conducted [in the robing room] out of the
presence of the other panelists and the public, but in the
presence of the Court, counsel and the court reporter.

The decision whether to include or exclude the
press from the individualized examinations of the jury panelists
is for the Court.  The issue of exclusion of the press during jury
selection should be made solely on the merits of that question and
should not be affected by the fact that this experiment is being
conducted.

<u>Individual Voir Dire Questioning of Jury Panelists</u>
<u>Out of the Presence of the Other Panelists</u>

## I.  Introduction and Legal Background

Rules 47(a) of the Federal Rules of Civil Procedure and 24(a) of the Federal Rules of Criminal Procedure vest trial courts with broad discretion to determine the scope and method of voir dire.  "This discretion includes the decision whether the jurors should be questioned collectively or individually." <u>United States v. Colarurcio</u>, 659 F.2d 684, 689 (5th Cir. 1981). Although no circuit court has adopted <u>in camera</u> individual voir dire of prospective jurors as a standard method of conducting the voir dire, the federal courts of appeal have commented favorably upon the procedure when it is utilized to meet the exigencies of a particular case.  See <u>United States v. Bryant</u>, 471 F.2d 1040 (D.C. Cir. 1972), <u>cert denied</u>, 409 U.S. 112 (1973); <u>United States v. Colabella</u>, 448 F.2d 1299, 1303-1304 (2nd Cir. 1971), <u>cert denied</u>, 405 U.S. 929; <u>Silverthorne v. United States</u>, 400 F.2d 627 (9th Cir. 1968).

Individualized voir dire of prospective jurors out of the presence of the other panelists has been mostly commonly adopted and approved in cases involving substantial pre-trial publicity. <u>United States v. Gerald</u>, 624 F.2d 1291, 1298 (5th Cir. 1980), <u>cert denied</u>, 450 U.S. 920 (1981); <u>United States v. Davis</u>, 583 F.2d 190, 197 (5th Cir. 1978); <u>Patricia v. United States</u>, 402 U.S. 314 (1st Cir. 1968), <u>cert denied</u>, 393 U.S. 1022 (1969); <u>Silverthorne v. United States</u>, <u>supra</u>. This is consistent with the recommendation made in section 3.4(a) of the Proposed Final Draft of the

-33-

A.B.A. Project on Minimum Standards for Criminal Justice, Standards Relating to a Fair Trial and Free Press (1967), which provides:

> "Whenever there is believed to be a significant possibility that individual talismen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors."

The use of the procedure has not, however, been limited to cases involving substantial pre-trial publicity. The Second Circuit, for example, has approved of individual, in camera examination of prospective jurors "when there is any foundation for concern about juror partiality, partiality of the sort which, if expressed, might affect other prospective jurors." United States v. Colabella, supra, 448 F.2d at 1304. Similarly, the Report of the Committee on the Operation of the Jury System on Voir Dire Procedures, approved at the 1970 session of the Judicial Conference, stated (at 130):

> "The Committee wishes to call attention to the fact that trial judges, in their broad discretion over voir dire proceedings, may occasionally find it appropriate to examine jurors individually, out of the presence of other jurors, when questions relevant to the case may call for personal or potentially embarassing responses."

When a trial court does examine individual prospective jurors outside the presence of the other panelists, questions may arise as to who may or should be present at this questioning. Both the exclusion of counsel, United States, v. Pappas, 639 F.2d 1, 2 (1st Cir. 1980), cert denied, 451 U.S. 913 (1981), and the exclusion of the defendants in a criminal case, United States v. Allessandrello, 637 F.2d 131, 134-144 (3rd Cir. 1980, have

-34-

been disapproved by the circuit courts, although not found to be reversible error.

The Supreme Court has recently placed substantial restrictions on a trial court's ability to exclude the press from the voir dire. In Press-Enterprise Co. v. Superior Court, 104 S.Ct. 819 (1984), the Court held that there is a presumption of "openness" with respect to the voir dire that

> "may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered."

The Court expressly recognized a prospective juror's "significant interest in privacy" as one of the "overriding interest[s]" capable of supporting a limited exclusion of the press from the voir dire of a particular juror. Id at 825-826.

In addition to questions concerning the propriety of excluding the press, there are two other potential drawbacks associated with the procedure of individualized in camera examination of prospective jurors. First and most obvious is the time the procedure requires--the reason why most courts do not use the procedure without some good cause. Second, although the procedure may be viewed as an accommodation to the jurors because it shields them from rebuke for embarassing responses, at least one study has shown that jurors often resent the procedure as overly personal and a challenge to their integrity and honesty. Broeder, Voir Dire Examination: An Empirical Study, 38 So.Cal. L.Rev. 503, 525-526 (1965).

II. **The Experiment**

    A. Introduction

    Three judges conducted a total of 9 trials (three civil, nine criminal) in which general questions were put to the jury panelists in open court, followed by further questioning of individual prospective jurors in the robing room. The individual questioning was conducted in the presence of the judge, counsel and the court reporter, but outside the presence of the other panelists and the public. The decision whether to exclude any members of the press who may have been present was left to the judge. None of the respondents indicated that the press was even present at any of the experimental trials.

    B. Overall Results

    All nine of the attorneys who evaluated the procedure--four prosecutors, two plaintiffs' counsel and three defense counsel (one civil and two criminal) were pleased with it. They cited a number of reasons for their positive evaluations. Two attorneys felt that they gained greater insight into the prospective jurors. Three counsel noted that the jurors seemed to feel more relaxed and important during the individualized questioning, and were consequently more candid about their biases. Two other attorneys attributed the helpfulness of the procedure to the type of questions asked by the judges--open-ended rather than leading.

    Responses were received from judges in all nine of the experimental trials. Judges in five cases were, like all responding counsel, quite pleased with the individual questioning of prospective jurors. One judge commented that the attorneys tended to appreciate the procedure (an observation confirmed by

both counsel in the case). Another judge found that the procedure led to the discovery of juror bias.

In four other cases, the judges were not so enthusiastic. In two of these cases, both criminal, the judges found that the procedure "somewhat helpful". The judge in one of these two cases attributed his ambivalence to the great amount of time expended in the experiment, and stated that only the benefit of protecting a juror from embarrassment would outweigh the drawback of the experienced delay. The second judge was pleased with the procedure because it revealed some juror prejudice, but was similarly dismayed by the time expenditure required. In addition, he was concerned about the rights of the public and the defendant to be present at all stages of the voir dire.

The judges in the remaining two trials (one civil, one criminal), were displeased with the experiment. Both reported delays in the trial, and asserted that no useful information was garnered.

The overall evaluations of the participating judges were somewhat critical of the experimental procedure. One judge, who individually questioned prospective jurors in only one case, thought that the procedure was "counterproductive". He felt that jurors are more candid about themselves after listening to the questioning of other panelists, and lamented the loss of this "overlap" due to the experimental procedure. He expressed his intention to conduct in camera individualized voir dires only in cases prone to involve juror prejudice or excitement, or when the need arises for--and the juror requests--privacy. Another judge,

-37-

who conducted four trials using the experimental procedure, seconded this assessment. Although he found the procedure helpful in a couple of trials, he concluded that the time wasted on the procedure outweighed any benefits derived from it. Consequently, he maintained that the procedure would be useful only in a small number of sensitive cases. The third participating judge had conflicting opinions in the individual evaluations he returned for each of the trials in which the experimental procedure was used. His overall assessment was that the procedure was not particularly beneficial in civil cases; but that he would continue to use it in criminal cases.

### C. The Problem of Delay

A number of participants commented on the time the experimental procedure entailed. One judge (in a civil case) and four attorneys--one prosecutor, one plaintiff's counsel, one civil defense counsel and one criminal defense counsel--expressly noted that the procedure involved no undue expenditure of time. In contrast, the judges in eight cases (two civil, six criminal) and three prosecutors reported a delay in the proceedings due to the procedure.

The extent of the delay was noted by several respondents. One judge and one attorney observed that the questioning of prospective jurors took twice the usual amount of time required. Other respondents who felt that the time was not well spent reported delays of between 30 minutes and an hour. One attorney thought the delay was "slight", while another felt that the procedure was "time-consuming--though not unduly."



## Individual Questioning of Jury Panelists: Summary of Responses

| Evaluation of Procedure | Helpful | Unhelpful | Somewhat Helpful | Total Responses |
|---|---|---|---|---|
| Judges: | 2  3  5 | 1  4 | 2 | 9 |
| Plaintiffs' Counsel and Prosecutors: | 2  4  6 | | | 6 |
| Defense Counsel: | 1  2 | | | 3 |

Civil Cases ▭   Criminal Cases ▨   Total of Both ■

Number of Judges Participating in Experiment: 3   Number of Cases in Which Procedure was Used: 9

III.  INSTRUCTIONS FOR EXPERIMENT ON PRE-INSTRUCTING THE JURY

(as furnished to the participating judges)

THE EXPERIMENT

Prior to the swearing of the first witness, the Court will hold a conference with counsel to determine the issues and principles upon which the jury will be pre-instructed.  (The judge may ask that counsel confer separately on the subject prior to trial and that the agreed instructions be set out in a pre-trial order.)  The goal is to give the jurors maximum guidance about the principles that will govern their evaluation of the evidence and ultimately their decision in the case.  Consequently, the Court and counsel should attempt to identify all legal principles whose applicability to the case at hand cannot reasonably be questioned, and to agree on instructions on these principles.  Any objections by counsel to proposed pre-instructions should be made on the record in the conference, with a statement of the reason(s) for the objection.  Of course, final decision on the propriety of any particular pre-instruction is for the Court.

The Court will deliver its pre-instructions to the jury prior to opening statements by counsel.  At this time, the jury will be advised, in substance:

These preliminary instructions were intended simply to help orient you as you hear the evidence. Later, before you begin deliberations, I will instruct you again. I am sure you will keep an open mind until you have heard all of the evidence, and my formal instructions.

The Court should have the court reporter transcribe the pre-instructions. If a prepared text is used and you can conveniently do so, please include a copy of the pre-instructions with the judge's questionnaire.

## Pre-Instructing the Jury

### I.   Introduction and Legal Background

Rule 51 of the Federal Rules of Civil Procedure and Rule 30 of the Federal Rules of Criminal Procedure both provide that the judge must instruct the jury at the close of the evidence and after counsel's closing arguments.  Although the federal case law discussing the propriety of also instructing the jury at the outset of the trial is sparse, those decisions that have addressed the matter have found "pre-instruction" to be a commendable practice so long as the jury is again fully instructed at the close of the proceedings.  United States v. Ruppel, 666 F.2d, 274 (5th Cir. 1982); Jerrold Electric Corp. v. Westcoast Broadcasting Co.,341 F.2d 653 (9th Cir.), cert. denied, 382 U.S. 817 (1965).

There are a number of possible advantages to be gained from pre-instruction.  First, pre-instruction may enhance the jurors' ability to remember the information presented at trial.  This is because attention and memory processes are more acute when a perceiver has an understanding of what he or she is looking for. Hastie, An Empirical Evaluation of Five Methods of Instructing the Jury 1983 Report, prepared for the National Institute of Justice at p.7.  Second and relatedly, by serving as a sort of table of contents of the issues in a case, pre-instruction may increase the jurors' ability to assimilate the evidence and to link the evidence to the relevant issues in the case.  Third, pre-instruction may help jurors to identify prejudices that they may have that bear on the matters at trial, and thereby assist

-42-

them in resisting these extralegal biases. Finally, pre-instruction on procedural matters, such as the evaluation of credibility or the nature of reasonable inferences, may enable jurors to apply these procedures while perceiving the witnesses and evidence at trial instead of retroactively during deliberations. Hastie, supra at p. 8.

On the other hand, there are several potential disadvantages to pre-instruction. First, to the extent that jurors exhibit tendencies to settle on a verdict early in the trial-- and there is some social science evidence that individuals have a persistent tendency to reason in a confirmatory manner-- pre-instruction may exacerbate this tendency. Second, pre-instruction may focus all, or at least most of the jurors on the same issues and testimony. To the extent that the deliberative process is enriched by a diversity of perspectives and attitudes, the deliberative process may be diminished by the homogenization that pre-instruction encourages. Further, pre-instruction if to be more abbreviated than the closing charge, may be an oversimplification of the issues being tried. Moreover, because so high a percentage of cases are settled on the eve of trial or soon after trial has begun, many judges defer their most careful scrutiny of the issues in a case until the trial has progressed sufficiently so that settlement seems unlikely. Pre-instruction of the jury therefore either compels the court to expend greater time and effort earlier in the proceedings or results in a less carefully thought out discussion of the issues.

There has been a growing consensus that at least some form of pre-instruction would be beneficial. There has been some disagreement, however, as to the desirable scope of such pre-instruction. The American Bar Association, for example, approves of pre-instruction, but would limit it to include only "the nature of [the jury's] duties and [an introduction] to trial procedure and legal terminology." ABA Project on Minimum Standards for Criminal Justice: Standards Relating to Trial by Jury sec. 3.1 (Tent. Draft 1968). The ABA would specifically exclude from pre-instruction "anything to be regarded by the jurors as instruction of law to be applied in any case..." Id. Other commentators, however, including several noted judges, have taken a different view and have advocated pre-instruction that goes beyond mere jury indoctrination. Comment, Memory, Magic and Myth: The Timing of Jury Instructions, 59 Oregon L.Rev. 451 (1981); Winslow, the Instruction Ritual, 13 Hastings L.J. 456 (1962); Prettyman, Jury Instructions: First or Last? 46 A.B.A.J. 1066 (1960).

II.  The Experiment

   A.  Introduction

In an effort to gauge the broadest use of pre-instruction, the experiment encouraged pre-instruction that would give the jurors "maximum guidance about the principles that will govern their evaluation of the evidence and ultimately their decision in

the case."   To protect against the inclusion of unnecessary or complicating charges, or the omission of important applicable law, the experiment requested that the judge and counsel have a charging conference prior to the swearing of the first witness. At the conference there was to be an "attempt to identify all legal principles whose applicability to the case at hand cannot reasonably be questioned," with an eye to pre-instructing on these principles.

Three judges used this procedure in a total of 14 trials-- ten civil and 4 criminal.  The judges completed questionnaires for all four criminal cases and for nine of the ten civil cases.  The prosecutors and defense counsel completed questionnaires for three of the four criminal cases.  In the civil cases, eight of the ten plaintiffs' counsel responded, as did nine defense attorneys.  The nine defense counsel reponses, however, covered only six cases because two of the cases involved multiple defendants, and more than one defense counsel responded in these two cases.

B.  Overall Results

Although a majority of the responding participants favored the continued use of pre-instruction, the reactions to the experiment were divided.  In nine of the 13 cases in which they responded, the judges found the procedure helpful, as did six of the 11 responding prosecutors or plaintiffs' counsel and eight of the 12 responding defense counsel.  In all four criminal trials the judges were pleased with the procedure, as were all counsel-- three prosecutors and three defense counsel--who responded in

those cases.

On the other hand, the judges in three of the nine civil cases were dissatisfied with the procedure. Four of the eight plaintiffs' counsel and three of the nine civil defense counsel agreed that pre-instruction was unhelpful. (One judge, one plaintiffs' attorney and one defense attorney were unable adequately to evaluate the procedure on the basis of the case in which they participated.).

C.  Correlations Among Respondents

In 12 of the cases, at least two of the participants completed an evaluation of the case. In nine of these cases, the respondents agreed with each other in assessing the utility of disutility of pre-instruction. The correlation of the responses in each of these cases was so close that the respondents' reactions corresponded in terms of degree as well as in overall assessment. Notably, in every instance in which the responding judge was favorably impressed with the experimental procedure, responding counsel was similarly pleased.

In two of the three cases in which the participants did not all agree in their evaluation of the procedure, all of the participants completed an evaluation form. (In one multi-party case, two defense counsel responded.) One of these cases, a civil rights action, was the only trial of the seven conducted by the judge [Coffrin] in which the judge was decidedly pleased with the pre-instruction procedure. The defense counsel, who represented the prevailing party, was also pleased with the procedure. The plaintiffs' counsel, on the other hand, did not find the experiment useful and noted that there was considerable

-46-

disagreement among opposing counsel and the court as to which issues to include in the pre-instruction. The other such case was a products liability action. All counsel were unimpressed with the procedure, stating that it was not particularly helpful and that any benefits were outweighed by additional time and effort required of counsel. The judge, however, concluded that the time involved in the pre-instruction procedure was well-spent and that the procedure was useful in that type of case.

D. Analysis

Because all respondents in all of the criminal trials were consistent in their positive evaluation of the pre-instruction procedure, reaction to the procedure could be viewed as hinging somewhat on the type of case involved. However, the most salient factor affecting responses to the experiment appears to be the judge conducting the procedure.

In all six trials utilizing the experimental procedure conducted by one judge [Burns], the judge and all responding counsel (four plaintiffs' counsel or prosecutors and six defense counsel) were pleased with the procedure. In contrast, the second judge [Coffrin] was positive in only three of six civil cases (he did not evaluate the seventh case). Only two plaintiffs' counsel and two defense counsel of the thirteen responding attorneys in these cases gave the procedure favorable assessments. The third participating judge conducted only one trial using the procedure. He was uncertain in his assessment of the procedure, and none of the counsel participating in the trial returned questionnaires.

-47-

The first judge pre-instructed not only on the role of the jury, but also on the elements of the case, the burdens of proof, and evaluating witness credibility. Counsel for both sides, as well as the judge, noted that this pre-instruction helped the jury to understand better, its function, and focused the jury's attention upon the legal issues involved in the case. Additionally, counsel remarked that opening statements are generally not permitted in that court. Although the pre-instruction did not take the place of opening statements, it did serve as an introduction to the trial.

The second judge agreed that pre-instruction focused the jury's attention on the relevant issues, but he regarded the procedure as unhelpful except in complicated cases. The judge attributed his "mixed feelings" to counsels' unhelpfulness and disinterest. This complaint is consistent with the responses of counsel in that judge's trials. Four attorneys, disapproving of the procedure, specifically referred to the increased burden it placed on counsel. They maintained that significant issues could more easily be clarified in a pre-trial conference between the judge and counsel. They did not explain how the jurors were to be given the benefit of this clarification. Two attorneys cited disputes that arose as to the content of the pre-instruction, and asserted that they would rather introduce the case themselves in their opening statements. Yet one defense counsl, who prevailed and, perhaps consequently was inclined to favor the experimental procedure, felt that pre-instruction helped the jury better understand the "legal rules" because jurors give greater credence

-48-

to the court's pre-instruction then to counsels' opening statements. This attorney commented positively on the additional effort pre-instruction entails, noting that it encouraged counsel to better prepare for trial.

### E. Overall Utility of Pre-Instruction

Although the rather small number of participants renders any observations tentative, a number of points were mentioned that reflect on the merits of the proposed procedure.

The judge in three cases, and counsel in eight cases, elaborated upon the benefits of pre-instructing the jury. The procedure was applauded by these respondents as more fully explaining the function of the jury, clarifying and emphasizing the elements of the case, and introducing the case and thereby increasing juror attentiveness. One responding attorney noted that these benefits are especially significant when the jury has been chosen some time prior to trial.

As noted above, four attorneys believed that the experimental procedure increased the pre-trial time expenditures of counsel. Nevertheless, three other attorneys commented that the pre-instruction procedure did not cause any delay and one judge noted that the jury asked fewer questions during deliberations.

In sum, it appears that most, if not all, of the ambivalence toward pre-instruction stems from an unfamiliarity with the procedure and the increased burden it may place on the court and counsel. Not a single respondent pointed to any negative effect of pre-instruction on the jury.



## Pre-Instructing the Jury: Summary of Responses

Evaluation of Procedure

| | Helpful | Unhelpful | Don't Know | |
|---|---|---|---|---|
| Judges: | 5, 4, 6 | 3 | 1 | 13 |
| Plaintiffs' Counsel and Prosecutors: | 3, 3, 6 | 4 | 1 | 11 |
| Defense Counsel: | 5, 3, 6 | 3 | 1 | 12 |
| Total: | 13, 10, 23 | 10 | 3 | 36 |

Civil Cases ▭   Criminal Cases ▨   Total of Both ▬

Number of Judges Participating in Experiment: 3   Number of Cases in Which Procedure was Used: 14

## IV.  INSTRUCTIONS FOR EXPERIMENT PERMITTING JURORS

## TO SUBMIT QUESTIONS

### (as furnished to the participating judges)

### THE EXPERIMENT

After the opening statements by counsel, but before the first witness is sworn, the Court will advise the jurors that they may seek to have questions asked of any witness at the conclusion of the witness' examination by all of the attorneys.  The jurors should be told that the prime responsibility for presenting evidence rests with counsel and that they should exercise this opportunity sparingly and only if they believe that their questions will not or cannot be answered by some other witness likely to be called.  The jurors will be told that if they have questions they would like to ask the witness, they should write the question down, fold the paper on which the question is written, and pass the paper to the clerk to be given to the judge. The jurors should be further informed in substance, as follows:

> Some of you may submit written questions to me that
> I will not ask the witness.  Please don't be offended if
> this happens.  My decision whether to ask a submitted
> question has nothing to do with the quality of the
> question.  There are technical rules of evidence that the
> lawyers and I must follow in the courtroom.  These rules
> can be complicated, and you, as lay people, certainly have
> no reason to know them.  Also, I may decline to ask the
> question if I know that another witness is to be called to
> deal with the matter raised by the question.  You are not
> to count my decision not to ask your question for or
> against any party in this case.

At the conclusion of each witness' testimony, the jurors will be given the opportunity to write any questions they may have. Before the Court asks any question submitted by a juror, the Court will conduct a sidebar conference at which the question will be shown to counsel and counsel will be asked if there are any objections.

Allowing Jurors to Submit Questions to Witnesses

## I.  Introduction and Legal Background

The right of a federal trial judge to question witnesses is well established and is embodied in Rule 614(b) of the Federal Rules of Evidence.  There has been relatively little discussion, however, of the propriety of permitting jurors to question witnesses through the judge.  Those courts, including the Second Circuit, that have addressed the issue have found it to be within the district court's discretion to ask questions submitted by jurors.  United States v. Callahan, 588 F.2d 1078, 1086 (5th Cir.).  cert denied, 444 U.S. 826 (1979); United States v. Gonzales, 424 F.2d 1055 (9th Cir. 1970); United States v. Witt, 215 F.2d 580, 584 (2nd Cir.), cert denied sub nom. Talanker v. United States, 348 U.S. 887 (1954).

In Callahan, the Fifth Circuit elaborated upon some of the benefits of the procedure (588 F.2d at 1086):

> "There is nothing improper about the practice of allowing occasional questions from jurors to be asked of witnesses.  If a juror is unclear as to a point in the proof, it makes good common sense to allow a question to be asked about it.  If nothing else, the question should alert trial counsel that a particular factual issue may need more extensive development.  Trials exist to develop truth.  It may sometimes be that counsel are so familiar with a case that they fail to see problems that would naturally bother a juror who is presented with the facts for the first time."

In addition, allowing jurors to submit questions to witnesses may encourage increased juror attentiveness and foster a greater sense of responsibility and participation in the trial.    Weighted against these potential benefits is the possibility that the procedure may disrupt counsel's orderly presentation of the case or focus the jurors on irrelevant or improper matters, and the practical difficulty counsel may experience in objecting to a question asked by a juror.

## II.   The Experiment

### A.   Introduction

The experimental procedure was designed to explore the potential benefits of permitting jurors to question witnesses while eliminating, to the extent possible, the drawbacks of the procedure.    After counsel's opening statements, jurors in participating trials were informed that they would be given an opportunity to ask the witnesses questions by writing their inquiries down and submitting them to the judge.    They were then cautioned that the "prime responsibility for presenting evidence rests with counsel and that they should exercise this opportunity sparingly and only if they believe that their questions will not or cannot be answered by other witnesses likely to be called."    In addition, the jurors were specifically instructed that some of the submitted questions might not be asked because of the rules of evidence, and that no significance was to be attached to the refusal of the judge to ask a submitted question.    The jurors were then given, at the conclusion of each witness' testimony, an opportunity to submit written questions to the judge to be asked

of the witness.

Twenty-six trials were conducted by six judges in accordance with these guidelines. The trials were evenly divided among civil and criminal cases. The judges completed evaluative questionnaires in 24 of the cases. Prosecutors or plaintiffs' counsel responded in 16 cases and defense counsel responded in 20 cases. The procedure was challenged as being violative of due process in the defendant's motion for a new trial in one civil case. That challenge was rejected by the district court and was not appealed.

B. Overall Results

The participating judges were substantially in favor of allowing jurors to question witnesses through the court, being positively impressed with the experimental procedure in twelve cases (nine civil and three criminal) but finding it unhelpful in six (one civil and five criminal). Prosecutors and plaintiffs' counsel were even more favorable in their assessment. The five plaintiffs' counsel and four prosecutors who evaluated the experiment all expressed a high regard for the procedure. (These numbers, as well as the figures for defense counsel, do not add up to the total number of responses received because of the omission of ambivalent responses and responses returned in cases where no questions were asked.)

In contrast, seven defense counsel in three civil and four criminal cases found the experiment helpful, while eight defense counsel in six civil cases and two criminal cases disapproved of it. Three defense counsel found the procedure "somewhat helpful,"

but they remained ambivalent about its use.  Interestingly, in one criminal case involving multiple defendants, one defense attorney firmly approved of the procedure while the other did not.

### C.  Correlations Among Respondents

Responses were received from more than one participant in 15 of the 26 cases.  In eight of these cases, the respondents agreed in their assessments of the procedure.  Only one of these eight cases, however, contained responses from all participants. In the remaining seven cases, six of which contained responses from all of the participants, there was disagreement among the respondents.

### D.  Correlation With Quantity of Questions

The jurors in nine of the 26 cases (four civil and five criminal) elected not to ask any questions at all.  In the 15 cases in which the judge described the jury's behavior in some detail, only one question was posed in one trial, two questions were submitted in three trials, "several" questions were posed in nine trials, 40 questions were submitted in one trial and 56 questions were posed in one case.  The judges were clearly adverse to the experiment in only three of these cases, emphatically pleased in five cases, and generally supportive of the procedure in the remaining seven cases.

There does not, however, appear to be a correlation between the number of questions asked and the judge's perception of the utility of the procedure.  The negative judicial evaluations were given on one trial in which two questions were asked, one trial in which "several" questions were asked, one trial in which "several"

-56-

and the trial in which 56 questions were submitted.
Interestingly, although the judge in the last case considered only
one of the 56 questions at all relevant, both the prosecutor and
defense counsel in the case were enthusiastic about the procedure,
noting that it was a great help in focusing their attention on the
jurors' concerns.  The favorable judicial evaluations were given
in one case in which one question was asked (that question
concerned insurance coverage and lead to a juror's discharge), one
case in which two questions were asked, two cases in which
"several" questions were asked, and the case in which 40 questions
were posed.  (The judge in the last case considered 20 of the 40
questions highly relevant and helpful.)

### E.  The Procedure's Effect on Jurors

Five judges, one plaintiff's attorney, one prosecutor and
two defense counsel noted that the procedure focused the jury's
attention upon important issues and kept the jurors alert by
increasing their sense of involvement in the proceedings.
Nevertheless, some judges did not find the effect on the jurors
beneficial.  In one case, the judge concluded that jurors who
submitted questions were more likely to have preconceptions about
the case and to be inflexible during deliberations.  Another judge
maintained that the procedure tended to distract the jurors.  One
possible source of this complaint was the use by some jurors of
the pen and paper provided for questions to take notes.  (The
implications of permitting jurors to take notes are discussed in
Experiment IV, infra.)  One judge eliminated this complication by
supplying paper only upon request by a juror who wished to

submit a question.

### F.  Overall Judicial Evaluation

Four of the six participating judges expressed a favorable impression of the experimental procedure at the conclusion of their participation in the experiments.  There is a general perception that juror questioning of witnesses would be most useful in complex cases.  One judge, who presided over the civil trial in which the procedure was the basis for a new trial motion, stated that he is rather wary of adopting the procedure for regular use in criminal cases.

Two of the six judges do not intend to allow jurors to submit questions to the court in the future.  One of these judges maintained that jurors who publicly express their positions by asking a question are likely to have preconceptions and tend towards inflexibility.  This is a serious concern and a partial response may be to admonish juries that their questions should be factual in nature and not indicate any leanings on their part since they are to keep an open mind until they begin their deliberations.

The second judge found the procedure generally disruptive. That judge additionally believes that the questioning of witnesses is solely within the province of counsel, and that if jurors are in need of essential informtion, they will ask the court for elucidation despite the absence of a set of procedures for their questions.



## Allowing Jurors to Submit Questions to Witnesses: Summary of Responses



Civil Cases ☐   Criminal Cases ▬   Total of Both ▬

Number of Judges Participating in Experiment: 6   Number of Cases in Which Procedure was Used: 26

*Breakdown of responses does not equal the total number of responses because some ambiguous responses and responses in cases in which no questions were submitted by the jurors are excluded.

## V.   INSTRUCTIONS FOR EXPERIMENT PERMITTING
## JUROR NOTE-TAKING

(As furnished to the participating judges)

### THE EXPERIMENT

After the jury is chosen, but before the swearing of the first witness, the jurors are affirmatively advised that they may take notes. In addition, they are given the following cautionary instructions (drawn with modifications from Federal Judicial Center Pattern Criminal Instruction 3(b));

> If you want to take notes during the course of the trial, you may do so. If you do take notes, be sure that your taking of notes does not interfere with your listening to and considering all of the evidence. Also, if you take notes, do not discuss them with anyone before or during your deliberation. If you take notes, they are to be used solely to assist you and your notes are not to substitute for your recollection of the evidence in the case. The fact that a particular juror has taken notes entitles that juror's views to no greater weight than those of any other juror and your notes are not to be shown to any other juror during the course of deliberations. If, during your deliberations, you have any doubt as to any of the testimony, you will be permitted to request that the official trial transcript which is being made of these proceedings be read to you.

The latter portion of this instruction (beginning with the third sentence) may be repeated (changing "take" to "took") as part of the Court's charge to the jury.

Each juror is to be furnished with a pencil and a pad. Each juror is to maintain possession of his or her notes, and is to be so informed.

## Permitting Jurors To Take Notes

### I.  Introduction and Legal Background

Although the Supreme Court has never directly addressed the issue, see Agnew v. United States, 165 U.S. 36 (1897), the virtually "unanimous view of federal appellate courts***[is that w]hether or not to allow note-taking by jurors is a matter committed to the sound discretion of the trial judge." United States v. Maclean, 578 F.2d 64, 65 (3rd Cir. 1978). See e.g., United States v. Johnson, 584 F.2d 148, 157-158 (6th Cir. 1978); United States v. Riebold, 557 F.2d 697, 705-706 (10th Cir. 1977); United States v. Bertolotti, 529F.2d 149, 159 (2nd Cir. 1975); United   States v. Braverman, 522 F.2d 218, 224 (7th Cir. 1975), cert denied, 423 U.S. 985.  Indeed, one court indicated that in certain circumstances, it is not an abuse of a trial judge's discretion to make note-taking compulsory.  United States v. Standard Oil, 316 F.2d 884, 897 (7th Cir. 1963).  Moreover, there has been appellate unanimity that allowing the use of juror notes during deliberation is similarly a matter within the trial court's discretion.  United States v. Johnson, supra, 584 F.2d at 157; United States v. Bertolotti, supra, 529 F.2d at 159; United States v. Marquez, 449 F.2d 89, 93 (2nd Cir. 1971).

There is also a consensus that where juror note-taking is permitted, it is advisable for the court to instruct the jurors on the proper use of their notes.  Such instructions may advise the jurors that "their notes are only aids to memory and***are not conclusive and should not be given precedence over their independent recollection of the facts," United States v. Maclean

supra, 578 F.2d at 66; that they should not be influenced at all by another juror's notes, Toles v. United States, 308 F.2d 590, 594 (9th Cir. 1962); and that they should not allow their note-taking to distract them from the on-going proceedings. United States v. Riebold, supra, 557 F.2d at 706.

The arguments in favor of allowing jurors to take notes are fairly straight forward. "The obvious and strongest argument in favor of allowing note-taking is that, when done properly, it is a valuable method of refreshing memory. In addition, note-taking may help focus jurors' concentration on the proceedings and help prevent their attention from wandering." United States v. Maclean, supra, 578 F.2d at 66. A non-scientific survey conducted in a DuPage County (Illinois) Circuit Court in 1976--the only reported empirical study on juror note-taking--suggested that these supposed benefits are indeed real. Flango, Would Jurors do a Better Job if They Could Take Notes, 63 Judicature 436 (1980).

Critics of the procedure cite a number of concerns. As summarized by the court in Maclean (578 F.2d at 66):

> "Probably the gravest concern is that the best note takers (or the only note taker) may dominate jury deliberations. It has been asserted that a dishonest juror could sway the verdict by falsifying notes. Others fear that jurors will attach too much significance to their notes merely because they are in writing, and attach too little significance to their own independent memory. Another concern is that jurors, busily taking notes, may miss important testimony. Jurors, who are not trained or experienced in note-taking, may accentuate irrelevancies in their notes and ignore the more substantial issues and evidence. Also note-taking jurors may not pay sufficient attention to witnesses' behavior which is so important in assessing credibility.

The circuit courts, have not found these concerns sufficient reason to prohibit or restrict juror-note taking. Nor has the Judicial Conference or the American Bar Association. In 1960, the Report of the Judicial Conference Committee on the Operation of the Jury System made the following recommendation (26 F.R.D. 411, 424);

> "Trial jurors should, in the discretion of the trial judge, be permitted to take notes for use in their deliberations regarding the evidence presented to them and to take these notes with them when they retire for their deliberations. When permitted to be taken, they should be treated as confidential between the juror making them and his fellow jurors."

In substantially similar language, Standard 4.2 of the Standards Relating to Trial by Jury published under the auspices of the American Bar Association Project on Minimum Standards for Criminal Justice (Approved Draft 1968) provides:

> "Jurors may take notes regarding the evidence presented to them and keep these notes with them when they retire for their delibertions. Such notes should be treated as confidential between the juror making them and his fellow jurors."

## II.  The Experiment

### A.  Introduction

Six judges in 32 trials advised the jurors that they could take notes of the proceedings if they so desired.  The jurors in these trials were furnished with a pencil and pad either at the beginning of the trial or upon the request of a juror or the jury foreman.  In addition, to minimize the possibility that adverse consequences would flow from the jurors' note-taking, the jurors received the following cautionary instruction at both the beginning and the end of the trial:

> If you want to take notes during the course of the trial you may do so.  If you do take notes, be sure that your taking of notes does not interfere with your listening to and considering all of the evidence.  Also, if you take notes, do not discuss them with anyone before or during your deliberation.  If you take notes, they are to be used solely to assist you and your notes are not to substitute for your recollection of the evidence in the case.  The fact that a particular juror has taken notes entitles that juror's views to no greater weight than those of any other juror and your notes are not to be shown to any other juror during the course of deliberations.  If, during your deliberations, you have any doubt as to any of the testimony, you will be permitted to request that the official trial transcript which is being made of these proceedings be read to you.

### B.  Overall Results

The six judges conducted the note-taking experiment in 17 civil and 15 criminal cases.  The judges evaluated the procedure in 31 of the 32 cases.  They were pleased with the experimental note-taking in 26 of these cases (14 civil, 12 criminal.  They were also favorably disposed to the procedure in the remaining five cases, but believed that the note-taking in those cases was

-65-

too infrequent to provide a fair basis for evaluation.

Evaluative responses were received from plaintiffs' counsel in 10 (civil) cases, prosecutors in seven (criminal) cases and defense counsel in 18 cases (nine civil, nine criminal). Five plaintiffs' counsel and five prosecutors found the procedure beneficial while two plaintiffs' counsel and one prosecutor disliked the procedure. Three plaintiffs' counsel and one prosecutor were unsure of their evaluations. Two of these four ambivalent counsel reported that the jurors did not take notes in their trials, but they thought that the procedure would generally prove useful. The other two ambivalent counsel expressed concern about potential drawbacks to juror note-taking, although they experienced no such difficulties in their own trials.

Seven defense counsel (three civil, four criminal) considered the juror note-taking helpful as opposed to ten defense counsel (five civil, five criminal) who found it unhelpful. One defense attorney could not evaluate the procedure because no juror took notes. He believed, however, that the procedure would be of valuable assistance to jurors in other trials who wished to take notes.

### C. Correlations Among Responses

In half of the experimental trials (16), more than one participant completed an evaluation of the experiment. In the seven cases in which all of the respondents agreed in their evaluation of the note-taking procedure, the assessment was favorable. In eight of the 165 cases, the presiding judge was pleased with the procedure while one of the participating

attorneys was not.  In the remaining case, the judge did not evaluate the procedure and the prosecutor and defense counsel differed in their assessments.

### D.  The Volume of Note-Taking

There was only one case in which all of the participants agreed that the jurors did not take any notes whatsoever. According to the judges' responses, there was extensive note-taking in 6.2% (2/32) of the cases, moderate note taking in 68.8% (22/32) of the cases, infrequent note-taking in 21.9% (7/32) of the cases, and no note-taking in 3.1% (1/32) of the cases. These numbers vary somewhat from the assessment of the volume of note-taking by participating counsel.  (See Chart 5-2, infra.) For example, plaintiffs' counsel and prosecutors perceived that in the plurality of cases (43.75%), jurors infrequently took notes, while the judges and defense counsel reported that in the majority of cases jurors engaged in moderate note-taking.  Such disparities are in part attributable to the fact that participating counsel responded in fewer cases than the participating judges and that plaintiffs' counsel and prosecutors and defense counsel responded in different cases.  However, the discrepancies in the volume of note-taking observed by the participants also stem from the differences in perception and use of evaluative terms by the respondents.  For example, in one case in which the amount of note-taking was reported as moderate by the judge, infrequent by defense counsel and extensive by the prosecutor, the prosecutor clarified that three or four jurors continuously took notes while

defense counsel deemed it infrequent, the judge explained that two or three jurors took extensive notes while the remaining jurors took no notes at all.

E.   Relationship of Note-Taking to the Complexity of the Trial

The participants in the experiment addressed a number of considerations recognized by the courts as factors potentially affecting the utility of juror-note-taking.  Four of the judges remarked that the benefits of note-taking increase proportionately with the length and complexity of the trial.  Two of these judges, who expressed their firm intention to use the procedure in complex cases, state that it "might not be necessary" in a single-party, single-issue case.  A third judge felt that note-taking would be very helpful in complicated cases, but unnecessary or even counter-productive in short trials.  These opinions are consistent with the prevailing notion that juror note-taking may serve as a useful memory aid.  Although counsel, on the whole, did not discuss the relationship between note-taking and the nature or length of the trial, one defense attorney did remark that the procedure would be equally useful in short cases.

F.  Note-Taking As A Memory Aid

The judges in 11 cases and counsel in six cases stressed that note-taking aided the jurors in recalling facts and in keeping track of the exhibits.  These observations were seconded by the jurors polled in one criminal case, tried by Judge Broderick, that resulted in an acquittal.  Seven of the 12 jurors interviewed specifically noted that they took notes and that the notes were a useful memory aid.

-68-

Several participants believed that note-taking affected the jury's need to have portions of the record read during their deliberations. Two judges and two attorneys noted that the jury did not request any reading of the record and attributed this to the jurors' note-taking and resulting greater recall of the trial. In another case, an attorney believed that note-taking helped the jury focus upon which portion of the record they needed read. This last observation was confirmed by four of the jurors polled in the criminal case noted above. These jurors specifically noted that one of the principal benefits of note-taking was its usefulness in pinpointing the testimony that the jurors wanted to hear again.

Six attorneys objected on the basis of its effect on the jurors' need or desire to have certain testimony read. These counsel maintained that the jurors tended to rely on their notes instead of turning to the court for a reading of the record; and they believed that a reading of the record would be more accurate and less likely to impute undue significance to a juror's notes. Interestingly, these fears are largely refuted by the juror responses to the poll conducted in the criminal case that resulted in an acquittal. Six of the polled jurors expressly noted that their note-taking did not affect their willingness to have testimony read.

### G.   Note-Taking as Affecting the Relative Influence of Jurors on Each Other

Seven attorneys expressed concern note-taking jurors would exercise undue influence over their fellow jurors because their notes would lend greater credence to their opinion.  The majority of these attorneys added, however, that they had no evidence of such a problem in their own case and that the judge's cautionary instructions seemed to alleviate the problem.   One criminal defense counsel, who perceived that note-taking jurors would be more influential during deliberations, attempted to capitalize on this anticipated dynamic by directing his arguments to those jurors.

One plaintiff's attorney and one judge, who himself polled the jurors in three cases (two civil cases that settled and one criminal case that resulted in an acquittal), observed that well-educated jurors appeared to take more notes than other jurors.   The judge expressed his concern that the influence exerted by note-taking jurors might lead to the domination of jury deliberations by the well-educated and affluent.   However, this judge noted that in the six trials he conducted, the experiment did not prove unduly divisive in jury deliberations.   Most importantly, all of the jurors polled by this judge, as well as all but one of the jurors responding to the poll in the criminal case tried by Judge Broderick that resulted in an acquittal, were enthusiastically in favor of the procedure.

### H. Note-Taking and Juror Attentiveness

Three of the judges and a number of participating counsel observed that note-taking increased juror attentiveness. Not only did the note-taking not prove distracting, but it raised the jury's interest in the trial.

In contrast, five plaintiffs' counsel or prosecutors and four defense counsel felt that note-taking distracted the jury. Two attorneys expressed their belief that the jurors must pay total attention to the witnesses in order to effectively evaluate the witness' credibility, and expressed concern that note-taking would interfere with jurors' observation of the witnesses.

### I. General Observations About Juror Note-Taking

As Chart 5-1, _infra_, indicates, most of the participants in the note-taking trials were favorably impressed with the experiment. In addition, many of the negative responses were engendered not so much by aversion to the procedure as by doubts as to its usefulness. Accordingly, some attorneys maintained that note-taking was of slight value because the jurors did not focus upon significant issues, but rather tended to take notes when bored. They also noted that most jurors--indeed, most people-- tend not to be good note-takers. In contrast, the judges generally found the jurors to be rather effective note-takers. Moreover, there was a feeling among the judges that even if jurors were not proficient note-takers, they should nevertheless be given the opportunity to take notes because, as one judge stated,

"it does no harm and it may do some good." Importantly, all but one of the jurors questioned in four trials that were either settled or resulted in verdicts of acquittal agreed with the judges and were in favor of the procedure.

An interesting connection between this experiment and the experiment involving providing the jury with a copy of the charge should be noted. A number of respondents, in commenting on the utility of permitting jurors to take notes, observed that the procedure was particularly beneficial when the jurors took notes of the court's charge. Presumably, these respondents agree with the rationale and conclusion of those judges and attorneys who approved of furnishing a written copy of the charge to the jury for use during deliberations. Furthermore, a number of complaints levelled at juror note-taking emanated from the juror's supposed reliance on their notes in preference to requesting a reading of the record. A similar complaint was voiced by detractors of the experiment providing jurors with a written copy of the charge, who were displeased with the jury's failure to request instruction from the court.

J.   A Note on the Mechanics of Juror Note-Taking

Some of the attorneys, as well as a number of the jurors, offered suggestions to enhance the implementation of juror note-taking. First, it was suggested that pencils and pads should be supplied to all jurors at the outset of the trial so that a juror wishing to take notes would not be singled-out by his or

-72-

her request for writing instruments. Second, a number of
participants requested or suggested procedures to ensure that the
jurors' notes would remain confidential and within the courtroom
or juryroom at all times. For example, the jurors could be
supplied with envelopes in which they could seal their notes,
leaving them in the secured juryroom overnight or during a
recess. Finally, all of the participants who commented on the
cautionary instructions viewed them as a substantial safeguard
against the misuse of juror notes.



## Permitting Jurors to Take Notes: Summary of Responses



Evaluation of Procedure

| | Helpful | Unhelpful | Don't Know | Total Responses |
|---|---|---|---|---|
| **Judges:** | 14 / 12 | | 2 / 3 | 31 |
| **Plaintiffs' Counsel and Prosecutors:** | 5 / 5 | 2 | 3 | 17 |
| **Defense Counsel:** | 3 / 4 | 5 / 5 | 1 | 18 |

Civil Cases ▭   Criminal Cases ▬   Total of Both ▬

Number of Judges Participating in Experiment: 6   Number of Cases in Which Procedure was Used: 32

Chart 5-2

Permitting Jurors to Take Notes:   Volume of Note-Taking

| Quantity | Judges | Plaintiffs Counsel and Prosecutors | Defense Counsel |
|----------|--------|------------------------------------|-----------------|
| None | 3.1% (1/32) | 6.25% (1/16) | 5.9% (1/17) |
| Infrequent | 21.9% (7/32) | 43.75% (7/16) | 35.3% (6/17) |
| Moderate | 68.8% (22/32) | 37.5% (6/16) | 52.9% (9/17) |
| Extensive | 6.2% (2/32) | 12.5% (2/16) | 5.9% (1/17) |

VI.   INSTRUCTIONS FOR EXPERIMENT IN WHICH

JURORS ARE FURNISHED WITH A COPY OF

THE CHARGE AFTER ITS DELIVERY

(As furnished to the participating judges)

### THE EXPERIMENT

The jurors are furnished with a copy of the charge after its delivery.  The jurors take the charge into the jury room during deliberation.

## Providing the Jury With a Written Copy

## of the Charge

### I.  Introduction and Legal Background

The Courts of Appeal have consistently held that whether to provide a jury with a written copy of the court's charge is a matter within the discretion of the trial judge.  United States v. Engleman, 648 F.2d 4473, 480 (8th Cir. 1981); United States v. Cobb, 397 F.2d 416, 419 (7th Cir. 1968); United States v. Blane, 375 F.2d 249, 255 (6th Cir. 1967); Oertle v. United States, 370 F.2d 719, 728-729 (10th Cir. 1967), cert denied, 387 U.S. 943; Corrado v. United States, 210 U.S. 712, 722-723 (D.C. Cir. 1953), cert denied, 347 U.S. 1018.  Although the Supreme Court has not spoken at any length on the propriety of the procedure, it has addressed the practice twice.  In Hopt v. People, 104 U.S. 631, 634-635 (1882), the Court, in dictum, approved of a Utah statute that required that the charge be reduced to writing; and in Haupt v. United States, 330 U.S. 631, 643 (1947), the Court ruled that, in the particular case before it, submitting a copy of the charge to the jury did not amount to "unfairness of irregularity."

Providing the jury with a written copy of the charge has been considered especially helpful in complex trials.  United States v. Blane, supra, at 255; United States v. Standard Oil Co., 316 F.2d 884, 896 (7th Cir. 1963).  This is for the obvious reason that giving the jury a copy of the charge alleviates the need for the jurors to rely wholly on their memories for the legal principles applicable to the case.

On the other hand, at least one Circuit Court has expressed the concern that a jury given a written copy of the charge may be tempted to accord too much significance to the one segment of it. United States v. Schilleci, 545 F.2d 519, 526 (5th Cir. 1977). The most effective way for a trial judge to meet this concern is to instruct the jury that the charge is to be considered as an integrated whole, and that sections of the charge are not to be emphasized to the exclusion of other sections. United States v. Hooper, 575 F.2d 496, 498 (5th Cir. 1978). In Schilleci, the trial court did not give such a cautionary instruction, and the Fifth Circuit found that this omission, when compounded with other errors, warranted reversal of the defendant's conviction.

As a variation on the procedure of providing the jury with a written copy of the charge for use during deliberations, some courts have distributed their instructions to the jury in writing prior to the commencement of deliberation so that the jurors could follow the text of the instructions as the judge delivered them. This practice was upheld in United States v. Naylor, 566 F.2d 942 (5th Cir. 1978).

## II. The Experiment

### A. Overall Results

The four judges participating in this experiment conducted a total of 17 trials in which they provided the jury with a copy of the court's charge for use in the jury room during deliberations. The judges completed evaluation forms for 14 of these cases. They found the procedure to be very helpful in eight cases, somewhat helpful in four cases and not helpful in two cases.

-78-

Twenty participating attorneys completed evaluative questionnaires. Twelve of them were pleased with the experimental procedure while eight counsel considered it unhelpful or detrimental. These responses were fairly evenly divided between prosecuting and defense attorneys, and between civil and criminal cases.

There were eight cases in which evaluations were returned by more than one participant. The respondents agreed in their assessment of the procedure in three cases, in all of which the judge and one attorney shared a favorable assessment of the experiment.

In contrast, the respondents in the remaining five cases expressed differing views of merits of the experiment. In two cases, the judges commended the procedure while one of the attorneys disliked it. In another case, it was the opposing counsel who disagreed on the usefulness of supplying a copy of the charge to the jury. In the fourth case, a complex criminal trial, the judge, both prosecutors and two defense counsel approved of the procedure, but two other defense attorneys (representing multi-party defendants) were not pleased with it. In the final case, in which the judge did not respond, the prosecutor and three of the five defense counsel (representing multi-party defendants) evaluated the procedure positively; but the other two counsel either had a negative view of the procedure or could not evaluate it.

B.  Perceived Benefits and Detriments

A number of participants--the judges in four cases and one prosecutor-- noted that there were no juror requests for a re-reading of the charge, or portions of it.  These respondents attributed the jury's apparently greater comprehension of the instructions to the jurors' ability to examine the written copy of the charge.  In addition, by sparing the court a re-reading of the instructions, providing the jury with a copy of the charge resulted in a concomitant savings in court time.

Yet two prosecutors, one of whom participated in two experimental trials, and one criminal defense counsel, disapproved of the procedure for this very reason.  They maintained that the jury, in receiving a written copy of the charge, was effectively discouraged from asking the judge for assistance with respect to the charge.  They believed that the jurors had re-read the charge instead of requesting elucidation from the court or providing the court with the opportunity to give new instructions.  As one attorney remarked, the procedure might save the court time, but it inhibited the jurors from asking questions and lead them to "interpret the law" on their own.  A partial response to this concern may be for the court to emphasize in its charge that although jurors would be given a copy of the charge, they should feel free to ask questions should they wish any clarification of the charges.

In about one-third of the cases, the participants expressed the view that the benefits of providing the jury with a written copy of the charge increased directly with the complexity of the trial. They speculated that this was so from the jury's standpoint because of the greater difficulties associated with a complicated or lengthy charge. The judges had a more practical basis for this conclusion. They observed that the effort necessary to produce a written copy of the charge is worthwhile only when the copy of the charge is _really_ useful to the jury-- that is, in a longer or more complex trial.

C.  Mechanics

Three of the four participating judges usually have a written copy of their charge, typed by their secretaries, from which they read to the jury. These three judges were therefore able to furnish counsel with copies of the charge in advance of supplying it to the jury. Two of these judges noted that they would not allow the jury to follow the written charge as they read it aloud. Both had allowed the jury to read along during one of their experimental trials before rejecting the practice. They found that it not only proved too distracting to the jurors, but it also restrained the judge from extemporizing.

The fourth judge had the court reporter prepare a written copy of the charge from the oral charge. Consequently, this judge could not furnish counsel with an advance copy of the charge. He

-81-

explained that he did not wish to prepare a final version of the charge until after the summations.  Two attorneys who participated in trials conducted by this judge specifically recommended that a copy of the charge be distributed to counsel in advance.

    D.  <u>Overall Judicial Evaluation</u>

The judges' overall evaluations varied.  One judge deemed the procedure "excellent" and stated that he would furnish a written copy of the charge to the jury "in almost every case." Another judge found the procedure "very helpful" and worthwhile, but added that his use of a written charge would depend on the type of case, the complexity of its facts and the legal issues involved.

The third judge, who considered the procedure "somewhat helpful", intends to furnish a written copy of the charge to the jury when time permits.  He noted that the written charge appeared to save a re-reading of the instructions and was, overall, an improvement.

Although the fourth judge was somewhat pleased with the experimental procedure in two of five trials, he maintained that the procedure was not worth the effort it entailed.  This judge termed the procedure a "logistical nightmare," despite the fact that he usually had a written charge prepared from which he read in orally instructing the jury.

## Providing the Jury With a Written Copy of the Charge: Summary of Responses



|  | Evaluation of Procedure Helpful | Somewhat Helpful | Unhelpful | Total Responses |
|---|---|---|---|---|
| Judges: | 8 | 4 | 2 | 14 |
| Plaintiffs' Counsel and Prosecutors: | 4 |  | 4 | 8 |
| Defense Counsel: | 8 |  | 3 | 12* |
| Total: | 20 | 4 | 9 | 34* |

Number of Judges Participating in Experiment: 4   Number of Cases in Which Procedure Was Used: 17

*One defense counsel was unable to evaluate the procedure.

## VII.   INSTRUCTIONS FOR EXPERIMENT IN WHICH
## JURORS ARE FURNISHED WITH A TAPE
## RECORDING OF THE CHARGE

(As furnished to the participating judges)

### THE EXPERIMENT

The Court has a tape recording made of the charge and furnishes the jury with the tape and player for its use during deliberations.

## Providing the Jury With a Tape-Recording

## of the Court's Charge

### I.   Introduction and Legal Background

Largely relying on decisions allowing a written copy of the charge to be given to the jury to aid their deliberations, the Courts of Appeal have held that it is within a district court's discretion to provide jurors with a tape-recording of its instructions.  <u>United States v. Holman</u>, 680 F.2d 1340, 1354 (11th Cir. 1982); <u>United States v. Watson</u>, 669 F.2d 1375, 1386 (5th Cir. 1982).   Indeed, the Seventh Circuit has suggested that trial judges should well consider whether the need for supplemental instructions, with the concomitant greater opportunity for error such instructions pose, "may be reduced by sending into the jury room* * * either a written copy or tape recording of, together with equipment to enable the jury to hear, the complete instructions."  <u>United States v. Silvern</u>, 484 F.2d 879, 883 ( 7th Cir. 1973).  Consistently with these decisions, the Second Circuit recently upheld the practice of providing the jury with a tape of the charge in one of the trials involved in this experiment.  <u>United States v. Castenada</u>, F.2d (1984) (summary affirmance pursuant to § 0.23 of the Local Rules of the Court of Appeals for the Second Circuit).

## II.  The Experiment

### A.  Results

Three judges furnished the jury with a tape-recording of their instructions in a total of 14 civil and criminal trials The judges returned evaluative questionnaires for all 14 of these trials.    However, only five attorney evaluations have been returned (two prosecutors, one plaintiff's counsel, one civil and one criminal defense counsel).    In addition, one of the participating judges polled the jurors in the three cases he conducted using the experimental procedure.

With the exception of two attorneys--one prosecutor and one criminal defense counsel--the respondents were unanimous in their enthusiastic support for the counsel.    In 13 of the 14 experimental trials, the judges found that furnishing the jury with a tape of the charge was "very helpful," termed the procedure "excellent" and "superb," and stated their firm intention to use it regularly.    (In the fourteenth case, the judge found the procedure "somewhat helpful."[*]    The judges believed that providing the jury with a tape-recording of the charge helped the jury to understand the instructions, and, additionally, saved the court's time by alleviating the need for a re-reading of the charge.    Two attorneys agreed that the procedure was not only

---

[*] One of the four judges who began the experiment, however, advised that "My first and only effort to try it out became so entangled that it convinced me that it could, in the long run, cause me more problems than the enterprise was worth."    This conclusion was reached after defense

helpful but a good "time-saving device" as well.

Significantly, in all three trials in which one of the participating judges polled the jurors, "the jurors * * * responded that they did indeed play the tape of [the] charge and that they found it very helpful in each instance."

B.  Concerns

Echoing the concerns noted by the court in Holman, supra, one attorney stressed that the jury should be instructed not to overemphasize one portion of the charge to the exclusion of the others.  The participating judges all cautioned the jurors not to do so.[**]  Moreover, the polled jurors confirmed that they had played the charge through in its entirety.

One civil defense attorney suggested that the jury's need to skim through large portions of the charge in order to find the desired passage might be eliminated by taping each major element of the charge on a separate tape.  Another means for achieving this end would be for the clerk to note the tape-counter number at which different portions of the charge begin (and end).

counsel requested an opportunity to listen to the tape of the lengthy charge before it was sent to the jury.  To deal with the possibility of mechanical malfunctioning, consideration should be given to including an instruction in the charge covering this possibility (see fn. ** infra.) and to preservation of the tape until all appellate procedures have been concluded or there is consent to its erasure.

** In United States v. Larson, 83 246 (S.D.N.Y.) Judge Brieant instructed the jurors as follows:

> A tape recording will be furnished to you for use in the jury room if you wish to listen to the Court's instructions in whole or in part again.  I would like to say also that if the tape recording is unclear for any reason, we do have the court reporter here who can read back from the stenotapes,--so if you should find any difficulty with the tape recording, you can send out a note, and if you want any portion of the charge read, I will bring you back into the Courtroom to do that.

Both of the attorneys who expressed displeasure with the experiment noted their preference for having the jury brought back into court for re-instruction, and their fear that having the tape would discourage the jurors from asking questions of the court. These concerns parallel the misgivings expressed by some of the attorneys who participated in Experiment 6, supra, in which the <u>jury was provided with a written copy of the court's charge.</u>

> I also caution you that if you do undertake to play the
> tape of these instructions, you must remember that the
> jury instructions given by the Court must be treated in
> their entirety, and it would not be appropriate to take
> any single instruction standing alone and consider it with
> regard to the balance of the instructions.  But as I said,
> the tape is there for your assistance, if you need to play
> all or part of the Court's instructions for purposes of
> having them repeated.   Whether you do  so  or  not  is
> entirely       for      you      jurors      to       decide.



## Providing Jury With a Tape-Recording of the Charge: Summary of Responses

| | Evaluation of Procedure | | | |
| --- | --- | --- | --- | --- |
| | (Very) Helpful | Somewhat Helpful | Unhelpful | Total Responses |
| Judges: | 13 | 1 | | 14 |
| Plaintiffs' Counsel and Prosecutors: | 2 | | 1 | 3 |
| Defense Counsel: | 1 | | 1 | 2 |

Number of Judges Participating in Experiment: 3   Number of Cases in Which Procedure was Used: 14

CONCLUSIONS

AND

SUGGESTIONS FOR FURTHER STUDY

CONCLUSIONS

The Committee recognized prior to embarking on these experiments that they would "prove" nothing. The sampling is simply too small and too self-selective to be conclusive. What the experiments were intended to explore was the feasibility of some of these procedures, to uncover unanticipated problems that might be encountered in their implementation and to gain some sense of their utility under actual trial conditions.[*] We believe that our knowledge of these procedures has been enhanced by these procedures.

Although hardly conclusive, we think it is noteworthy that, for example, almost all of the judges who began to tape their charges experimentally have decided to continue the practice, and other judges, not participating in the experiments, are following their example.

_____

[*] For example, the interrelationship between use of the struck panel system and attorney participation for limited time periods in the voir dire was not apparent to us until Judge Elfvin called it to our attention just prior to the start of the experiments.

The Committee notes that diversity of practice among the district judges with respect to certain jury practices is widespread. Although this diversity imposes some burden on counsel to learn and adjust to the techniques of the individual judges, we believe it is preferable to mandating adherence to a particular procedure. For these reasons, we do not recommend that any of the experiments set forth in this report become embodied in any mandatory court rules. Rather, we regard them as possible techniques which individual judges should feel free to use or reject in particular cases provided that counsel are given sufficient advance notice so that they may adjust their trial techniques where appropriate.

### Suggestions for Further Study

During the course of its activities, the Committee encountered at least one area which it believes warrants research and study by the district courts. We refer to possible increased use of written questionnaires in jury selection. This is a standard procedure in some districts, such as the Eastern District of Pennsylvania, but has been rarely used in the districts of the Second Circuit except in unusual cases such as the Agent Orange litigation.

Much time is presently consumed during the voir dire process by the asking of routine questions, e.g., residence, marital status, occupation. Prospective jurors spend considerable periods of time in idleness while they await assignment. If some of this idle time were spent completing questionnaires which the panelists would bring with them to the courtroom and these

questionnaires were then made available to counsel, the time spent on routine questioning might be expended more productively.

## Further Activity of the Committee

It is the present intent of the Committee to conduct or participate in one or more symposia in conjunction with the federal courts committees of local bar associations to discuss further these and other possibly useful jury techniques. The judges and attorneys who participated in the experiments will be invited to attend and further share their experiences with the bench and bar. One such symposium will be held on October 3, 1984 at 7:30 P.M., at the Association of the Bar of the City of New York.

The committee is also of the opinion that from time to time, perhaps at two year intervals, there should be a further opportunity for judges who use these and other innovative techniques and the attorneys who appear before them to describe their experiences. Thus, the bench and bar could periodically evaluate these procedures, consider whether it is advisable to continue the present diversity of practice or whether in some instances adoption of uniform practices by rule-making would be preferable, and learn of new needs and techniques as they develop. We respectfully recommend to the Circuit Council that the Circuit Executive or some Reporter be assigned the responsibility for conducting these periodic reviews.

Respectfully submitted,

The Committee on Juries of
the Judicial Council of
the Second Circuit

August 1984

Except as noted above, the Committee will deem its assignment to have been completed although of course the individual members of the Committee stand ready and willing to respond to any further requests of the Judicial Council.