# COMMENT

## DON'T MESS WITH TEXAS VOIR DIRE*

### TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................202

II.  THE PURPOSES OF VOIR DIRE AND HOW IT
     HAS DEVELOPED ..............................................................204
     A.  *Purposes of Voir Dire Examination* ...........................204
         1.  *To Ensure That a Fair and Impartial Jury is
             Empanelled* .........................................................204
         2.  *Voir Dire Is an Integral Part of the Adversary
             Process* ...............................................................205
     B.  *Implementation of These Purposes Through Rules
         Adopted to Govern Jury Trials in Texas* .....................206
         1.  *Voir Dire Rules in the Texas Statutes
             and Rules of Civil Procedure* ...............................206
         2.  *Voir Dire Rules Established by the Courts* ...........207

III. CHALLENGES TO CURRENT VOIR DIRE RULES: A PUSH
     FOR FUNDAMENTAL CHANGES ...........................................209
     A.  *An Overview of the Demand for Change* .....................209
     B.  *Does Objective Evidence Suggest a Systemic Need
         for Change?* ...............................................................211
         1.  *Does Any Change in the Nature of Litigation
             Require Alteration of the Voir Dire Rules?* ...........211
         2.  *Do Current Voir Dire Practices Result in
             Unrepresentative Juries?* .....................................214
         3.  *Does Existing Case Law Regarding the Jury
             Selection Process Reveal a Need for Change?* .......215

---

\* This paper was selected as the recipient of the 2001 Baker Botts Award for an outstanding paper in the area of Texas evidence law.

**Exhibit 10**

C. *A "Six-Shooter" of Proposed Changes Aimed
      at Voir Dire* ................................................................216
   1. *Fixed Time Limits Should Be Imposed
         on Voir Dire*.........................................................216
   2. *Leading Questions by Attorneys Should
         Be Barred* ............................................................221
   3. *Attorneys Should Be Precluded from Asking
         Whether a Prospective Juror Is "Leaning"
         Toward or Away from Either Side* .......................222
   4. *The Right to Rehabilitate Prospective Jurors
         Should Be Expanded* ...........................................226
   5. *The Number of Peremptory Strikes Should Be
         Eliminated or Reduced*........................................230
   6. *Use of Juror Questionnaires Should
         Be Limited*...........................................................235

IV. CONCLUSION: THE "SIX-SHOOTER" FIRED BLANKS—THE
     PROPOSED CHANGES ARE UNWARRANTED .........................240

## I. INTRODUCTION

An intrinsic aspect of the constitutionally protected right to a jury trial in Texas is the litigant's right to conduct a voir dire examination of prospective jurors.[1] A number of fundamental rules governing the jury selection process have evolved over the last century and are designed to ensure the essential component of the right to a jury trial—a fair and impartial jury. Those rules are embodied both in common law principles[2] and in court procedural rules.[3]

Recently, several commentators proposed that certain changes be made to the voir dire rules observed in Texas courts.[4] Specifically, critics of the current voir dire system suggest the following: (1) that strict time limits be imposed; (2) that leading questions by attorneys be barred; (3) that "leaning" questions be eliminated; (4) that rehabilitation of prospective jurors be expanded; (5) that the number of peremptory strikes be eliminated or reduced; and, finally, (6) that the use of juror

---

1.   TEX. CONST. art. I, § 15 ("The right of trial by jury shall remain inviolate.").

2.   Refer to Part II.B.2 *infra* (examining the common law scope of voir dire in Texas).

3.   Refer to Part II.B.1 *infra* (discussing the various statutes and rules that govern the jury selection process).

4.   Refer to Part III.A *infra* (chronicling recent complaints about the voir dire system that have culminated in a call for reform).

questionnaires be narrowly restricted.[5] This Comment examines these proposals and concludes that, because the current jury system in Texas functions well, the proposed changes are unwarranted.[6]

In arriving at this conclusion, this Comment focuses upon whether proponents of these changes have provided objective evidence in whole or in part supporting the adoption of those changes.[7] The analysis fails to reveal systemic abuses of voir dire under current rules. The absence of such evidence in the extensive record of Texas jury selection procedural appeals confirms that the jury selection process is not disserved by the existing rules.[8] The proponents of these changes are relegated instead to anecdotal observations and arguments rooted in the subjective postulate that, unless changes are adopted, litigants, through their attorneys, will somehow bias or exploit the jury selection process.[9] These arguments provide no persuasive basis for justifying the changes recommended.

This Comment examines the proposed changes solely in the context of the Texas system of attorney-conducted voir dire. It does not include the federal voir dire system within its scope because the federal judiciary made the judgment that voir dire is, with limited exception, to be conducted by the court.[10] This Comment focuses primarily, though not exclusively, on voir dire in Texas civil cases with the understanding that similar voir dire rules apply to Texas criminal cases.[11]

---

5. Refer to Part III.C.1–6 *infra* (considering the six proposed changes individually).

6. Refer to Part III.C.1–6 and Part IV *infra* (examining the main criticisms of the voir dire process and concluding that they are unwarranted).

7. Refer to Part III.B.1–3 *infra* (exploring the lack of objective evidence presented by critics of the voir dire system).

8. Refer to Part III.B.3 *infra* (evaluating the appellate record for evidence of a need for change in the voir dire process).

9. Refer to Part III.B–C *infra* (considering the broader issue of objective evidence and applying this standard to the six areas of proposed change).

10. *See* FED. R. CIV. P. 47(a) (stating that the court may permit attorneys to question the venire panel, or the court may choose to conduct voir dire itself). The considerations underlying this decision have been the subject of comment elsewhere. *See, e.g.,* Fred D. Howard, *Judge-Versus Attorney-Conducted Voir Dire,* UTAH B.J., Oct. 1991, at 13, 14 (arguing that lawyers are better able to ferret out bias and that judge-conducted voir dire should allow increased lawyer participation).

11. While both criminal and civil voir dire share a common adherence to the judge-made principle of broad latitude, the underpinnings of effective voir dire are closely tied to state and federal constitutional rights to effective counsel and to other specific rules embodied in the Texas Code of Criminal Procedure. TEX. CRIM. PROC. CODE ANN. § 35.17 (Vernon 1998 & Supp. 2001); *see also* Scott A. Brister, *Lonesome Docket: Using the Texas Rules to Shorten Trials and Delay,* 46 BAYLOR L. REV. 525, 538 (1994) [hereinafter Brister, *Lonesome Docket*] (explaining the differences between criminal voir dire issues and civil voir dire issues).

This Comment evaluates the proposed changes in light of the following issues: (1) the purposes of voir dire; (2) the implementation of these purposes through the current rules limiting the permissible conduct of voir dire; (3) the proposed changes to those rules; (4) whether there is objective evidence of a systemic need for change in all or part of these rules; and (5) the extant Texas case law evaluating and applying these controlling principles.

## II. THE PURPOSES OF VOIR DIRE AND HOW IT HAS DEVELOPED

### A. *Purposes of Voir Dire Examination*

*1. To Ensure That a Fair and Impartial Jury Is Empanelled.* Voir dire is considered by many attorneys, jurists, and commentators to be the most important aspect of the trial.[12] Defined by Black's Law Dictionary as "to speak the truth,"[13] the purpose of voir dire is to ferret out bias and prejudice, thus ensuring a fair trial by jury.[14] The process of jury selection finds its origins, in part, in the Texas Constitution, article I, section 15, which guarantees the right to trial by a fair and impartial jury.[15] Voir dire is the first crucial step in ensuring this outcome.[16] If the jury selection process works well, the ultimate result of voir dire should be the selection of a jury properly qualified to fairly and impartially decide the disputed fact issues in the case. Stated alternatively, the objective of voir dire is to empanel a jury composed of veniremen who, when

---

12. *See, e.g.*, McCoy v. Wal-Mart Stores, Inc., 59 S.W.3d 793, 801 (Tex. App.—Texarkana 2001, no pet. h.) ("We recognize that voir dire questioning is possibly the most important part of any jury trial . . . ."); Cathy E. Bennett et al., *How to Conduct a Meaningful & Effective Voir Dire in Criminal Cases*, 46 SMU L. REV. 659, 659 (1992) ("Effective and skillfully conducted voir dire is the most important ingredient in winning a trial . . . ."); Rick Fried, *Thoughts on Voir Dire and Opening Statement from a Plaintiff's Perspective*, HAW. B.J., Nov. 1997, at 6, 6–7 ("Obviously, all parts of the trial are important, but the first two parts of a trial, voir dire and opening statement, are generally the most important."); Harvey Weitz, *Voir Dire in Conservative Times*, LITIG., Summer 1996, at 15, 15 ("Voir dire is the most important, yet least understood portion of a jury trial."); James M. Mehaffy, *A Few Tips on Jury Selection: A View from the Bench*, 63 TEX. B.J. 878, 878 (2000) ("[L]awyers understand that, above all, jury selection is the most important part of the whole process.").

13. BLACK'S LAW DICTIONARY 1569 (7th ed. 1999).

14. *See* Richard J. Crawford & Daniel W. Patterson, *Exploring and Expanding Voir Dire Boundaries: A Note to Judges and Trial Lawyers*, 20 AM. J. TRIAL ADVOC. 654 (1997), WL 20 AMJTA 645, at *1 (stating that the simple purpose of voir dire is to provide for a fair and impartial resolution of the dispute).

15. TEX. CONST. art. I, § 15 ("The right of trial by jury shall remain inviolate.").

16. *See* Bill Robbins III, *Voir Dire in Texas After Babcock v. Northwest Memorial Hospital*, 28 HOUS. L. REV. 487, 487 (1991) (recognizing that voir dire allows litigants to secure their right to trial by an impartial jury).

charged by the court at the end of the case, are not debilitated by any bias or prejudice that would prevent them from rendering a fair verdict.[17] Indeed, so fundamental is the right to trial by an impartial jury that "[t]he trial court errs if it seats a juror whom voir dire has shown to be biased."[18]

2. *Voir Dire Is an Integral Part of the Adversary Process.* Why is voir dire so important to the adversary process? In Texas state-court practice, lawyers ultimately have only three opportunities to speak directly to the jury—during voir dire, opening statements, and closing arguments. Only during voir dire are attorneys permitted to speak *with* rather than *to* the jury and to engage in a meaningful dialogue.[19] Voir dire allows a lawyer to gain insights into the education, training, experience, and attitudes of the prospective jurors who may sit on the jury; by knowing his jury better, he may present his case in the manner most effective to his client's interests.[20]

At this preliminary stage in the trial, both the defense's and the plaintiff's counsel are attempting to ferret out bias and prejudice against their clients. During this process, the attorneys are necessarily articulating issues relevant to their clients' positions in the case even before the trial begins.[21] In this respect, voir dire is essential because "[t]he task at hand is more than the mere gleaning of information helpful to counsel in exercising challenges against unwanted jurors. Added purposes of voir dire include setting the jurors at ease, creating a degree of rapport with them, and stating the general nature of the case, all in such a way that the jurors will be on the counsel's side from the beginning."[22] Creating an open atmosphere in which all parties

---

17. *See* H. Lee Godfrey, *Civil Voir Dire in Texas: Winning the Appeal Based on Bias or Prejudice*, 31 S. TEX. L. REV. 409, 410 (1990) (stating that a juror who conceals any bias or prejudice during voir dire is guilty of misconduct which could result in reversal of the case).

18. *Id.; see, e.g.,* Gum v. Schaefer, 683 S.W.2d 803, 808 (Tex. App.—Corpus Christi 1984, no writ) (per curiam) (finding reversible error where a potential juror who admitted bias was rehabilitated and seated on the panel).

19. James L. Gilbert et al., *Overcoming Juror Bias in Voir Dire*, TRIAL, July 1, 1997, 1997 WL 9957729, at *1.

20. *See* Robert F. Hanley, *Getting to Know You*, 40 AM. U. L. REV. 865, 869–70 (1991) (proposing a strategy of focusing voir dire inquiries on such things as jurors' hobbies, education, and reading materials to determine whether they have biases that would work against a client's interests).

21. *See, e.g.,* Gilbert, *supra* note 19, at *2 (discussing ways in which attorneys can counter misinformation regarding a client or his position and "awaken" a juror's sense of fair play); Godfrey, *supra* note 17, at 439 (recommending that an attorney "[s]teal [his] opponent's thunder by bringing out the facts most unfavorable to [his client's] side").

22. 8 WILLIAM V. DORSANEO III ET AL., TEXAS LITIGATION GUIDE § 120.02[1] (2000) (offering these additional functions of voir dire).

feel that the jury can decide the issues fairly and impartially is crucial to an effective trial.[23]

## B. *Implementation of These Purposes Through Rules Adopted to Govern Jury Trials in Texas*

1. *Voir Dire Rules in the Texas Statutes and Rules of Civil Procedure.* In Texas, civil voir dire is not strictly governed by particular rules of procedure.[24] The Texas Rules of Civil Procedure make no mention of the scope and function of voir dire.[25] Instead, the rules and certain statutes establish threshold juror qualifications such as being of sound mind, being over eighteen years of age, and never having been convicted of a felony. They also establish certain exemptions from jury service, including exemptions for persons over seventy years of age or students enrolled in college, as well as for particular religious observations.[26] While not explicitly defining the scope and function of voir dire, the Texas Rules of Civil Procedure and related statutes do address the function and use of peremptory challenges and challenges for cause in the jury selection process.[27] The state's procedural rules afford six peremptory challenges during voir dire.[28] These challenges may be exercised for any reason that counsel sees fit, so long as the disqualification does not rest on the impermissible grounds of race or sex.[29] Each

---

23.   *See* Godfrey, *supra* note 17, at 452–53 (reminding attorneys that a successful voir dire occurs when an attorney is friendly, candid, and "[m]ake[s] it clear [to the jurors] that [his] questioning is designed only to obtain for [his] client a fair and impartial jury").

24.   *See* Brister, *Lonesome Docket*, *supra* note 11, at 538 (explaining the lack of formal rules governing the civil trial voir dire process).

25.   *Id.* at 537 (noting that the Texas Rules of Civil Procedure "do not set out the manner for conducting voir dire, and in fact hardly mention it at all").

26.   *See* 8 DORSANEO, *supra* note 22, § 120.01[4][a]–[b] (listing all the statutory qualifications and exemptions for jury selection).

27.   *See* TEX. GOV'T CODE ANN. § 62.105 (Vernon 1998 & Supp. 2000) (addressing disqualification of a juror from the panel); TEX. R. CIV. P. 227 (allowing a challenge to be made against a juror for cause or with a peremptory strike); TEX. R. CIV. P. 228 (defining the phrase "challenge for cause"); TEX. R. CIV. P. 229 (explaining the procedure for disqualifying a juror for cause); TEX. R. CIV. P. 232 (stating that peremptory challenges can be asserted without giving a reason); TEX. R. CIV. P. 233 (listing the available number of peremptory challenges); TEX. R. CIV. P. 327 (governing motion for a new trial based on juror misconduct).

28.   *See* TEX. R. CIV. P. 233 (allowing six peremptory challenges per side in district court, three in county court). In multi-party cases, additional peremptory challenges may be granted to either or both sides at the discretion of the court. *See* 8 DORSANEO, *supra* note 22, § 120.02[4][b]. The court also has discretion to "equalize" strikes between all parties on the plaintiff and defense side of a case. *See id.*

29.   *See* Edmonson v. Leesville Concrete Co., 500 U.S. 614, 628, 630 (1991) (applying to civil cases the holding of the criminal case decision in *Batson v. Kentucky*, 476 U.S. 79, 96, 106 (1986), that peremptory strikes may not be based on race); J.E.B. v. Alabama, 511

side may also interpose challenges for cause which are granted by the court on a showing of juror bias or prejudice.[30] The court must disqualify a venireman if, upon questioning, he exhibits either bias or prejudice toward the persons or issues in the case.[31] Further, there can be no rehabilitation of a juror who exhibits conclusive bias or prejudice.[32]

   2. *Voir Dire Rules Established by the Courts.* In addition to applying the disqualification rules and those regarding peremptory challenges and challenges for cause, the courts have established additional rules governing the permissible scope of voir dire. The permissible scope of voir dire has been largely judicially created and thus governed by Texas common law.[33] The case law defines a broad scope of voir dire for attorneys, allowing them wide latitude in their inquiries subject only to the trial court's discretion.[34] Broad latitude is imperative to ensure that "challenges may be intelligently exercised."[35] Courts impose relatively few standard limitations upon voir dire.[36] These include, for example: (1) rules limiting the types of questions to be asked so that the jurors are not unfairly committed to a verdict before any evidence is shown;[37] (2) preventing an attorney

---

U.S. 127, 129–30 (1994) (holding that peremptory strikes can not be used to disqualify on the basis of gender).

   30. TEX. GOV'T CODE ANN. § 62.105 ("A person is disqualified to serve as a petit juror in a particular case if he . . . has a bias or prejudice in favor of or against a party in the case . . . ."). Disqualification for cause extends to bias or prejudice regarding the subject matter or issues of the particular case. Julie A. Wright, *Challenges for Cause Due to Bias or Prejudice: The Blind Leading the Blind Down the Road of Disqualification*, 46 BAYLOR L. REV. 825, 826–27 (1994) (expanding the bias test to jurors' attitudes about the parties, the issues, and even the type of lawsuit).

   31. *See* Compton v. Henrie, 364 S.W.2d 179, 182 (Tex. 1963) (confirming that if juror expresses a bias or prejudice, disqualification occurs as a matter of law).

   32. TEX. GOV'T CODE ANN. § 62.105(4) (requiring disqualification of jurors who are biased or prejudiced).

   33. *See* McCoy v. Wal-Mart Stores, Inc., 59 S.W.3d 793, 797 (Tex. App.—Texarkana 2001, no pet. h.) ("Generally speaking, the scope of voir dire examination is a matter which rests largely in the sound discretion of the trial court.").

   34. *See* Babcock v. N.W. Mem'l Hosp., 767 S.W.2d 705, 709 (Tex. 1989) (recognizing that Texas courts allow for broad inquiries during voir dire).

   35. *Id.* (reinforcing the importance of allowing great latitude on voir dire so that litigants may discover any bias or prejudice and thus use their strikes wisely).

   36. *See, e.g., id.* (recognizing that, in Texas courts, "voir dire examination is largely within the sound discretion of the trial judge," and this discretion is only limited "when [the court's] denial of the right to ask a proper question prevents determination of whether grounds exist to challenge for cause or denies intelligent use of peremptory challenges"); *McCoy,* 59 S.W.3d at 801 ("[P]arties in any given case should be afforded full opportunity to examine the jury panel with no more interference from the trial court than necessary.").

   37. Campbell v. Campbell, 215 S.W. 134, 137 (Tex. Civ. App.—Dallas 1919, writ ref'd) (acknowledging that while the utmost freedom should be allowed during voir dire

from advising the juror as to the effect of his answers;[38] and (3) prohibiting attorneys from making inflammatory statements which prejudice the jury against the other side.[39] These broad parameters of voir dire have remained relatively unchanged over the past century in Texas.[40]

It is apparent under these rules that a crucial function of the attorney in voir dire is to thoroughly question the veniremen to determine how to disqualify biased panel members for cause and, therefore, to reserve the exercise of his peremptory challenges for the remaining panel members in the most effective manner possible.[41] The significance of the peremptory challenge is considered in greater detail in Part III.C.5 of this Comment.

In sum, the current rules in Texas regarding the conduct of voir dire afford the lawyer wide latitude in questioning prospective jurors. Historically, the only curtailment has been the court's discretion in deciding how to place reasonable limitations on voir dire depending upon the type of case and the issues at hand.[42]

---

questioning, the courts must forbid any inquiry that attempts to commit the prospective juror to a view before the juror has heard any evidence).

38. Texas Employers Ins. Ass'n v. Loesch, 538 S.W.2d 435, 441–42 (Tex. Civ. App.—Waco 1976, writ ref'd n.r.e.) (holding that questions informing a prospective juror as to the effect of his answer were in error but harmless because of defendant's lack of a timely objection).

39. Texas & N.O.R. Co. v. Lide, 117 S.W.2d 479, 480 (Tex. Civ. App.—Waco 1938, no writ) (condemning an attorney's statements during voir dire as highly improper because his sole motivation was to prejudice and inflame the jury).

40. *Compare* Lassiter v. Bouche, 41 S.W.2d 88, 90 (Tex. Civ. App.—Dallas 1931, writ ref'd) (allowing broad latitude in a civil case to the attorney in questioning the panel, subject only to the trial court's discretion), *with* Clemments v. State, 940 S.W.2d 207, 209 (Tex. App.—San Antonio 1996, pet. ref'd) (declaring that an attorney in a criminal case has the right to question potential jurors freely, subject to limitations imposed at the trial court's reasonable discretion), *and McCoy*, 59 S.W.3d at 801 (recognizing the broad latitude of voir dire).

41. *See Babcock*, 767 S.W.2d at 709 (holding that the trial court abused its discretion when it denied an attorney the right to ask a proper question, therefore preventing the attorney from intelligently exercising peremptory challenges and challenges for cause); *see also* Frank Finn & John W. Bickel II, *Please Don't Stop Us from Asking* (setting forth the importance of the peremptory strike to seat an impartial jury), http://www.abanet.org/litigation/committee/pretrial/fa97finn.html (last visited Nov. 14, 2001).

42. *See* Robinson v. Lovell, 238 S.W.2d 294, 297 (Tex. Civ. App.—Galveston 1951, writ ref'd n.r.e.) (explaining that an attorney's right to question is broad, subject only to the court's discretion); Bennett et al., *supra* note 12, at 688 (summarizing the trial court's discretion in setting time limits for voir dire).

## III. CHALLENGES TO CURRENT VOIR DIRE RULES: A PUSH FOR FUNDAMENTAL CHANGES

### A. *An Overview of the Demand for Change*

Over the past decade or so, a movement toward possible changes in the jury selection process occurred both nationally and in Texas.[43] This trend is principally reflected in anecdotal complaints regarding alleged abuses of the voir dire system and reinforced by some judge-supported criticism along with several proposals for change.[44] In 1996, in response to particular criticisms of voir dire procedures, the Texas Supreme Court established a Jury Task Force to research the issue and to determine whether certain changes should be implemented, including adoption of proposed new rules that would arguably improve the function of voir dire.[45] The Jury Task Force examined several aspects of the jury selection process and, in turn, formed a number of subcommittees to consider particular areas of concern.[46] Of interest specifically to the voir dire issue was the trial procedure reform subcommittee, chaired by Judge Scott Brister.[47] This committee analyzed the current jury selection system and existing limitations on voir dire and determined whether changes should be recommended and, if so, what recommended rules it would propose.[48] The Task Force report was completed in 1997 and was presented to the Texas

---

43.  *See* Phoebe C. Ellsworth, *Jury Reform at the End of the Century: Real Agreement, Real Changes*, 32 U. MICH. J.L. REFORM 213, 214–16 (1999) (highlighting the history of jury reform and recent discussions on a broad, nationwide basis); Brenda Sapino Jeffreys, *Voir Dire Plan Raises Trial Lawyer's Ire*, TEX. LAW., May 22, 2000, WL 5/22/2000 TEXLAW 1, at *1–3 (underscoring the growing debate regarding jury selection and the possible implementation of the Jury Task Force recommendations); Morris Dees, *The Death of Voir Dire*, LITIG. (Fall 1993) (lamenting the erosion of attorney-conducted voir dire).

44.  *See, e.g.*, Reid Hastie, *Is Attorney-Conducted Voir Dire an Effective Procedure for the Selection of Impartial Juries?*, 40 AM. U. L. REV. 703, 725–26 (1991) (concluding that "[e]xtended attorney-conducted voir dire procedures are ineffective at winnowing out prejudiced jurors" and that jury selection "should limit attorney participation to modest levels and reduce or eliminate the institution of peremptory challenges"); Brister, *Lonesome Docket*, *supra* note 11, at 538 (criticizing the inefficiency of voir dire and expressing hope that rules creating limits will be considered).

45.  EXECUTIVE SUMMARY REPORT OF THE SUPREME COURT JURY TASK FORCE 5 (Sept. 1998) [hereinafter JURY TASK FORCE] (on file with the Houston Law Review).

46.  *Id.* at 74–75 (identifying the four subcommittees as: (1) the committee on juror compensation; (2) the committee on jury size and non-unanimous verdicts; (3) the committee on juror composition and juror satisfaction; and (4) the committee on trial procedures).

47.  *Id.* at 76.

48.  *Id.* at 76–77, 84.

Supreme Court advisory subcommittee on September 8, 1997.[49] Since then, no major changes have been adopted by either the Supreme Court or the Texas legislature in response to the subcommittee's findings and recommendations.[50]

Despite the Supreme Court's declination to impose changes in the rules governing voir dire, the proponents of change continued to actively push for their implementation.[51] A resurgence of debate over this issue recently occurred in May, 2000, when the chairman of the Jury Task Force subcommittee on trial procedure reform, Judge Scott Brister, renewed his call for reform to the voir dire system in Texas.[52] Judge Brister argued vigorously for his proposed changes—most of which focused on issues identical to those debated by the Jury Task Force.[53] Because the Jury Task Force analysis and Judge Brister's declared positions on those issues capture the essence of the current debates,[54] this Comment focuses upon the six most debated issues regarding jury selection in order to evaluate whether the current rules of voir dire should be changed. Specifically, this Comment examines the current voir dire rules with respect to the following: (1) imposition of time limits; (2) a bar on asking veniremen leading questions; (3) a bar on asking jurors whether they are "leaning" toward or away from one side or another; (4) an increased right to rehabilitate a venireman; (5) a reduction or elimination of peremptory challenges; and (6) a limit on the use of juror questionnaires.[55]

---

49. *Id.* at 2.

50. *See* TEX. R. CIV. P. (reflecting adoption of no new rules); *see also* Tex. S.B. 1863, 76th Leg. R.S. (1999) (proposing various time limits on voir dire but never enacted), *available at* http://www.capitol.state.tx.us (last visited Feb. 15, 2002).

51. *See* Jeffreys, *supra* note 43, at *1–3 (summarizing the positions taken in the voir dire reform debate).

52. *See id.* at *2 (reiterating Judge Brister's arguments made in earlier 1997 articles while serving on the Jury Task Force); *see also* Scott A. Brister, *Wanted: Docile, Uninformed Jurors?*, TEX. LAW., Jan. 27, 1997, WL 1/27/1997 TEXLAW 32, at *1–4 [hereinafter Brister, *Docile Jurors*] (voicing the author's top ten list of practices to eliminate from voir dire); Scott A. Brister, *Democracy Strikes Out*, TEX. LAW., Mar. 10, 1997, WL 3/10/1997 TEXLAW 32, at *5 [hereinafter Brister, *Democracy Strikes Out*] (calling for a decrease in the number of peremptory strikes allowed during voir dire).

53. *Compare* Brister, *Docile Jurors, supra* note 52, at *1–4, *and* Brister, *Democracy Strikes Out, supra* note 52, at *1–5, *with* JURY TASK FORCE, *supra* note 45, at 84 (illustrating Judge Brister's opinion that the voir dire system needs revision and proposing changes).

54. *See, e.g.,* Crawford & Patterson, *supra* note 14, at *2–3 (analyzing whether restrictions on time and peremptory challenges are warranted).

55. *See* JURY TASK FORCE, *supra* note 45, at 1, 140–84 (covering these issues); Brister, *Docile Jurors, supra* note 52, at *1–4 (presenting this list of proposed changes).

## B.  *Does Objective Evidence Suggest a Systemic Need for Change?*

1.  *Does Any Change in the Nature of Litigation Require Alteration of the Voir Dire Rules?* Before considering the six proposed changes to voir dire, it is useful to determine whether there has been any change in the nature of litigation as a whole that would suggest the historical procedures for voir dire are inadequate and possibly produce unrepresentative juries. It has been suggested, perhaps generally consistent with the observation of most active trial attorneys, that over the past twenty-five years federal litigation has grown more complex and often more technical.[56] While it appears that there has been no systematic analysis of the precise nature of state court filings over that time, there has likely been a similar proliferation of complexity in Texas cases.[57] Assuming that this characterization is accurate, the question arises whether the increasing complexity of litigation requires any changes to be made in the voir dire process. No objective evidence has been proffered suggesting that a change in the nature of litigation, civil or criminal, compels enacting these proposed changes to limit voir dire in Texas. To the contrary, the purpose of voir dire—the selection of a fair and impartial jury—indicates that further limitations do not need to be imposed on voir dire.[58] Instead, in the face of increasingly complex litigation, commentators have reaffirmed that the voir dire rules should retain broad latitude in order to ferret out bias and prejudice which may be obscured by those very complexities, and that the rules should therefore remain unchanged.[59]

Periodically, judges and commentators have suggested that voir dire should be more judge-controlled and limited by specific

---

56.  *See* Joe S. Cecil et al., *Citizen Comprehension of Difficult Issues: Lessons from Civil Jury Trials*, 40 AM. U. L. REV. 727, 728–29 (1991) (noting the "increasing complexity of issues presented for adjudication").

57.  *See id.*

58.  *See* Patrick E. Longan, *Civil Trial Reform and the Appearance of Fairness*, 79 MARQ. L. REV. 295, 303–04 (1995) (arguing that abbreviated judicial voir dire undermines the appearance of fairness, leading to the belief that the jury cannot be impartial); Dees, *supra* note 43, at *14–15 (noting the increased restrictions on voir dire are "part of a greater trend: the effort to limit jury trials" and expressing hope that the trend will swing back in the other direction).

59.  *See* Crawford & Patterson, *supra* note 14, at *2 (rejecting the idea of limits on attorneys that would relegate their questions to guesswork and concluding that both attorney and juror need a "meaningful exchange on significant case-related issues"); McCoy v. Wal-Mart Stores, Inc., 59 S.W.3d 793, 801 (Tex. App.—Texarkana 2001, no pet. h.) ("The parameters set for voir dire questioning should always be fair and reasonable, and take into consideration the complexity and uniqueness of each case. These boundaries should also be flexible, subject to exceptions as justice and the circumstances require.").

rules, perhaps in the hope that these rules will create some quantum movement from a broad discretionary-based standard to a more rigid rule-based standard that would limit voir dire.[60] Some have even expressed the view that voir dire as currently practiced is a "waste of time."[61] Certain changes urged by the Jury Task Force have some surface appeal, especially as applied to simpler cases presenting fewer complexities and with narrowly defined issues. For example, critics of the current system have expressed frustration with lawyers who use extended voir dire interrogations and techniques in simple, straightforward cases, and have suggested that a rule imposing time limits offers a viable solution.[62] But Texas should not simply pass a rule that imposes arbitrary time limits on voir dire in all types of suits because no one rule can fairly cover the myriad types of cases and voir dire requirements.[63] Limitations should instead be tailored—as they are under the current rules and case law—on an individual basis through the mechanism of court discretion.[64]

Many of the proposed changes to voir dire are unnecessary if the trial court simply exercises the power it already possesses, because the scope of voir dire is broad but still subject to the trial court's discretion.[65] If the scope of voir dire is within the trial court's discretion, the court can impose reasonable limits to prevent attorneys from abusing the system.[66] Those rulings will not be reversed unless the time limitations imposed constitute an abuse of discretion.[67] In practice, it is nearly impossible to obtain

---

60. *See* Brister, *Docile Jurors, supra* note 52, at *2–5 (listing ten restrictions to impose on voir dire, including time limits).

61. Jeffreys, *supra* note 43, at *2 (quoting Judge Scott Brister).

62. *See* Brister, *Docile Jurors, supra* note 52, at *5 (arguing that if the Supreme Court allows only thirty-minute arguments, lower courts should not allow voir dire to "last for hours").

63. *See, e.g., McCoy*, 59 S.W.3d at 801 (concluding that voir dire boundaries should remain flexible and noting that different levels of complexity deserve different approaches to limiting voir dire).

64. *See, e.g.,* Ratliff v. State, 690 S.W.2d 597, 599–600 (Tex. Crim. App. 1985) (en banc) (ruling that trial courts have discretion to determine, on a case-by-case basis, the reasonableness of time limits); *McCoy*, 59 S.W.3d at 801.

65. Refer to notes 33–42 *supra* and accompanying text (citing examples of how courts use their discretion to address voir dire limits on an individualized basis).

66. *See Ratliff*, 690 S.W.2d at 599 (holding that trial courts can control voir dire time as long as the limits imposed are reasonable); Boyd v. State, 811 S.W.2d 105, 115–16 (Tex. Crim. App. 1991) (en banc) (upholding the trial court's reasonable limitation of time); Clemments v. State, 940 S.W.2d 207, 209 (Tex. App.—San Antonio 1996, pet. ref'd) (stating that the trial court has discretion to impose time limits); *McCoy*, 59 S.W.3d at 795, 801–02 (affirming a trial court's discretion to prevent a voir dire examination that is unduly repetitious or prolonged for a simple personal injury case).

67. *See* Zeh v. Singleton, 650 S.W.2d 518, 519–20 (Tex. App.—Houston [14th Dist.] 1983, no writ) (refusing to find reversible error when appellant failed to show a "manifest

a reversal on voir dire issues from an appellate court.[68] Thus, with respect to time limits, the trial court currently has the discretion to limit voir dire as long as the limitation is reasonable and does not prejudice one side over another.[69]

An obvious reason not to impose fixed and rigid limitations on voir dire is the reality that any process designed to seek out truth regarding juror bias and prejudice must be flexible enough to accommodate issues in litigation as they change from case to case.[70] It is neither possible nor arguably wise to arbitrarily eliminate or reduce the scope of voir dire questioning in all cases simply because a trial court may favor more limited voir dire in a particular type of case,[71] such as in the case of smaller personal injury claims.[72]

Although time limitations may have a superficial appeal, and courts can impose such restrictions at many stages of a lawsuit,[73] it is not clear whether the imposition of fixed time limits will reduce the overall time and expense of litigation. No

---

abuse of discretion" by the trial court); Godfrey, *supra* note 17, at 410–11 ("Texas appellate courts treat the decision by the trial court that the potential juror is not biased as a finding of fact entitled to review by a deferential standard."); *McCoy*, 59 S.W.3d at 797 ("To obtain a reversal, an appellant must show that the trial court abused its discretion and that the error was calculated to cause and probably did cause the rendition of an improper judgment.").

68. Godfrey, *supra* note 17, at 410 ("Getting a case reversed on [grounds of bias or juror misconduct] is unlikely."). To prove abuse of discretion by the trial court for failing to extend voir dire, the appellate court must consider the following three factors:

> 1) whether a party's voir dire examination reveals an attempt to prolong the voir dire; for example, whether the questions were irrelevant, immaterial, or unnecessarily repetitious; 2) whether the questions that were not permitted were proper voir dire questions; and 3) whether the party was precluded from examining veniremembers who served on the jury.

*McCoy*, 59 S.W.3d at 797.

69. *See Clements*, 940 S.W.2d at 210–11 (reversing the trial court because the rigid time control prevented the attorney from intelligently exercising her challenges); *McCoy*, 59 S.W.3d at 795, 802 (affirming the trial court because the time limit on the voir dire examination was reasonable and fair in light of the simplicity of this personal injury case).

70. *See Clements*, 940 S.W.2d at 211 (opining that automatic and rigid time limits threaten the protections of a fair and impartial jury, and that "[e]ach case must be examined on its own facts; a reasonable time limit for one case may not be reasonable for another").

71. *See id.* at 210–11 (recognizing that while time issues are a legitimate concern, structured limits on voir dire may threaten a participant's interest in a fair trial); *McCoy*, 59 S.W.3d at 801 (noting that limits on voir dire should be fair and reasonable and should remain flexible in the interest of justice).

72. *See McCoy*, 59 S.W.3d at 795, 802 (affirming the trial court's decision to limit voir dire to thirty minutes in a simple personal injury case).

73. *See* Boyd v. State, 811 S.W.2d 105, 116 (Tex. Crim. App. 1991) (en banc) (upholding the rule that trial courts have discretion to impose time limits on voir dire); *McCoy*, 59 S.W.3d at 802 (affirming the trial court's limitation of voir dire to thirty minutes because of the simplicity of the case).

empirical studies or case surveys have been identified that examine whether particular voir dire practices have unduly prolonged cases or increased the costs of litigation.[74] In the absence of concrete evidence of the benefits of fixed limits on voir dire, it is difficult to perceive the need for such change.

   2.   *Do Current Voir Dire Practices Result in Unrepresentative Juries?* Proponents of further voir dire limitations argue that abuses by both sides eliminate otherwise qualified jurors and create "unrepresentative" juries.[75] This broad and subjective assertion naturally invites the question: What objective evidence exists to support this claim? As demonstrated below, the case law does not support this argument.[76] Indeed it is difficult, absent a corroborated survey of jurors or relevant case law, to conceive how it may be objectively determined that voir dire abuses are eliminating qualified jurors in favor of those who are less qualified.[77] One commentator has even made the broad claim that voir dire "has become a tool for eliminating everyone except the uninformed and the docile."[78] Notably, no objective support was provided demonstrating whether this statement is rooted in fact or reality.[79]

   Proponents of the notion that voir dire as presently conducted produces unrepresentative juries provide no proof in support of their claim but rely instead upon their own subjective beliefs.[80] They have provided no quantifiable evidence that suggests the adverse parties and their counsel routinely whittle down the jury panel to an "unrepresentative" group, thus undermining the purpose of voir dire.

---

   74.   To the contrary, the cases reveal no evidence of routine or widespread abuses; instead, the case law confirms the obvious and wide deference given to the trial court's exercise of discretion in overseeing the voir dire process. Refer to note 108 *infra* (citing cases upholding the trial court's exercise of discretion).

   75.   *See* Brister, *Docile Jurors, supra* note 52, at *1 (claiming that "[a]s more jurors are eliminated [during a lengthy voir dire], the panel becomes less reflective of the whole").

   76.   Refer to Part III.C.1–6 *infra* (addressing the argument that expansive voir dire creates unrepresentative juries and concluding that this claim is unfounded).

   77.   Lawrence J. Madigan, *Brister's Wobbly Stance on Voir Dire*, TEX. LAW., Apr. 7, 1997, WL 4/7/1997 TEXLAW 39, at *1 (questioning the assertion that the venire panel remaining after all challenges have been exercised is not representative of the community).

   78.   *See* Brister, *Docile Jurors, supra* note 52, at *1 (criticizing current voir dire practices).

   79.   *Id.* at *2 (offering no case studies or objective evidence to support the assertion that "in large and long cases . . . we need to rethink jury selection").

   80.   *See id.*; Richard Waites, *Is Restricting Voir Dire Just Good Court Management or Infringement of Due Process?*, THE LEGAL INTELLIGENCER, July 11, 2000, WL 7/11/2000 TLI 7, at *1 (rebutting the three arguments urging more voir dire restrictions advanced by critics of the current system).

A thorough questioning of jurors during voir dire and the exercise of challenges in a reasoned and intelligent manner should not thwart the purpose of seating a fair and impartial jury.[81] Logic would suggest the opposite conclusion—the more intense and expansive the voir dire, the more bias and prejudice will be ferreted out, and the chances of empanelling a fair and impartial jury should be enhanced.[82] Conversely, the more restricted the scope of voir dire, the less qualified jurors are likely to be because the attorneys have not had an adequate opportunity to elicit evidence of bias or prejudice.[83] The lack of objective criteria by which to evaluate a claim of "unrepresentative jurors" renders it difficult to accept the argued necessity for changes to voir dire. The proponents of this argument have failed to sustain their contention.

3. *Does Existing Case Law Regarding the Jury Selection Process Reveal a Need for Change?* An important potential source of evidence for whether voir dire abuses are prejudicing the judicial system lies in the appellate record. If one or both sides in litigation were routinely being prejudiced by abuse of the voir dire process, claims of prejudice should be reflected in appellants' complaints. A review of appellate decisions in Texas handed down over the last century reveals no discernible trend supporting the need for any of the proposed voir dire changes.[84] The analysis below examines the purported need for each of the six proposed changes to voir dire. Part III.C of this Comment will analyze existing case law to determine whether: (1) a problem exists; (2) a change in the nature of litigation warrants a change in voir dire; and (3) the appellate courts have expressly or implicitly suggested that existing common law principles regulating voir dire are inadequate to ensure the selection of a constitutionally-adequate jury.

---

81. *See* Waites, *supra* note 80, at *2 ("How can a court ensure that a jury is impartial if the court does not give a litigant the opportunity to ask penetrating questions about attitudes and opinions of possible jurors and does not allow sufficient peremptory challenges in the absence of such questions?").

82. *Id.* at *1–2 (arguing that to ensure an impartial jury, it is necessary to permit the lawyer to ask "penetrating questions").

83. *Id.* at *2 ("[A]dequate voir dire is the only safeguard for a litigant to be protected from inappropriate juror bias."); *see also* Weitz, *supra* note 12, at 15 (lamenting that a lack of extensive voir dire turns the jury selection process into a guessing game).

84. Refer to note 40 *supra* (comparing the scope of voir dire in Texas cases at the beginning and the end of the twentieth century and noting no significant differences or changes in voir dire over this time).

## C. A "Six-Shooter" of Proposed Changes Aimed at Voir Dire

*1. Fixed Time Limits Should Be Imposed on Voir Dire.* Currently, there are no explicit limitations on the time attorneys can spend on voir dire.[85] The Jury Task Force and certain commentators have argued for a rule imposing time limitations.[86] The primary justification behind proposals limiting time to conduct voir dire is the well-worn "save time and money" argument supporting enhanced judicial efficiency.[87] Existing case law does not suggest, however, a need to create a rule specifically limiting time for voir dire. Currently, as with almost all aspects of voir dire, the time involved in voir dire can be limited through the trial court's discretion.[88] Appellate courts seem to think that judicial discretion adequately protects "time and money" for the courts, attorneys, and jurors, as long as the discretion is exercised reasonably.[89] Current case law illustrates that trial courts possess the power to limit trial time and that the exercise of this power will be overturned by the appellate court only if the limitations were arbitrary or capricious.[90] The appellate decisions contain neither lamentations about the lack of a strict rule to limit time, nor dicta suggesting that such a rule is warranted.

Advocates for imposing time limitations contend that if a specific rule were adopted, trials would become more stream-lined and efficient.[91] The committee report on trial procedures, which favored time limits, argued that "[l]eaving trial length to the judgment of the litigants is no restriction at all."[92] With respect to voir dire, this statement suggests that attorneys control the length of all facets of a trial, and thus the court serves

---

85. *See* Brister, *Lonesome Docket*, *supra* note 11, at 539 (noting that the mode of voir dire is determined at the discretion of the trial courts).

86. *See id.* at 538–39 (suggesting rules to further restrict voir dire); JURY TASK FORCE, *supra* note 45, at 143 (recommending an adoption of a rule imposing "reasonable" time limits on voir dire); Brister, *Docile Jurors*, *supra* note 52, at *5 (concluding that time limits will better focus the attorney's attention on the voir dire process).

87. JURY TASK FORCE, *supra* note 45, at 140 (arguing that longer trials create higher attorney's fees that the client must ultimately bear); Brister, *Lonesome Docket*, *supra* note 11, at 526 (basing the argument for time limitations on the need for more efficiency, alluding to the "rising cost of justice").

88. Refer to notes 107 and 111 *infra* (listing various examples of cases in which the trial court imposed time limits based on broad discretion and on a case-by-case basis).

89. Refer to note 111 *infra* (presenting cases in which the appellate court affirmed the trial court's discretion to properly limit voir dire).

90. Refer to note 111 *infra* and accompanying text (evidencing Texas courts' power of discretion).

91. JURY TASK FORCE, *supra* note 45, at 140–43 (outlining reasons behind its proposed time limits rule).

92. *Id.* at 154.

only a passive function.[93] Existing procedural and court-crafted rules governing the conduct of trials contradict this theory of passivity. If this circumstance exists in a particular court or trial, it is the responsibility of the court to rectify the problem by exercising the powers available to it. Because the trial court *already* possesses the power to control and limit all aspects of the trial, including the time for voir dire,[94] it is unclear how the system will benefit from predetermined or fixed time limits. Any rule adopting fixed "reasonable limitations" would introduce an element of inflexibility that would abrogate the common law practice of affording judges the reasonable discretion to set such limitations on a case-by-case basis.[95]

Advocates for change suggest that rigid time limits would almost certainly guarantee shorter trials.[96] The essential flaw in adopting such a rule is that cases vary in scope and content. An inflexible rule arbitrarily limiting the duration of voir dire in all cases will inevitably conflict in many cases with the fundamental purpose of the voir dire process—the selection of a fair jury. The objective of voir dire would thus be compromised in the name of judicial efficiency.[97] Some cases are simple and warrant little voir dire time; others are far more complex, requiring an expenditure of substantially more time to deal with the issues, parties, and subject-matter.[98] To impose inflexible time limits, even if tied to

---

93. *Contra* James W. McElhaney, *Getting the Most Out of Jury Selection*, A.B.A. J., Jan. 1993, WL 79-JAN A.B.A. J. 78, 78 (quoting a judge at a litigation seminar as stating, "Any judge worth his or her salt can put a stop to improper argumentation during jury selection. Easiest thing in the world.").

94. *See, e.g.*, Garza v. State, 18 S.W.3d 813, 819 n.2 (Tex. App.—Fort Worth 2000, pet. ref'd) (noting that it is up to the trial court's broad discretion to limit voir dire and that courts have the power to reasonably limit the time of voir dire, prevent vexatious or repetitive questions, and limit any inquiries which are personally invasive and irrelevant to show bias or prejudice); McCoy v. Wal-Mart Stores, Inc., 59 S.W.3d 793, 801 (Tex. App.—Texarkana 2001, no pet. h.) (recognizing that the court can impose limits on voir dire as long as they are reasonable and fair under the circumstances).

95. *McCoy*, 59 S.W.3d at 801 (noting the importance of flexibility during voir dire "as justice and the circumstances require").

96. *See* Brister, *Lonesome Docket, supra* note 11, at 537–39 (declaring that firmer limits would result in shorter trials). *But see McCoy*, 59 S.W.3d at 801 (noting that trial courts already have "considerable latitude in controlling voir dire examinations" in order to deal with over-burdened dockets and the pressure to expedite litigation).

97. *See* Longan, *supra* note 58, at 296 (noting that trial procedures "must not only be accurate and efficient," but "they must also be perceived by the litigants as fair").

98. *Compare* Carpenter v. Wyatt Construction Co., 501 S.W.2d 748, 749–50 (Tex. Civ. App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.) (presenting a straightforward personal injury suit where a woman fell down a stairway), *and McCoy*, 59 S.W.3d at 795 (concerning a plaintiff who was injured when glassware fell on her head in a Wal-Mart store), *with* Texaco, Inc. v. Pennzoil, Co., 729 S.W.2d 768, 784 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (presenting the jury with significantly more complex and time-consuming issues); *see also* Torres v. State, 4 S.W.3d 832, 835–36 (Tex. App.—

the three levels of cases identified in the Texas Rules of Civil Procedure,[99] could grossly hinder the parties' ability to probe prospective jurors for bias—the fundamental function of voir dire—in order to adequately exercise their peremptory challenges and challenges for cause.[100] One commentator postulates that "[j]urors want to be fair, but how can they report bias during jury selection when they know little about the case? Even if they do have a good overview of the case, few people can assess their biases accurately."[101] It logically follows that restricting an attorney's ability to thoroughly question a jury panel can significantly hinder his or her ability to elicit bias and prejudice.[102]

A complaint frequently registered by trial lawyers is that unreasonably restrictive time limits require them to rely on stereotypes in striking jurors because they lack sufficient time to

---

Texarkana 1999, pet. ref'd) ("Each case must be examined on its own facts, and a reasonable time limitation for one case may not be reasonable for another.").

99. The Texas Rules of Civil Procedure assign cases to one of three "levels" or classifications which differ in the amount of discovery permitted each side. TEX. R. CIV. P. 190.1. Level 1 includes suits requesting monetary relief of $50,000 or less. TEX. R. CIV. P. 190.2. Level 2, including all suits not covered by Rules 190.2 or 190.4, provides for more extensive discovery than Level 1. TEX. R. CIV. P. 190.3. Level 3 cases include presumably more complex cases in which a party requests that discovery be tailored to the needs of the particular suit. TEX. R. CIV. P. 190.4. A bill was introduced in, but not enacted by, the Texas legislature that would have tied time limits for voir dire to the level of the case. S.B. 1863, 1999 Leg., 76th Sess. (Tex. 1999) (unenacted), *available at* http://www.capitol.state.tx.us, proposing the following amendment to voir dire requirements:

Sec.30.006. VOIR DIRE REQUIREMENTS. . . .

(b) In any civil action to be tried before a jury, the trial court shall allow each side voir dire, as follows:

(1) in Level 1 cases, as defined by Rule 190.2, Texas Rules of Civil Procedure, at least one hour;

(2) in Level 2 cases, . . . at least two hours; and

(3) in Level 3 cases, . . . at least three hours.

(c) The time allocated in Subsection (b) shall not include time consumed in making peremptory challenges or challenges for cause to jurors or in making or responding to objections.

100. *See* Ratliff v. State, 690 S.W.2d 597, 599 (Tex. Crim. App. 1985) (en banc) (explaining that the right to counsel, guaranteed by article I, section 10 of the Texas Constitution, "encompasses the right of counsel to question the members of the jury panel in order to intelligently exercise his peremptory challenges," and noting that "the right of counsel to question veniremembers and the right of the trial court to control the voir dire and impose reasonable restrictions . . . coexist and must be harmonized"); *see also* Patricia McEvoy, *Streamline Voir Dire, but Carefully*, NAT'L L.J., Nov. 8, 1999, at A17 ("It is up to the trial attorney to ask questions, listen to the answers and decide whether to use a cause challenge or peremptory strike.").

101. McEvoy, *supra* note 100, at A17.

102. *See* Waites, *supra* note 80, at *2 (proposing that the essential question is: "How can a court ensure that a jury is impartial if the court does not give a litigant the opportunity to ask penetrating questions . . . ?").

engage in adequate questioning.[103] As more restrictive time limitations are placed on an attorney during voir dire, the risk that the goal of seating a fair jury has been sacrificed in the name of judicial economy is arguably increased.[104] Furthermore, public faith in the efficacy of the selection process may be undermined.[105]

A further argument advanced for fixed time limitations is the notion that these limits would somehow improve summary presentation of the facts and force attorneys toward greater clarity in their questioning.[106] Again, this claim is of dubious validity because of the difficulty in objectively determining whether limiting the time allowed for voir dire would promote "better" voir dire by attorneys. Does "better" translate into "more prepared?" It may be that a lawyer will prepare questions in advance if he is operating under tight time limits. Presumably, however, skilled attorneys will adequately prepare in advance for voir dire regardless of the available time.[107] The converse is equally probable. If time is tightly restricted, the attorney may be compelled to limit his questions to those calculated only to elicit evidence of extreme bias, as well as be forced to revert to reliance on stereotypes when striking peremptorily. Perhaps a better solution for preventing "cumulative" or "repetitive" voir dire would be for either the court or the adverse party to lodge an objection seeking to expedite the voir dire process if it is improperly bogged down.[108]

---

103. *See* Hanley, *supra* note 20, at 867–68 (instructing that, although time is limited, lawyers should not cling to stereotypes but should instead probe into the individual's attitude and personality).

104. *See* Weitz, *supra* note 12, at 15 (concluding that the more limited the scope of voir dire, the less effective voir dire becomes).

105. Longan, *supra* note 58, at 296–97 (postulating that a crucial foundation of the jury trial system is the faith that all participants believe that they will receive a fair and just outcome).

106. *See* JURY TASK FORCE, *supra* note 45, at 140–41 (arguing that "[t]ime limitations would force the litigants to focus on the main issue").

107. *See, e.g.*, Hanley, *supra* note 20, at 870–71 (detailing the extensive preparation, involving both jury specialists and mock jurors, undertaken by the author prior to a voir dire examination); McCoy v. Wal-Mart Stores, Inc., 59 S.W.3d 793, 801 (Tex. App.— Texarkana 2001, no pet.)

> Because voir dire questioning is such an important part of the proceeding, counsel should plan for it well in advance and be prepared to elicit from the veniremembers all necessary information within the parameters set by the court. The prudent lawyer will recognize that this may require some adjustment of the voir dire questioning from what that lawyer would prefer to what must be done within the time allotted.

*Id.*

108. *See* Torres v. State, 4 S.W.3d 832, 835 (Tex. App.—Texarkana 1999, pet. ref'd)

Finally, it has been suggested that in the absence of an express rule, trial judges will tend to "underutilize" time limits.[109] Again, there has been no case law cited to support such a contention.[110] While some advocates for time limits have ascribed lesser motives to lawyers in proclaiming that "[i]f it is up to just [the] attorneys, they would consume the entire gross national product of the U.S. in voir dire,"[111] the necessary corollary that trial judges will routinely fail to control their courtrooms in the face of such overzealous advocacy is an equally infirm supposition.[112] Critics of attorney-conducted voir dire often widely vilify all lawyers for the abuses of a very few.[113]

While the battle-cry for time limitations on voir dire may have an initially plausible appeal, a review of the appellate decisions suggests that trial courts already hold, and have been exercising, the power to limit voir dire.[114] No explicit rule of "reasonableness," nor of fixed recommended limits, is needed to confer upon the court the power it already holds. Any rule imposing stringent time constraints needlessly threatens to endanger the interests of justice in the professed interest of saving time and money.[115] Of paramount importance is that all parties involved in litigation feel that they have had a reasonable opportunity to weed out bias and prejudice, thereby increasing their faith in the ultimate jury verdict.[116] If voir dire becomes a

---

(allowing the court to limit voir dire questions if that questioner is attempting to prolong voir dire or when voir dire becomes repetitive or cumulative); *McCoy*, 59 S.W.3d at 801–02 (affirming the judge's limitation on voir dire because the attorney engaged in unnecessarily prolonged voir dire questioning and did not utilize his time well).

109. JURY TASK FORCE, *supra* note 45, at 142 (stating the concern that judges are not comfortable utilizing their discretion to set time limits).

110. *Id.* (offering no case support to substantiate this statement); *see, e.g., McCoy*, 59 S.W.3d at 801 (evidencing that trial courts have no problems limiting voir dire to thirty minutes if reasonable).

111. Jeffreys, *supra* note 43, at *2–3 (reprinting a heated debate between a judge and a trial attorney over the scope of voir dire).

112. The following cases contain examples of how trial courts have imposed what they considered reasonable time limits on voir dire: Clemments v. State, 940 S.W.2d 207, 209 (Tex. App.—San Antonio 1996, pet. ref'd) (imposing what the appeals court concluded was an unreasonable limit of one hour); *Torres*, 4 S.W.3d at 834–35 (limiting voir dire to forty-five minutes); Tamez v. State, 27 S.W.3d 668, 673–74 (Tex. App.—Waco 2000, pet. ref'd) (affirming the trial court's time limitation as reasonable and holding that defendant's counsel simply failed to properly budget her time).

113. Weitz, *supra* note 12, at 15 (noting that the majority of lawyers are punished for the bad actions of only a few).

114. *See, e.g., Tamez*, 27 S.W.3d at 673–74 (affirming the trial court's time limitation as reasonable).

115. *See* Waites, *supra* note 80, at *1 (arguing that proponents of restrictions "would sacrifice important due process principles while not really improving court efficiency").

116. Longan, *supra* note 58, at 303–04 (noting that a problem with judicially-conducted voir dire is that it sometimes erodes the perception of fairness because the

largely perfunctory or ritualistic process, faith in the jury system is likely to be lessened.[117] The case for fixed time limits on voir dire has not been made.

*2. Leading Questions by Attorneys Should Be Barred.* Some critics of the current voir dire system would propose to bar attorneys from asking jury panel members leading questions.[118] Currently no procedural rule or case law prohibits the use of leading questions in the voir dire process. Proponents of the ban on leading questions suggest that attorneys who employ leading questions abuse the system by "identify[ing] an unfavorable juror and then try[ing] to stuff the most appalling mischaracterizations into [the juror's] mouth."[119] They propose a rule to ban leading questions to prevent attorneys from "convert[ing] a peremptory challenge into a challenge for cause."[120]

Aside from the notable lack of case support for such an assertion, there exists a valid rationale behind the use of leading questions.[121] Jurors, like the population of which they are a part, are fundamentally reticent to expose their biases and prejudices to others.[122] By using leading questions, an attorney can carefully craft questions to deal with jurors who manifest biases, such as hostility, in order to determine whether he or she should be stricken for cause.[123]

Aside from the threshold question of whether a ban on leading questions is necessary, a further inquiry inheres in determining what kind of limiting rule could be placed on the use of such questions that would add anything to the trial court's existing power over the form of lawyer questions. While an all-out ban has been summarily rejected by most commentators,[124]

---

parties feel they have no control of the process).

117.   *Id.* at 297 (arguing that the value of a jury verdict depends upon the perception of its fairness and that such perceived fairness is undermined by current restrictions on voir dire in the federal system).

118.   *See* JURY TASK FORCE, *supra* note 45, at 151 (considering a rule to limit a litigant's ability to ask leading questions in all circumstances during voir dire).

119.   Brister, *Docile Jurors, supra* note 52, at *2; JURY TASK FORCE, *supra* note 45, at 151.

120.   JURY TASK FORCE, *supra* note 45, at 151–52; *see also* Brister, *Docile Jurors, supra* note 52, at *2.

121.   *See* Waites, *supra* note 80, at *2 (noting metaphorically that a juror's voluntary admission of prejudice during voir dire is akin to the public admission of having a venereal disease).

122.   *Id.*

123.   *See* Coyt Randal Johnston, *Curtail Voir Dire? A Practitioner Responds,* TEX. LAW., Feb. 24, 1997, WL 2/24/2000 TEXLAW 27, at *1.

124.   *See* JURY TASK FORCE, *supra* note 45, at 156–57 (opting for a rule stressing a

the Jury Task Force did propose a rule which would "grant limited discretion to the court to control the form of the examination . . . [and] prohibit unreasonably invasive examination that goes beyond what is necessary or appropriate to the intelligent exercise of challenges and strikes."[125] This proposal adds nothing to the trial court's existing power to "disallow questions asked in an improper form."[126] The apposite case law reveals that the courts have full authority to control the nature and form of questions so long as the exercise of that discretion does not prevent the fair exercise of challenges for cause and peremptory strikes.[127] Thus, any argument condemning leading questions rings hollow under the current rules in which judges maintain the power to limit the scope of questions during voir dire.

*3. Attorneys Should Be Precluded from Asking Whether a Prospective Juror Is "Leaning" Toward or Away from Either Side.* Critics of the current voir dire system have proposed a ban on questions which inquire whether a prospective juror is leaning toward or away from either side.[128] A principle criticism regarding leaning questions is the claim that they are veiled attempts to impermissibly commit a prospective juror to a particular view or conclusion.[129] The issue becomes whether this is a valid concern and whether prior case law suggests this is a critical problem. An examination of cases in this area does not substantiate the concerns advanced. Instead, the case law distinguishes between properly asking questions that will determine whether a prospective juror should be stricken and impermissibly attempting to commit the prospective juror to a certain position.[130] Certain courts have acknowledged this bright-line "general rule" as follows:

> [T]he utmost freedom on examination on voir dire should be permitted in order to discover any interest, bias, opinion, or

---

"reasonable" standard for trial courts to follow in limiting the use of leading questions).

125.    *Id.* at 157.

126.    Garza v. State, 18 S.W.3d 813, 819 n.2 (Tex. App.—Fort Worth 2000, pet. ref'd) (listing this power to limit voir dire as among several that the trial court possesses to shape voir dire).

127.    *Id.* at 820.

128.    *See* JURY TASK FORCE, *supra* note 45, at 163 (outlining the various arguments for the ban on "leaning" questions); Brister, *Docile Jurors, supra* note 52, at *3 (criticizing the use of leaning questions in voir dire).

129.    JURY TASK FORCE, *supra* note 45, at 163; Brister, *Docile Jurors, supra* note 52, at *3.

130.    *See, e.g.*, Campbell v. Campbell, 215 S.W. 134, 137 (Tex. Civ. App.—Dallas 1919, writ ref'd) (presenting a detailed discussion of the difference between a proper inquiry into a prospective juror's inclinations versus an improper attempt to commit a panel member to a certain position).

other fact tending to disqualify or affect the impartiality of prospective jurors ... both for the purpose of challenging the juror for cause, and as an aid to the intelligent exercise of the right of peremptory challenge.[131]

In contrast, other courts more narrowly limit the attorney's inquiry in order to "forbid[] any examination the purpose of which is to have the juror indicate his views on certain facts, and thereby commit him to certain views or conclusions."[132] Courts have concluded that this pre-commitment form of questioning is contrary to the purpose of voir dire because it may lead a juror to commit to a result before any evidence has been adduced, thereby preventing the parties from receiving a fair trial on the evidence adduced.[133] Thus, courts are demonstrably aware of the need for a balance between allowing broad latitude in identifying potential bias and the disallowance of any attempt to unfairly prejudice the outcome before the trial has even commenced.[134]

In exercising their discretion to regulate the scope and form of questions during voir dire,[135] the courts have addressed the problem of pre-committing a prospective juror to a particular view or conclusion.[136] No courts have suggested, however, any need for a blanket ban on questions which would inquire into whether a juror was leaning one way or another on an issue because this is the very purpose of prospective juror examination—to determine whether he or she has a bias or prejudice for or against one side or the other.[137] Indeed, bias is typically defined as "an inclination toward one side of an issue rather than to the other."[138] It is fundamentally appropriate, therefore, to ask whether a juror already leans one way or another as long as the attorney does not try to commit the juror

---

131. *Id.*

132. *Id.*; *see also* Godfrey, *supra* note 17, at 427–28.

133. *See* John T. Bibb, *Voir Dire: What Constitutes an Impermissible Attempt to Commit a Prospective Juror to a Particular Result*, 48 BAYLOR L. REV. 857, 874–75 (1996) (explaining the rationale behind this restriction).

134. *Id.* (noting that courts deny questions that attempt to commit prospective jurors as to the weight of the evidence before any evidence has even been presented).

135. Refer to notes 36–42 *supra* and accompanying text (discussing the broad latitude that Texas courts have in voir dire proceedings).

136. *See, e.g., Campbell*, 215 S.W. at 137 (disallowing questions intended to commit jurors to a view in advance of any evidence).

137. *Id.* at 137–38 (distinguishing between asking how a juror feels regarding certain case facts and "the effect or influence [that] material facts and circumstances will exercise upon the reason in reaching a conclusion upon a given issue, and any bias, prejudice, preconceived notions, or opinions concerning the right, propriety, reasonableness, or justice of the act itself").

138. Godfrey, *supra* note 17, at 428 (quoting Compton v. Henrie, 364 S.W.2d 179, 181–82 (Tex. 1963)) (defining bias and prejudice).

to a certain outcome.[139] As one proponent of the leaning question so aptly stated, "[t]he disclosure that a juror favors one side before any evidence is heard may disclose the very kind of prejudice that cannot be overcome by evidence. Lawyers certainly won't need peremptory challenges if they're not allowed even to ask who favors the opposition."[140] While critics of leaning questions fear perhaps that attorneys will use these questions surreptitiously in an attempt to commit a juror to a particular conclusion,[141] a ban on leaning questions would eliminate one of the most effective ways for a lawyer to discover bias and prejudice of a juror.[142]

The leaning question is crucial because it allows the parties to determine whether a challenge for cause is appropriate or whether they want to intelligently use their peremptory strikes. While some prospective jurors may forthrightly admit their biases,[143] others will not disclose their attitudes, either as active concealment or, more frequently, because they do not believe that their attitude reflects any actual bias or prejudice.[144] When bias is admitted outright, the judge must strike the juror for cause as a matter of law.[145] Frequently, however, the juror may be harboring a particular bias and will not relinquish it absent further questioning. Inquiry into whether a juror leans toward one side

---

139.	Johnston, *supra* note 123, at *1 (advocating the need for leaning questions).

140.	*Id.*

141.	*See* Brister, *Docile Jurors*, *supra* note 52, at *3, observing:

> Nobody thinks it's proper during voir dire to state the facts and ask potential jurors how they think they will vote. Yet many lawyers and judges apparently think it's proper to ask the same jurors if they are "leaning" toward or away from either side. There is no difference in these questions; both are improper. If we disqualify jurors based on their initial reactions to the facts, then outrageous claims and defenses become tools to eliminate the most reasonable people. Impartiality is not the absence of initial impressions but the willingness to keep an open mind. Litigants are entitled to a jury of their peers, not their supporters.

*Id.*

142.	*See* Johnston, *supra* note 123, at *1 (concluding that leaning questions are a necessary tool to help ferret out bias); JURY TASK FORCE, *supra* note 45, at 163 (listing this as one of the valuable aspects of using leaning questions).

143.	*See, e.g.*, Godfrey, *supra* note 17, at 428–29 (discussing several cases in which reversal was automatic for failure to strike for cause those panelists who "forthrightly" admit bias).

144.	*See, e.g.*, Henry Lewis Miller, *Voir Dire 2000*, LAW. J., Mar. 24, 2000, at 8, 8 ("[M]erely asking a person whether he or she is biased on a particular subject is futile. No one thinks of himself as being prejudiced. Getting someone to acknowledge his or her predisposition in a public setting is all but hopeless."); *see also* Dr. Rick R. Fuentes, *Tips for Voir Dire and Jury Selection*, NAT'L B. ASS'N MAG., Sept.-Oct. 1993, at 12, 12–13 (noting that many jurors want to give responses that are "socially acceptable and noncontroversial").

145.	TEX. GOV'T CODE ANN. § 62.105(4) (Vernon 1998 & Supp. 2000) (requiring disqualification of a juror if biased or prejudiced).

or another is an obvious method for exposing this bias.[146] The court may determine that this preconceived notion or "leaning" amounts to bias or prejudice and that the juror must be excluded for cause. Alternatively, the court may not believe that the "leaning" rises to such a level, in which case the attorney must decide whether it is necessary to utilize a peremptory strike to eliminate the juror.

A fundamental purpose underlying voir dire is to effectively balance the scales at the outset of trial and to ensure the parties an equal footing with fair and impartial jurors.[147] This can happen only if the parties are free to engage in questioning which allows them to ferret out this bias or prejudice.[148] The Texas Supreme Court has already stated that a blanket ban on particular types of questions in voir dire may ultimately interfere with the constitutional right to a fair trial.[149] While some critics fear that the moment parties have discovered that a person is leaning one way or the other, they will strike the juror before the juror has had a chance to hear the facts of the case,[150] this fear appears exaggerated. Leaning questions are merely one avenue to determine where the parties stand with the prospective jurors at the outset of the case. Not every instance of an affirmative response to a "leaning" inquiry will result in a strike for cause or peremptory strike, and it is difficult to conceive how lawyers can be expected to utilize their strikes effectively without knowing where jurors stand on potential issues that could prejudice the juror's mind.[151]

As courts currently have virtually unlimited discretion to control voir dire questioning,[152] and as few, if any, courts have expressed problems with the notion of leaning questions, the

---

146. Johnston, *supra* note 123, at *1 (arguing that "leaning questions" are necessary to ascertain whether a juror harbors prejudice that cannot be swayed by the evidence).

147. *See* Howard, *supra* note 10, at 13 (stating that the purpose of voir dire is to elicit bias and prejudice).

148. Daniel J. Sheehan, Jr. & Jill C. Adler, *Voir Dire: Knowledge Is Power*, 61 TEX. B.J. 630, 633 (1998) ("It is an abuse of discretion for a trial court to deny your right to ask a proper question which prevents determination of whether grounds exist to challenge for cause or denies intelligent use of peremptory challenges.").

149. Babcock v. N.W. Mem'l Hosp., 767 S.W.2d 705, 709 (Tex. 1989) (holding that the trial court abused its discretion by disallowing all questions regarding the impact of the "lawsuit crisis" because it prevented the determination of whether jurors were biased or prejudiced).

150. *See* Brister, *Docile Jurors*, *supra* note 52, at *2 (expressing fear that disqualification based merely on an initial reaction to facts is really just discrimination against a possibly favorable juror).

151. *See* Johnston, *supra* note 123, at *1 (supporting the use of leaning questions as a valid avenue for determining bias).

152. Godfrey, *supra* note 17, at 411.

proposed ban appears unwarranted. Even the Jury Task Force conceded in its recommendations that any proposed rule would be merely a restatement of the power that the courts already hold.[153] The parties must be able to exercise their strikes intelligently, and any attempt to place restrictions on determining whether a juror has a preconceived prejudice or bias would be an impediment to the seating of a fair and impartial jury. Accordingly, an absolute ban on leaning questions is insupportable because it conflicts with the purposes underlying voir dire. Such a ban further implies a lack of confidence in the trial judge's ability to determine when an attorney has crossed the line and an impermissible attempt to precommit a juror has occurred.

    *4. The Right to Rehabilitate Prospective Jurors Should Be Expanded.* Another proposal considered and debated by the Jury Task Force committee was a rule that would increase the discretion of the trial courts to rehabilitate potential veniremen.[154] The current law does not prohibit rehabilitation in all circumstances.[155] Rather, it states that a venireman cannot be rehabilitated if the venireman exhibits a true bias or prejudice.[156] Alternatively, if bias or prejudice has not been shown, or is not firmly established, the court or opposing counsel may attempt to question the juror regarding whether a firm bias exists. If bias is not established, the juror may then be rehabilitated.[157] Accordingly, the term "rehabilitation" may be a misnomer. There

---

153.  JURY TASK FORCE, *supra* note 45, at 167. The proposed rule provides in part:

    Each party may examine any prospective juror concerning matters reasonably related to the exercise of challenges for cause or peremptory challenges. The court may, in its discretion, limit any examination that is unreasonable because it is unduly invasive, repetitive, *[leading and suggestive]* or argumentative. Questions concerning a prospective juror's opinion of applicable law must be prefaced by a proper statement thereof. A party may not inquire as to a prospective juror's probable vote, or attempt to commit a prospective juror to a particular verdict or finding as to any issue or evidence.

*Id.* The Task Force report recognized that this proposed rule is only "a codification of existing law." *Id.*

154.  *Id.* at 173 (considering the expansion of rehabilitation as a possible reform for voir dire).

155.  *Id.* (offering, in opposition to the proposal to increase rehabilitation of jurors, the basic notion that "present law does not prohibit questions that attempt to rehabilitate a panel member").

156.  *See id.*; TEX. GOV'T CODE ANN. § 62.105(4) (Vernon 1998 & Supp. 2000) (requiring disqualification of a juror as a matter of law if he or she is found to be biased or prejudiced).

157.  *See* Sheehan & Adler, *supra* note 148, at 633–34 (describing the situation in which a juror's initial indication of bias or prejudice proves to be based on a misunderstanding of the question or issue, and where, upon continued questioning, it is revealed that no prejudice actually existed).

can never be rehabilitation of a juror whose bias and prejudice is clearly established because he or she is to be stricken as a matter of law. However, a juror who exhibits signs of bias or prejudice may be questioned to determine whether bias in fact exists and, if the juror vacillates, it is permissible to inquire whether a juror can put aside any prior misconceptions and decide the case fairly.[158]

Proponents of a rule broadening the permissible scope of rehabilitation suggest that many judges and attorneys either do not realize or misunderstand their ability to rehabilitate a juror on the panel.[159] They argue that often it is not bias or prejudice that guides an answer, but simply the juror's misunderstanding of the question, misunderstanding of the law, or some other confusion that could easily be cleared up with further "rehabilitative" questioning.[160] They suggest that because many judges and attorneys are confused as to their discretion to rehabilitate, many perfectly fair jurors are unjustly stricken upon mere misunderstandings that could easily be cleared up.[161]

A review of existing case law addressing voir dire procedures reveals little evidence of confusion by the courts or lawyers over the rules governing rehabilitation.[162] The trial courts have consistently and effectively exercised their right to rehabilitate jurors.[163] As reflected in reported cases, courts have engaged in extensive rehabilitative questioning during voir dire and have a clear understanding of the underlying principles.[164] An example of trial courts' seeming comfort in rehabilitative questioning is provided by the death penalty case of *Howard v. State*.[165] The

---

158.   *See* Godfrey, *supra* note 17, at 428.

159.   JURY TASK FORCE, *supra* note 45, at 173 (presenting the pros of utilizing a more expansive rehabilitation technique).

160.   *Id.* (noting that panel member misunderstandings are a concern when striking a juror); Brister, *Docile Jurors*, *supra* note 52, at *3 (arguing for rehabilitation on the ground that misunderstandings occur because "[j]urors are human, unfamiliar with the magic words that are the tools of the lawyer's trade").

161.   JURY TASK FORCE, *supra* note 45, at 173 (offering other concerns relating to the lack of adequate rehabilitation).

162.   Refer to notes 163–167 *infra* and accompanying text (discussing the use of rehabilitative questioning).

163.   *See, e.g.*, Sullemon v. United States Fid. & Guar. Co., 734 S.W.2d 10, 16–17 (Tex. App.—Dallas 1987, no writ) (affirming the trial court's decision to rehabilitate a juror after questioning and its consequent refusal to strike for cause); Garza v. Tan, 849 S.W.2d 430, 432 (Tex. App.—Corpus Christi 1993, no writ) (holding that the trial court did not abuse its discretion by overruling challenge for cause after questioning the juror).

164.   *See, e.g.*, Howard v. State, 941 S.W.2d 102, 113–15 (Tex. Crim. App. 1996) (en banc) (examining and affirming the extensive use of rehabilitation interrogation).

165.   *Id.* (reviewing the trial court's lengthy questioning of eight prospective jurors after they initially stated they could not give the death penalty).

Court of Criminal Appeals sustained the trial court's decision to strike for cause eight panel members who stated that they could not sit effectively on a case involving the death penalty.[166] The trial court questioned each juror at length to determine whether his statements demonstrated a deep-seated bias against the death penalty—in which case he would have to be disqualified as a matter of law—or whether he simply harbored initial misgivings which did not rise to the level of bias or prejudice.[167] This case illustrates the discretion accorded the trial judge in determining whether bias exists and that reviewing courts "will give due deference to the trial court which is in a unique position to measure the venireperson's sincerity, comprehension and demeanor."[168]

The proponents of a rule widening rehabilitation claim that courts are reluctant to use rehabilitative questions as a method of clarifying whether the juror fully understood the facts or law underlying the issue or question.[169] This fear appears unfounded in the face of the existing case law. In the civil context, the case of *Sullemon v. United States Fidelity & Guaranty* affords an illustration of how Texas trial courts have used rehabilitative questions extensively to determine whether bias exists or whether a prospective juror simply misunderstood the question.[170] In *Sullemon*, the judge rehabilitated a juror after further questioning demonstrated that the juror's original answer was not based on bias or prejudice, but rather upon a mere misunderstanding of the attorney's definition of the law.[171] The appellate court affirmed the trial court's right to employ rehabilitative questions in distinguishing between when a bias exists and when a point of fact or law needs to be clarified.[172] The law is clear that "whether a juror is biased or prejudiced may be a factual determination for the court,"[173] and that rehabilitation

---

166. *Id.* (noting that the trial court made certain that venire members understood the special issues and asked whether they could give the death penalty under any facts or circumstances before granting a strike for cause).

167. *Id.*

168. *Id.* at 115.

169. *See* JURY TASK FORCE, *supra* note 45, at 176 ("Even if the cases do not prohibit rehabilitation questions, there is a widespread belief among lawyers and judges that they do.").

170. Sullemon v. United States Fid. & Guar. Co., 734 S.W.2d 10, 15–16 (Tex. App.—Dallas 1987, no writ).

171. *Id.* (asking if the juror could apply a definition to the facts of the case if that definition was written in plain English).

172. *Id.* (stating that merely expressing doubt as to a juror's own ability to follow a definition does not necessitate a finding of bias or prejudice).

173. Gum v. Schaefer, 683 S.W.2d 803, 807 (Tex. App.—Corpus Christi 1984, no writ) (per curiam) (discussing the procedures for proper and improper rehabilitation of a

of a juror found not to harbor a bias or prejudice is clearly appropriate.[174]

Arguably, concern over the rehabilitation issue should focus not on the need to *increase* rehabilitative practices, but instead on the need to further delimit such questioning in order to avoid improper rehabilitation of a clearly biased juror.[175] Viewed from this perspective, the problem is not one of too little rehabilitation, but perhaps one of too much. As one critic of increased rehabilitation succinctly stated, "[p]anel members can change their answers if they didn't understand or if they answered a misleading question, but a true revelation in open court of the type of prejudice that renders a panel member unfit to serve should not be the subject of rehabilitation."[176] This principle finds obvious support in the decisions holding that such prospective jurors are to be stricken as a matter of law.[177] The law is clear that "[w]hen a juror is biased or prejudiced, his affirmation 'that he can set this aside and try the case fairly upon the law and evidence' should be disregarded"[178] because evidence of bias and prejudice disqualifies the juror as a matter of law.[179] The law is unequivocal: once bias is established, there can be no rehabilitation.[180] When a juror genuinely vacillates between positions, rather than showing categorical bias, the trial court faces the problem of deciding whether bias exists based upon the statements made by the juror.[181] A fine line may distinguish a juror who is leaning one way or another but can still be impartial from a juror who is fundamentally biased and is thus

---

prospective juror).

174. *See, e.g.*, Swap Shop v. Fortune, 365 S.W.2d 151, 154 (Tex. 1963) (affirming the trial court's decision that a juror not shown to be biased should not be stricken for cause); Bullard v. Universal Underwriters Ins. Co., 609 S.W.2d 621, 624 (Tex. Civ. App.—Amarillo 1980, no writ) (noting that the conflicting evidence did not conclusively establish bias, and thus the trial court was not required to strike for cause).

175. Refer to note 183 *infra* and accompanying text (discussing cases in which improper rehabilitation occurred).

176. Johnston, *supra* note 123, at *2 (revealing the dangers of inappropriate rehabilitation of panel members).

177. *E.g.*, *Gum*, 683 S.W.2d at 807–08 (reversing the trial court's refusal to strike a juror for cause because the juror held overt bias and prejudice).

178. Carpenter v. Wyatt Constr. Co., 501 S.W.2d 748, 750 (Tex. App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.) (quoting Lumbermen's Ins. Corp. v. Goodman, 304 S.W.2d 139, 145 (Tex. Civ. App.—Beaumont 1957, writ ref'd n.r.e) (disallowing rehabilitation of a juror who had admitted bias but later stated that he could be fair)).

179. *Gum*, 683 S.W.2d at 808 (explaining the current law on rehabilitation); TEX. GOV'T CODE ANN. § 62.105(4) (Vernon 1998 & Supp. 2001).

180. *Carpenter*, 501 S.W.2d at 750; TEX. GOV'T CODE ANN. § 62.105(4).

181. *See* Sheehan & Adler, *supra* note 148, at 634 (concluding that "the process of identifying bias or prejudice, except in clear cases, can be a delicate one where the conclusion is finally drawn from the totality of the responses").

disqualified.[182] In many cases, the courts have concluded that an improper rehabilitation of a juror occurred in just such a situation.[183] A blanket rule which mandates wider rehabilitation runs the risk of increasing improper rehabilitation and arguably deflects the court's analysis away from a case-by-case focus. The cases concluding that impermissibly broad rehabilitation occurs under existing rules governing this aspect of voir dire demonstrate that the problem here is not one of too little rehabilitation. The proposal of wider rehabilitative rules appears unwarranted.

Against this backdrop, a further problem with widening the scope of rehabilitation emerges in how to articulate a rule encouraging, if not mandating, its implementation in all cases. The Jury Task Force has proposed the following one-line rule which appears to add nothing to the existing articulation of the law of rehabilitation: "The court may examine, or *[shall]* allow any party to examine, a prospective juror for the purpose of clarification or reconsideration of a previous answer given by that prospective juror."[184] This generic proposal demonstrates that any blanket directive purporting to increase the scope of rehabilitation is so diluted as to add nothing to existing law. Juror rehabilitation is presently done on a case-by-case basis, and the court has broad discretion in determining the "sincerity, comprehension and demeanor" of the juror when ruling upon whether he or she should be stricken for cause or is a candidate for rehabilitation.[185] Any suggestion that the courts misperceive their inherent discretion to rehabilitate a witness based on a misunderstanding or clarification of the question is not reflected in the authorities. The critics of the current rehabilitation rules are truly trying to "fix something that ain't broke."

*5. The Number of Peremptory Strikes Should Be Eliminated or Reduced.* Another criticism leveled at Texas jury selection concerns whether peremptory strikes should be reduced

---

182. *Id.* at 633–34 (analyzing the blurry line between an ineffective retraction of bias and the honest belief that a juror is not biased and can decide the case fairly).

183. *See, e.g., Carpenter,* 501 S.W.2d at 750 (finding error in the trial court's decision not to strike a juror for cause but not reversing because complainant failed to object timely); *Gum,* 683 S.W.2d at 807–08 (objecting to the trial court's rehabilitation of a biased juror); *Shepherd v. Ledford,* 926 S.W.2d 405, 412 (Tex. App.—Fort Worth 1996), *aff'd,* 962 S.W.2d 28 (Tex. 1998) (reversing the trial court because of its failure to strike a juror for cause after the juror expressed bias and prejudice).

184. JURY TASK FORCE, *supra* note 45, at 159.

185. Howard v. State, 941 S.W.2d 102, 115 (Tex. Crim. App. 1996) (en banc) (giving a detailed explanation of the rehabilitation process).

in number or eliminated from the voir dire process.[186] As presently formulated in Texas, each side is allowed six peremptory strikes in civil cases,[187] and ten in non-capital criminal cases.[188] Peremptory strikes can be exercised for any reason the party wishes, as long as strikes are not based on race or gender.[189] An attorney is therefore free to strike a juror for any other reason without explanation.[190] Proponents of elimination or reduction in the number of peremptory strikes advance several arguments in support of this proposal.[191] Two of the most prominent arguments are that peremptory strikes somehow decrease the representative quality of the jury and that they waste time and money.[192] Other, more vociferous critics have criticized peremptory strikes as "the most undemocratic feature of our democratic trial system" and claim they function as racial and gender filters.[193] Taking each of these arguments in turn, it can be forcefully argued that not only are peremptory strikes crucial in seating a fair and impartial jury,[194] they are also a powerful tool that actually functions to reduce rather than increase whatever time and expense may be directly attributed to the voir dire process.[195]

In light of the crucial purpose of voir dire in selecting a fair and impartial jury,[196] there is nothing representative about a juror who harbors a strong inclination for or against a party and

---

186.    JURY TASK FORCE, *supra* note 45, at 186–93 (considering the peremptory strike issue). *See generally* Brister, *Democracy Strikes Out, supra* note 52 (advocating that peremptory strikes should be reduced in number to create a more representative jury).

187.    TEX. R. CIV. P. 233.

188.    TEX. CRIM. PROC. CODE ANN. § 35.15 (Vernon 1998) (allowing ten peremptory strikes in non-capital felony cases and fifteen in capital felony cases).

189.    8 DORSANEO, *supra* note 22, § 120.02[4][a] (presenting the rules governing peremptory strikes).

190.    *Id.*

191.    *See* JURY TASK FORCE, *supra* note 45, at 187–90 (enumerating possible arguments for and against limiting the number of peremptory strikes).

192.    *Id.* at 192–93.

193.    Albert W. Alschuler, *The Supreme Court and the Jury: Voir Dire Peremptory Challenges, and the Review of Jury Verdicts,* 56 U. CHI. L. REV. 153, 156 (1989) (quoting the Supreme Court's language in *Batson v. Kentucky* and arguing that peremptory strikes are used "on the basis of crude group stereotype[]" and to keep minority groups off juries).

194.    *See* Waites, *supra* note 80, at *3 (claiming that a reduction in peremptory strikes "would deny a litigant both the opportunity to question jurors appropriately and the opportunity to eliminate a juror where there is reasonable and credible evidence of bias that cannot be articulated").

195.    *See* JURY TASK FORCE, *supra* note 45, at 188–90 (noting that some evidence suggests that peremptory strikes can be efficient tools to dismiss "close call" jurors).

196.    *See* Hallett v. Houston N.W. Med. Ctr., 689 S.W.2d 888, 889 (Tex. 1985) (reminding the trial court that "[o]ur system of jury selection is designed to provide a jury composed of persons who are not biased or prejudiced").

who is unable to render an impartial verdict.[197] While it is true that jurors exhibiting outward signs of bias and prejudice must be stricken as a matter of law,[198] it is also true that jurors often will not readily reveal a potential bias or prejudice—a reality which threatens the opportunity for a fair trial.[199] Perhaps the most persuasive argument supporting the retention of peremptory strikes is that most jurors do not realize or, if they do, will not openly admit that they harbor a bias or prejudice.[200] Elimination of peremptory strikes could indeed destroy the benefits otherwise obtained in voir dire by seating jurors who harbor some strong impartiality.[201]

Nor is this problem solved by the existence of challenges for cause. A juror may exhibit signs of bias or prejudice that may not justify a causal strike but which nonetheless warrant disqualification because those signs demonstrate that the prospective juror is fundamentally partial.[202] It has been pointed out that much bias slips past the narrow standard of challenges for cause because the standard serves only to eliminate "categorical" bias.[203] If peremptory challenges are reduced or eliminated, only for-cause challenges remain to eliminate unfair or partial jurors.[204] Peremptory challenges reinforce the parties' faith in receiving a fair verdict because they afford, at least in this limited sense, the ability to shape the panel.[205] To reduce or eliminate peremptory challenges allocates to the court all control

---

197.   TEX. GOV'T CODE ANN. § 62.105(4) (Vernon 1998 & Supp. 2001) (requiring any biased or prejudiced panel members to be stricken as a matter of law).

198.   *Id.*

199.   *See* Waites, *supra* note 80, at *2 (expressing belief that prospective jurors often can not assess their own biases); Fuentes, *supra* note 144, at 13 (stating that people are "incapable of fully recognizing . . . their own biases"); Dees, *supra* note 43, at *14 ("Put simply, prospective jurors lie. Put more generously, jurors give socially acceptable answers.").

200.   *See* Waites, *supra* note 80, at *2; Fuentes, *supra* note 144, at 13.

201.   *See* Finn & Bickel, *supra* note 41, at *3 (arguing that limiting voir dire prevents attorneys from intelligently exercising their peremptory strikes and "has the potential to violate the constitutional rights of those who bring their cases to trial by inhibiting their counsel's ability to make those challenges").

202.   *See* Longan, *supra* note 58, at 308 ("There are abundant examples of indications of bias that do not suffice for a challenge for cause.").

203.   *Id.* at 308–09.

204.   *See* Nancy S. Marder, *Beyond Gender: Peremptory Challenges and the Roles of the Jury*, 73 TEX. L. REV. 1041, 1088–90 (1995) (acknowledging that one reason lawyers fear a diminution of peremptory strikes is that judges, who would then decide all strikes, may not probe as deeply as the parties would to discover bias). Marder argues that "[j]udges have an institutional bias in seeing that jury selection moves forward as quickly as possible." *Id.* at 1189.

205.   *See* Longan, *supra* note 58, at 307 (explaining that a primary function of the peremptory challenge is to give the parties a sense of power over their destiny).

over determinations of juror bias.[206] As one commentator warns, "[w]ithout peremptories, parties might experience greater unease about who is sitting in judgment of them and might believe that some jurors cannot be fair, even though the jurors claim they can be."[207] This observation is significant because the parties' faith in whether the jury fairly represents an impartial panel can be undermined—a consequence which destroys a core function of the jury trial.[208]

While it is true that jurors can be stricken with peremptory strikes for virtually any reason or no reason at all, this consequence does not necessarily produce a less representative jury. Instead, it may permit those jurors best fit to serve on the panel to be chosen.[209] For example, in a highly complex case involving engineering concepts, a juror who has no understanding of mathematics may have virtually no ability to effectively evaluate the evidence critical to the determination of liability.[210] While the juror could not be stricken for cause, he or she can be eliminated using a peremptory challenge. This does not decrease the representativeness of the panel but rather permits a better match between the subject matter or issues of a case and those prospective jurors best able to judge the matter fairly and effectively.

Alternatively, critics argue that peremptory challenges waste time and money.[211] They contend that the increased number of strikes requires an increase in the size of the juror pool, which in turn increases the time and money expended in questioning this larger group of jurors.[212] It has also been suggested that attorneys willingly waste valuable time by over-questioning the panel in order to exercise all their peremptory challenges most effectively.[213] Peremptory strikes, however, may serve a very different function. Rather than needing further

---

206. *See* Marder, *supra* note 204, at 1089 (noting the discomfort parties feel placing all of the control over selecting an impartial jury in the judge's hand).

207. *Id.* at 1093.

208. Longan, *supra* note 58, at 297 ("The legitimacy of any system of resolving civil disputes ultimately depends on the willingness of parties to abide by the results, and that willingness will be undermined by procedures that are perceived as unfair.").

209. JURY TASK FORCE, *supra* note 45, at 186 (recognizing that some jurors have no bias or prejudice but may still be unsuited to sit on the jury for some other reason).

210. *See id.*

211. *See id.* at 193 (presenting another perceived "con" of peremptory strikes in voir dire).

212. *See id.*

213. *See* Jeffreys, *supra* note 43, at *2 (quoting Judge Brister: "My experience is if you give attorneys three [strikes], they will take three. If you give them 30, they will take 30 . . . . Almost all judges think it's a waste of time . . . .") (second alteration in original).

questioning, the attorney may simply strike those persons about whom he has significant reservations. In this manner, these strikes provide a kind of safety net for the attorney in voir dire, allowing him to limit his questions and to reduce expenditures of time and money.[214] They provide a comfort zone for attorneys who cannot hope to question every potential juror in the reasonable time allotted regarding all possible biases and prejudices that may exist.[215] Assuming the courts properly exercise their discretion in fixing reasonable time limits,[216] an attorney can fine tune his questions and limit them to particular panel members about whom he is especially concerned, without worrying whether he must question every roll of a juror's eye or every head shake as a potential indication of bias that must be overtly pursued and exposed in order to obtain a strike for cause.[217] The elimination of or reduction in peremptory challenges would necessarily require an increase in time limits to reduce the possibility that a juror holding a bias or prejudice would be allowed to judge the outcome of the case.[218]

Peremptory challenges have been much maligned as a tool to perpetuate impermissible discrimination by striking jurors on the basis of race, gender, or other group characteristics.[219] While it is true that in the past, peremptories were sometimes used to prevent minority groups from sitting on juries, current law forbids the use of peremptories in such a discriminatory fashion.[220] The Supreme Court formulated a three-part inquiry to be implemented if it appears that an attorney is improperly using his strikes to eliminate jurors based on race or gender.[221]

---

214.   *See* JURY TASK FORCE, *supra* note 45, at 188–90 (acknowledging as an argument against limiting the number of peremptory strikes that "[w]ith 'close-call' jurors, the litigants can simply end their questioning and use a peremptory challenge").

215.   *Id.*

216.   Refer to notes 108–12 *supra* and accompanying text (dealing with the court's broad discretion to prescribe time limits).

217.   *See generally* Godfrey, *supra* note 17, at 436–50 (advancing techniques for determining bias in jurors during voir dire).

218.   JURY TASK FORCE, *supra* note 45, at 190 ("As every litigant is entitled to a fair and impartial jury, the litigants would need to be given considerably more time and leeway to ferret out potential prejudices.").

219.   *See, e.g.*, Alschuler, *supra* note 193, at 172–73 (noting that there are lawyers who skirt around the decision in *Batson* and still use their peremptory strikes on the basis of race); Marder, *supra* note 204, at 1046–47 (expressing fear that the use of strikes to discriminate against some groups is still prevalent).

220.   Refer to note 29 *supra* and accompanying text (discussing the *Batson* and *J.E.B. v. Alabama* decisions, which made it illegal to strike on the basis of race or gender).

221.   8 DORSANEO, *supra* note 22, § 120.02[4][c][ii] (describing the three-part analysis used when a party claims that a peremptory strike is based on race or gender). The three parts are: (1) the opponent of the peremptory strike must make a prima facie case of purposeful discrimination; (2) the proponent of the strike must produce a race—or gender-

While some attorneys may abuse peremptories to discriminate, skillful attorneys do not resort to this improper use when conducting an effective voir dire.[222] Even though the law only prevents use of peremptories to strike jurors on the basis of race and sex, a prominent litigator expressed the view that it is "ludicrous to select or excuse jurors on the basis of" race, sex, or other groupings, and it is "absolute nonsense . . . to analyze prospective jurors on the basis of these trite, airtight compartments!"[223] Effective voir dire is promoted by furnishing attorneys adequate time to probe the jurors to learn their individual attitudes and personalities, as well as how these particular characteristics are relevant to the particular facts and issues in the case.[224] This has been, and remains, the best method for understanding the jury and revealing any hidden biases. It is more likely to be an unskilled attorney who relies on stereotypes rather than on thoughtful questioning of individual jurors—a practice not likely to ferret out bias in an effective manner.[225] In sum, the concern over group-based or stereotypical peremptory strikes is more effectively alleviated by a broader voir dire process rather than by one which is more limited.[226]

      *6. Use of Juror Questionnaires Should Be Limited.* Finally, a debate has emerged over whether jury questionnaires should be allowed during voir dire examination.[227] Currently, trial judges in Texas have the authority, on the motion of a party or on their

---

neutral explanation; and (3) the court makes the ultimate determination of whether purposeful discrimination occurred. *Id.*

222.   *See, e.g.,* Godfrey, *supra* note 17, at 446 (cautioning against relying solely on stereotypes in voir dire and encouraging the use of open-ended questions to better elicit attitudes from prospective jurors); Hanley, *supra* note 20, at 867–69 (disparaging the technique of using stereotypes in voir dire).

223.   Hanley, *supra* note 20, at 867–68 (sharing the author's views of a successful approach to voir dire for trial attorneys).

224.   *Id.* at 867.

225.   *Id.* at 867–69; Weitz, *supra* note 12, at 15 (noting that restricting voir dire can make the jury selection process a mere "guessing game").

226.   *See* J. Vincent Aprile II, *More Extensive Voir Dire: A Supreme Court Mandate?,* CRIM. JUST., Fall 1994, WL 9-FALL CRIMJUST, at 43, 43–45. Aprile concludes that:

> More extensive and expansive voir dire should not be viewed as a burden on the litigants, the jury pool, the community, or even the judicial system itself. Instead, enhanced voir dire must be seen as a prophylactic measure designed to ensure that the underpinnings of the peremptory strike are the unique views and experiences of the individual venireperson rather than the unreliable and erroneous myths of invidious group stereotyping.

*Id.* at 45.

227.   *See* JURY TASK FORCE, *supra* note 45, at 176–78 (evaluating a proposal to use jury questionnaires in voir dire examination and recommending the inclusion of certain questions with the jury summons); Brister, *Docile Jurors, supra* note 52, at *4 (criticizing the use of jury questionnaires).

own motion, to allow the use of a case-specific questionnaire.[228] While courts currently use juror questionnaires in a limited capacity, proponents desire expanded use to facilitate more thorough questioning.[229] Critics of this voir dire tool contend that it: 1) invades juror privacy;[230] 2) constitutes a disguised method to eliminate anyone not fitting a "favorable psychological profile" so as to gain an advantage at trial;[231] and 3) further increases the duration of voir dire and thus wastes time and money.[232] Once again, any facial appeal attending these arguments dissolves upon deeper scrutiny. Questionnaires, when properly designed, can provide an invaluable tool for conducting voir dire on a more meaningful level and can, in fact, reduce the overall time required for jury questioning.[233]

Considering first the invasion of privacy argument, written questions do not come with any unique rules regarding scope or subject matter.[234] Some critics suggest that questionnaires function as a forum for attorneys to ask what they "would not dare ask" in open court.[235] But there exists no basis for this claim.[236] The general rules governing oral voir dire also apply to the use of questionnaires.[237] Courts clearly have the discretion to keep questions within reasonable bounds in light of the subject matter and issues at hand.[238] Furthermore, opposing lawyers and the court will inevitably review the questionnaire before it is

---

228.  Godfrey, *supra* note 17, at 450 (citing LISA BLUE & JANE N. SAGINAW, JURY SELECTION: STRATEGY AND SCIENCE § 5:07 (1986)).

229.  *See* Bennett et al., *supra* note 12, at 662–63 (extolling the usefulness of the questionnaire and observing that "[i]f lawyers make the effort now, questionnaires will be the norm in the next ten years"); Fuentes, *supra* note 144, at 13–14 (discussing the many advantages of the juror questionnaire).

230.  JURY TASK FORCE, *supra* note 45, at 176 (positing that the juror questionnaire may "encourage attorneys to pose more extensive and invasive questions" and may likewise raise a privacy issue); Brister, *Docile Jurors, supra* note 52, at *4 (arguing against the use of juror questionnaires).

231.  Brister, *Docile Jurors, supra* note 52, at *4.

232.  JURY TASK FORCE, *supra* note 45, at 176 (discussing possible disadvantages of the questionnaire); Bennett et al., *supra* note 12, at 663–64 (evaluating the time consumption argument against juror questionnaires).

233.  Bennett et al., *supra* note 12, at 663–64 (describing the questionnaire as a "procedure [that] generally eliminates the judge's concern of wasted time").

234.  *See* Johnston, *supra* note 123, at *3 (explaining that a questionnaire does not allow attorneys to ask questions that they otherwise could not ask during an oral voir dire).

235.  Brister, *Docile Jurors, supra* note 52, at *4 (warning that juror questionnaires often contain inappropriate questions).

236.  *See* Johnston, *supra* note 123, at *3 (rejecting any claim that juror questionnaires offer an opportunity to ask inappropriate questions).

237.  *Id.*

238.  Refer to notes 126–27 *supra* and accompanying text (discussing the court's authority to keep questions within certain boundaries).

distributed.[239] Attempts to ask inappropriate or biased questions are viewed dimly by most trial judges.[240] As with time limits and other questioning in voir dire, the trial judge retains wide discretion over the method and mode of questions posed to prospective jurors.[241]

The other principal argument lodged against juror questionnaires is that questionnaires purportedly have less to do with creating a representative jury than with winning a lawsuit.[242] This conclusion suffers from many flaws. As one attorney has stated, the entire litigation process is centered upon the constitutional requirement of effective advocacy for the client.[243] Accordingly, there is nothing inappropriate about an attorney's employment of valid techniques to prevail for a client. Winning a lawsuit and seating an impartial jury are neither mutually exclusive nor in conflict.

To malign juror questionnaires in this fashion is to unfairly taint their purpose. A look at the function and results of the jury questionnaire makes apparent that questionnaires arguably offer an additional method of discovering predispositions and signs of juror bias that could taint a jury.[244] Indeed, "[t]he combined process of the questionnaire plus attorney voir dire undeniably resulted in several strikes for cause that would not have otherwise been made. Biases that would only have been dimly evident were definitely flushed out through this combined process."[245] As stated previously, persuading jurors to acknowledge their personal inclinations in a public setting is

---

239. Bennett et al., *supra* note 12, at 662 (acknowledging that the questionnaire is subject to the court's discretion and "if it is one-sided, there is no reason for the prosecutor to agree nor for the judge to allow its use"); *see also* Godfrey, *supra* note 17, at 451 (cautioning against inserting "attitude questions" into a juror questionnaire because it may reveal too much to the opposing counsel).

240. Godfrey, *supra* note 17, at 451 (warning that questions should be carefully worded to avoid the judge viewing the questions as biased).

241. *See, e.g.*, Boyd v. State, 811 S.W.2d 105, 115 (Tex. Crim. App. 1991) (en banc) ("It is a well-established principle that the conduct of voir dire rests largely within the sound discretion of the trial court.").

242. Brister, *Docile Jurors*, *supra* note 52, at *4 (claiming that questionnaires deal only with winning, not with revealing bias or prejudice).

243. Johnston, *supra* note 123, at *3 ("It is the fundamental core of our judicial system that the adversarial process ultimately will reveal the truth about any conflict.").

244. *See* Fuentes, *supra* note 144, at 13–14 (observing that questionnaires increase the quality of personal information, "allow[] questions to be asked without identifying which party wants the information," and prevent cross-influence of jurors' experiences, thus helping to reveal juror bias).

245. *See* Robert B. Sykes & Francis J. Carney, *Attorney Voir Dire and Jury Questionnaire: Time for a Change*, UTAH B.J., Aug. 1997, at 10, 16 (arguing that more expansive use of the juror questionnaire would mean a better chance to effectively ferret out bias).

difficult.[246] One attorney admits that "[this] issue often must be approached obliquely."[247] Thus, having a juror privately answer a questionnaire is an acknowledged way of gaining deeper insight into certain gray areas of impartiality.[248] In addition, the questionnaire offers access to a juror's bias or mindset because the questions can be answered before the juror learns about the subject matter of the case.[249] Thus, additional insights may be obtained from a potential juror. Also, because answers are provided before trial, this mechanism eliminates any chance that one juror's answer on voir dire would impact another juror's responses.[250]

Similarly, practitioners further contend that questionnaires are invaluable in obtaining more in-depth results during voir dire.[251] Perhaps the most important goal of voir dire is to gather information in support of the exercise of challenges for cause and peremptory strikes.[252] Attorneys submit written questions in advance of voir dire to elicit general demographic information and juror attitudes on particular subjects.[253]

Questionnaires pose the first round of questions, and the actual voir dire can then consist almost entirely of follow-up questions that afford deeper insight into the intricacies of a juror's attitudes toward the case.[254] The follow-up question is often seen as the most important part of voir dire.[255] As one attorney summed up, "[t]he questionnaire is a diving board and voir dire is the swimming pool of feelings, attitudes, and opinions."[256] The end result is that both parties are able to seat jurors that do not have detrimental biases or inclinations and

---

246.  *See* Waites, *supra* note 80, at *3; Miller, *supra* note 144, at 8.

247.  Miller, *supra* note 144, at 8.

248.  *See* Fuentes, *supra* note 144, at 13–14 (propounding that, because questionnaires are answered in private, jurors are more likely to reveal potential biases).

249.  *Id.*

250.  *Id.*

251.  *See id.* (listing advantages of using juror questionnaires); *see also* Sykes & Carney, *supra* note 245, at 16 (concluding that the "[b]ottom line [is] a better, more efficient sifting process that [gives] us a fair jury").

252.  *See* Jeffrey T. Frederick, *Effective Voir Dire*, COMPLEAT LAW., Summer 1997, WL 14 No. 3 COMPLEAT 26, 26 ("The most important goal is to understand each juror's mindset.").

253.  *Id.* at 28.

254.  *See, e.g.*, Nancy Ritter, *Voir Dire Process Itself Facing Major Questions*, NEW JERSEY LAW., Mar. 6, 2000, WL 3/6/00 NJLNP 1, at *2 (quoting one experienced litigator as saying that "it's the follow-up that's so important").

255.  Arnold M. Weiner & Ethan L. Bauman, *Judge Conducted Voir Dire, in* THE JURY 1984: TECHNIQUES FOR THE TRIAL LAWYER 541, 567–68 (1984) (stating that a questionnaire "provides an excellent basis for probing follow-up questions").

256.  Bennett et al., *supra* note 12, at 662.

who are best fit to judge the subject matter of a particular case. This approach dissuades peremptory strikes based on stereotypes.[257] An increase in the use of juror questionnaires would provide a better understanding of particularized biases held by individuals which, in turn, would decrease the fall-back to stereotype-based strikes.

Finally, the arguments regarding alleged expenditures of time and expense must be addressed. Properly designed questionnaires have served, in the experience of many attorneys, to save time during voir dire.[258] Questionnaires permit the parties to quickly and simultaneously consider all the jurors against the backdrop of standard questions.[259] Less time is expended in establishing background and associational issues; the attorney can focus at the outset on those jurors whose answers reveal a particular mindset.[260]

It has been argued that a jury questionnaire may extend the time of voir dire to include at least parts of two days because one day must be given over to collecting, collating, and digesting the information contained in the questionnaires.[261] But this does not necessarily follow. One commentator has suggested that courts could reduce the time required by sending out the approved jury questionnaire with the jury summons to be returned before jury selection begins.[262] The questionnaires can be collected and examined while other pretrial matters are being resolved.[263] This alternative could serve to eliminate any additional time consumption.[264] Regardless of whether the traditional approach or this alternative is employed, in the long run, especially in more complex cases, the jury questionnaire will ultimately allow attorneys to better streamline their voir dire examinations.

The jury questionnaire can also lessen the risk of reversal on a jury selection issue.[265] As one commentator argues, "[j]ury questionnaires coupled with sufficient time to review the

---

257. Refer to Part III.C.5 *supra* (rationalizing that skillful attorneys, in an expanded voir dire, are less likely to rely on stereotypes).

258. *See, e.g.,* Godfrey, *supra* note 17, at 450; Fuentes, *supra* note 144, at 13 (concluding that the juror questionnaire "speeds up the voir dire process").

259. Fuentes, *supra* note 144, at 13.

260. *Id.* at 13–14 (advocating the speeding up of voir dire by eliminating the need to cover general background questions which can be asked beforehand on questionnaires).

261. JURY TASK FORCE, *supra* note 45, at 176 (analyzing whether juror questionnaires may increase or decrease the time of the voir dire process).

262. Bennett et al., *supra* note 12, at 663–64 (offering an efficient method of using a juror questionnaire without increasing the time for voir dire).

263. *Id.*

264. *Id.*

265. *Id.* at 664 (offering this argument as another advantage of voir dire).

information and to ask proper, meaningful, and relevant questions can eliminate most appellate reversals based on jury selection."[266] Many cases appealed on grounds related to jury selection deal with whether jurors engaged in misconduct by not fully answering questions regarding pertinent relationships, past experiences, injuries, and related information.[267] The use of juror questionnaires can help to eliminate many of these appealable issues, thus saving judicial resources in the long term.

Courts should expand rather than diminish the use of juror questionnaires. Even the Jury Task Force subcommittee considering this issue voted "overwhelmingly" to propose a rule encouraging the use of juror questionnaires at the pretrial conference stage.[268] Although privacy issues are always sensitive, the questionnaire poses no significant threat to jurors from invasive or inappropriate questions. There simply is no substantive proof of such a problem. Questionnaires allow each side to obtain a clearer picture of the mindset of jurors so as to better choose what each side feels to be a "winning" panel. This in no way undermines the usefulness of this tool. The questionnaire offers *both* sides an *equal* opportunity to make certain that panel members harbor no disqualifying bias or prejudice that cannot be overcome by the facts and evidence of the case. Questionnaires can save time by providing streamlined questioning and by preventing jury selection appeals.

IV. CONCLUSION: THE "SIX-SHOOTER" FIRED BLANKS—THE
PROPOSED CHANGES ARE UNWARRANTED

The right to a jury trial in Texas is a constitutionally protected privilege.[269] Proponents of fundamental changes in the processes employed to ensure selection of fair and impartial jurors bear a heavy burden in demonstrating a need for any change. Absent objective proof that existing voir dire rules are flawed or permit recurrent abuse by attorneys in the adversary process, change is unwarranted.

---

266.   *Id.*

267.   *See, e.g.*, Childers v. Tex. Employers' Ins. Ass'n, 273 S.W.2d 587, 587 (Tex. 1954) (reviewing an appeal based on a juror's failure to disclose his own back injury in a worker's compensation suit); Thompson v. Quarles, 297 S.W.2d 321, 323–26 (Tex. Civ. App.—Galveston 1956, writ ref'd n.r.e.) (reviewing an appeal based on two jurors' failure to disclose past personal injuries in response to a general voir dire question); Barron v. State, 378 S.W.2d 144, 145 (Tex. Civ. App.—San Antonio 1964, no writ) (reviewing an appeal based on a juror's failure to disclose that he was a close friend of the prosecution).

268.   JURY TASK FORCE, *supra* note 45, at 178.

269.   TEX. CONST. art. I, § 15.

An examination of the six proposed major changes and supporting arguments advanced by critics of the current jury selection process, against the backdrop of over a century's extant case law, fails to support the suggested revisions to the rules. The belief that voir dire needs fixed or rigid time limits falls flat considering the broad discretion the Texas trial courts currently have to enforce reasonable time limits on a case-by-case basis as necessary. The argument to ban leading questions fails because it does not consider the practical advantage that this voir dire tool has in ferreting out biased panel members, especially those who are hostile to the jury selection process. The claim that attorneys should also be barred from asking "leaning" questions is unfounded as well because such questions are clearly within the proper scope of inquiry. Any abuse can be addressed on an individualized basis through the trial court's vast discretion to mold the shape of voir dire. The notion that rehabilitation of prospective jurors should be expanded is also misguided because Texas courts currently err more frequently on the side of over-rehabilitating rather than under-rehabilitating venire members. The proponents of a limitation or reduction of the number of peremptory strikes available to each side fail to recognize that peremptory strikes are crucial to the selection of a fair and impartial jury and are not a means of group stereotyping or discrimination. Finally, advocates of narrow restrictions on the use of juror questionnaires have neglected to appreciate the questionnaires' value as a thorough and efficient means of discovering and eliminating impartiality from the jury. Taken together or individually, these six proposed changes could manifestly thwart voir dire's purpose in seating a fair and unbiased jury by rendering the jury selection process one of form over substance. The challenges to the current system are unwarranted because the voir dire process in Texas appears to be working effectively, favoring neither side of the case.

*Sydney Gibbs Ballesteros*

\*\*\*